## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SECURITY NETWORKS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 07-371 *** |
| | ) | |
| ALARM ONE, INC. and PETER MALTBY | ) | |
| | ) | |
| Defendants. | ) | |

### MOTION TO REMAND

Plaintiff Security Networks, LLC ("Plaintiff"), by and through its counsel, Reed Smith, LLP, hereby moves pursuant to 28 U.S.C. § 1447(c) for an order remanding this matter to the Court of Chancery of the State of Delaware on the grounds that it was inappropriately removed.

### BACKGROUND

1.      On or about December 23, 2005, Plaintiff and the defendants in the above-captioned action, Alarm One ("Alarm One") and Peter Maltby ("Maltby") entered into an Asset Purchase Agreement (the "APA") under which the parties agreed to submit certain disputes, *i.e.*, disputes regarding the Final Purchase Price, before Benchmark Partners ("Benchmark"), an independent arbiter.  Such a proceeding was held before Benchmark and Benchmark awarded Plaintiff $1,133,042.00.

2.      On May 3, 2007, Plaintiff filed a Verified Complaint (the "Complaint") pursuant to 10 *Del. C.* § 5713 in the Court of Chancery of the State of Delaware to confirm the Benchmark award against Alarm One and Maltby.  A copy of the Complaint is attached as

Exhibit A.  Both defendants were served with process in full compliance with the Court

Chancery Rules. [1]

3.     On June 11, 2007, at which time both defendants had been served with the

Chancery action, Alarm One filed a Notice of Removal (the "Notice of Removal").  That Notice

of Removal, a copy of which is attached as Exhibit B, fails to indicate that Maltby consents to or

joins in the Notice of Removal.  Indeed, Maltby responded to the Complaint on June 28, 2007

with a motion to dismiss without any reference to the Notice of Removal.  Accordingly, Maltby

has at no time joined in or consented to the Notice of Removal, though he has been given ample

opportunity to do so.

### LEGAL STANDARD

4.     The party bringing a removal notice bears the burden of establishing removal

jurisdiction and compliance with all procedural requirements.  *Boyer v. Snap-On Tools Corp.*,

913 F.3d 108, 111 (3d Cir. 1990).  The removal statute, 28 U.S.C. § 1441, "is to be strictly

construed against removal…so that the Congressional intent to restrict federal diversity

jurisdiction is honored." *Sammuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir.

2004).  Any doubts must be resolved in favor of remand.  *Id.* at 403; *Boyer*, 913 F.3d at 111;

*Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987) (internal

citations omitted).

5.     Remand to the state court is appropriate when a defect exists in the removal

process.  *PAS v. Travelers Ins. Co.*, 7 F.3d 329, 352 (3d Cir. 1993).  It is well settled that all

defendants must join in or consent to the notice of removal.  *Chicago, R.I. & P. Ry. Co. v.*

---

[1] Alarm One was served on May 21, 2007.  Maltby was served on May 30, 2007.

*Martin*, 178 U.S. 245, 247 (1900); *Balazik v. County of Dauphin*, 44 F.3d 209, 213 (3d Cir.

1995); *Lewis v. Rego Co.*, 757 F.2d 66, 68 (3d Cir. 1985).[2]

      6.      When a case is remanded, the Court may award the plaintiff its expenses,

including attorneys' fees, which it incurs in its efforts to have the matter remanded to state court.

28 U.S.C. §1447(c); *Mints v. Educational Testing Service,* 99 F.3d 1253 (3rd Cir. 1996).

## ANALYSIS

      7.      Because the Notice of Removal is procedurally defective, Plaintiff respectfully

submits that this matter must be remanded to the Court of Chancery. Maltby, an original

defendant named in the Complaint, did not join in the Notice of Removal. Moreover, Alarm One

has failed to offer any facts or explanation justifying Maltby's failure to join. Indeed, though he

has appeared in this matter, Maltby has done nothing to join in the removal process, though any

such efforts would now of course be too late and thus ineffective. Because all parties must join

in a petition to remove an action, this matter must be remanded.

      8.      Since that procedural requirement is well established and extant for over 100

years, remand is not a harsh result. Rather, the authority set forth above makes perfectly plain

that the requirements for removal must be followed scrupulously and that any deviation will

result in remand. Indeed, since federal courts are required to construe the requirements strictly in

favor of remand, Alarm One's failure to obtain Maltby's consent or joinder in the Notice of

Removal necessarily requires that this matter be remanded to the Delaware Court of Chancery

where it originated.

---

    [2] The Third Circuit has recognized, "The unanimity rule may be disregarded where: (1)
a non-joining defendant is an unknown or nominal party; or (2) where a defendant has been
fraudulently joined. [citations omitted]. Another exception is when a non-resident defendant has
not been served at the time the removing defendants filed their petition." 44 F.3d at 213. None
of those exceptions are applicable in this case.

9.    Finally, there can be little reasonable dispute that Alarm One has inappropriately removed this action in order to delay the confirmation of the Benchmark award and to postpone the entry of a judgment upon which Security Networks may execute.  Accordingly, Security Networks respectfully submits that it is entitled to its costs and attorneys' fees expended in the prosecution of the present motion.

WHEREFORE, Plaintiff Security Networks, LLC respectfully requests that the Court enter an Order remanding the above-captioned action to the Court of Chancery for the State of Delaware, awarding Plaintiff its reasonable costs and attorneys' fees incurred in the prosecution of this motion to remand and granting such other relief as the Court deems appropriate.

By: _____

Dated: June 29, 2007

David E. Wilks (Del. I.D. No. 2793)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, Delaware 19801-1163
(302) 778-7500

*Counsel for Plaintiff Security Networks, LLC*

4

# EXHIBIT "A"

EFiled: May 3 2007 2:04PM EDT
Transaction ID 14713259
Case No. 2939

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

SECURITY NETWORKS, LLC,           :
                                  :
              Plaintiff,          :      C.A. No. _____
                                  :
       v.                         :
                                  :
ALARM ONE, INC. and               :
PETER MALTBY,                     :
                                  :
              Defendants.         :

### VERIFIED COMPLAINT

Plaintiff Security Networks, LLC ("Plaintiff"), by and through its undersigned attorneys,

brings this action pursuant to 10 Del.C. § 5713 to confirm an arbitration award in its favor and

against Alarm One, Inc. and Peter Maltby.  Plaintiff states the following in support of its claims:

1.     The parties entered an asset purchase agreement (the "APA") on or about

December 23, 2005.  A copy of the APA is attached as Exhibit A.  Defendant Peter Maltby

personally guaranteed all of Defendant Alarm One, Inc.'s obligations arising under the APA.

See agreement attached as Exhibit B.

2.     The APA provides that the parties must arbitrate all disputes arising out of their

transaction.  Disputes concerning purchase price adjustments must be arbitrated before an

explicitly identified independent arbiter, Benchmark Partners.  See APA at § 2.1(d).  Other

disputes would be arbitrated in conjunction with the American Arbitration Association (the

"AAA").  See APA at § 8.3.  Arbitration under § 8.3 must take place in Wilmington, Delaware,

which the parties agreed to be "the most convenient forum for both parties."  Id.  In addition, the

APA is governed by Delaware law.  Id. at § 8.6.

3.    On August 17, 2006, Plaintiff initiated arbitration proceedings before the AAA. The parties later agreed to arbitrate a portion of those claims before Benchmark Partners. The APA provides that any purchase price adjustment amounts not in dispute must be paid before the Benchmark Partners arbitration or, in any event, in advance of the parties' receipt of Benchmark Partners' final determination. *Id.* at § 2.1(d). That requirement is of material import because the APA also provides that Benchmark Partners' fees and costs are allocated to the parties in proportion to their respective degrees of success in the proceedings before Benchmark Partners. By way of illustration, the APA states, "For example, if Seller's determination differs by $20,000 from the Independent Arbiter's determination, but Buyer's determination only differs by $5,000, Seller will bear 20/25 of such fees and costs and Buyer will bear 5/25 of such fees and costs." *Id.* at § 2.1(d).

4.    Though Defendants admitted to Benchmark Partners that Alarm One cannot dispute that it owes Plaintiff $785,627.82 in purchase price adjustments, it still, in contravention of § 2.1(d) of the APA, has not made any such payment to Plaintiff. Plaintiff contended in the Benchmark Partners arbitration that it is entitled to purchase price adjustments in the amount of $1,419,285.00 from Alarm One. On April 30, 2007, Benchmark Partners entered its final determination (the "Determination"), a copy of which is attached as Exhibit C. The Determination awards Plaintiff $1,133,042.00.

5.    Benchmark Partners' total fees and costs amount to $19,500.00. See invoice attached as Exhibit D. Since Defendants made none of the payments it admitted to owing to Plaintiff in purchase price adjustments in advance of Benchmark Partners' final determination and instead forced Security Networks to commence arbitration proceedings and incur the expense of proving all the amounts owed to it, Alarm One should be assigned no credit for its

belated admission to owing Plaintiff a substantial sum in purchase price adjustments for the purposes of allocating responsibility for Benchmark Partners' fees and costs. According to the method of calculation required by the APA, therefore, Defendants are responsible for $15,600.00 of Benchmark Partners' fees and costs in this action pursuant to 10 Del. C. § 5712.

6.    In the alternative, Plaintiff requests that the Court allocate responsibility for Benchmark Partners' fees and costs in a manner reflecting the parties' eventual positions in the Benchmark Partners proceedings as follows:

| | |
|---|---|
| Plaintiffs' determination of the purchase price adjustment: | $ 1,419,285.00 |
| Defendants' determination of the purchase price adjustment: | 785,627.82 |
| Final determination: | 1,133,042.00 |
| Plaintiff's share of Benchmark Partners' fees and costs: | 8,775.00 |
| Defendants' share of Benchmark Partners' fees and costs: | 10,725.00 |

WHEREFORE, Plaintiff respectfully requests that the Court confirm the arbitration award in favor of the Plaintiff in the sum of $1,133,042.00, plus $15,600.00 representing Benchmark Partners' fees and costs, plus court costs and interest from entry of judgment at the legal rate of interest and such other relief as the Court deems equitable and appropriate.

REED SMITH LLP

By:    /s/ David E. Wilks
David E. Wilks (I.D. No. 2793)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 778-7560
Facsimile: (302) 778-7575
E-mail: dwilks@reedsmith.com

Attorneys for Plaintiff
Security Networks, LLC

Dated: May 3, 2007

## VERIFICATION

I, Richard Perry, am President of Security Networks, LLC, the Plaintiff in the above-captioned action. I have read the allegations of the foregoing Verified Complaint and certify under penalty of perjury that those allegations are true and correct to the best of my knowledge, information and belief.

_Richard Perry_

Dated: May ___, 2007

SWORN TO AND SUBSCRIBED before me this ___ day of May, 2007.

_____
Notary Public

Christina Owens
Commission # DD495096
Expires: NOV. 30, 2009
www.AaronNotary.com

# EXHIBIT A

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

ALARM ONE, INC.

AND

SECURITY NETWORKS, LLC

## TABLE OF CONTENTS

1.   PURCHASE AND SALE OF ASSETS ................................................ - 1 -
     1.1    Assets to be Acquired. .................................................. - 1 -
     1.2    Excluded Assets. ......................................................... - 2 -
     1.3    Assumed Liabilities. .................................................... - 2 -
     1.4    Excluded Liabilities. ................................................... - 2 -

2.   PURCHASE PRICE AND CLOSING................................................ - 3 -
     2.1    Purchase Price. ........................................................... - 3 -
     2.2    Definitions................................................................. - 4 -
     2.3    Allocation of Purchase Price......................................... - 5 -
     2.4    Closing Date and Location............................................ - 5 -
     2.5    Noncompetition Agreement........................................... - 5 -
     2.6    Transition Services...................................................... - 5 -

3.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER................ - 5 -
     3.1    Organization of Seller. ................................................ - 6 -
     3.2    Authority of Seller. ..................................................... - 6 -
     3.3    Office Locations. ......................................................... - 6 -
     3.4    Title to Property. ......................................................... - 7 -
     3.5    Compliance With Laws; Litigation................................. - 7 -
     3.6    Condition of Assets....................................................... - 7 -
     3.7    Adverse Developments. ............................................... - 8 -
     3.8    Tax Returns and Payments........................................... - 8 -
     3.9    Agreements With Employees......................................... - 8 -
     3.10   Intellectual Property Rights.......................................... - 9 -
     3.11   Customer Contracts and Business Documents. ................. - 9 -
     3.12   Customer and System Information.................................. - 10 -
     3.13   Broker or Finder.......................................................... - 12 -
     3.14   Labor Relations. ......................................................... - 12 -
     3.15   Bulk Sales Compliance and Transfer Taxes...................... - 12 -
     3.16   Burdensome Agreements. ............................................. - 12 -
     3.17   Options, Warrants and Rights of First Refusal. ................ - 12 -
     3.18   Environmental Matters.................................................. - 13 -
     3.19   Disclosure. ................................................................ - 13 -

4.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER................. - 13 -
     4.1    Authority of Buyer. ..................................................... - 13 -
     4.2    Broker or Finder.......................................................... - 14 -
     4.3    Litigation................................................................... - 14 -

5.   CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER................ - 14 -
     5.1    Covenants and Warranties. ........................................... - 14 -
     5.2    Corporate Action.......................................................... - 14 -

|  | 5.3 | No Restraint or Litigation. | - 14 - |
|  | 5.4 | Necessary Consents and Permits. | - 14 - |
|  | 5.5 | Documents, Certificates and Other Items. | - 15 - |
|  | 5.6 | Satisfaction of Debts. | - 15 - |
|  | 5.7 | Accounts Receivable. | - 15 - |
|  | 5.8 | Use of Name. | - 15 - |
|  | 5.9 | Employees. | - 16 - |
| 6. | | CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER | - 16 - |
|  | 6.1 | Covenants and Warranties. | - 16 - |
|  | 6.2 | Delivery of Purchase Price. | - 16 - |
|  | 6.3 | Documents, Certificates and Other Items. | - 16 - |
|  | 6.4 | No Restraint or Litigation. | - 16 - |
| 7. | | INDEMNIFICATION | - 17 - |
|  | 7.1 | Indemnification by Seller and Buyer | - 17 - |
|  | 7.2 | Notice of Claims. | - 18 - |
|  | 7.3 | Survival of Indemnity Obligations. | - 18 - |
|  | 7.4 | Indemnity Basket and Cap. | - 18 - |
|  | 7.5 | Offset for Insurance. | - 19 - |
|  | 7.6 | Sole and Exclusive Remedy. | - 19 - |
| 8. | | GENERAL PROVISIONS | - 19 - |
|  | 8.1 | Survival of Obligations. | - 19 - |
|  | 8.2 | Transfer Charges and Taxes. | - 19 - |
|  | 8.3 | Arbitration. | - 19 - |
|  | 8.4 | Confidentiality. | - 20 - |
|  | 8.5 | Public Announcements. | - 20 - |
|  | 8.6 | Governing Law. | - 20 - |
|  | 8.7 | Notices. | - 21 - |
|  | 8.8 | Assignment. | - 21 - |
|  | 8.9 | Entire Agreement; Amendments. | - 21 - |
|  | 8.10 | Interpretation. | - 22 - |
|  | 8.11 | Waivers. | - 22 - |
|  | 8.12 | Expenses. | - 22 - |
|  | 8.13 | Partial Invalidity. | - 23 - |
|  | 8.14 | Further Assurances. | - 23 - |
|  | 8.15 | Counterparts. | - 23 - |
|  | 8.16 | Third-Party Beneficiaries. | - 23 - |

## INDEX OF DEFINED TERMS

| | |
|---|---|
| AAA | Section 8.3 |
| Agreement | Caption |
| Assets to be Acquired | Section 1.1 |
| Best Knowledge | Section 8.10 |
| Business Documents | Section 1.1(b)(ii) |
| Buyer | Caption |
| Buyer's Aggregate Net Loss | Section 7.1(a) |
| Chicago Employees | Section 3.9(c) |
| Claiming Party | Section 7.2 |
| Closing | Section 2.4 |
| Closing Date | Section 2.4 |
| Closing Payment | Section 2.1(d) |
| Customer Contracts | Section 1.1(b)(i) |
| Estimated Purchase Price | Section 2.1(d) |
| Excluded Claims | Section 7.3 |
| Final Purchase Price | Section 2.1(d) |
| Grace Period | Section 2.1(d) |
| Hazardous Materials | Section 1.4(f) |
| Including | Section 8.10 |
| Indemnifying Party | Section 7.2 |
| Independent Arbiter | Section 2.1(d) |
| Noncompetition Agreement | Section 2.5 |
| Occurrence basis | Section 3.6 |
| Performing RMR | Section 2.2(a) |
| Purchase Price | Section 2.1(a) |
| Security Business | Background |
| Seller | Caption |
| Seller's Aggregate Net Loss | Section 7.1(b) |
| Tangible Assets | Section 1.1(a) |
| Transition Agreement | Section 2.6 |
| Unearned Revenue | Section 2.2(b) |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of this 23rd day of December, 2005, by and between ALARM ONE, INC., an Illinois corporation ("Seller"), and SECURITY NETWORKS, LLC, a Florida limited liability company ("Buyer").

## BACKGROUND

WHEREAS, Seller owns and operates a security alarm business serving the area in and around Chicago, Illinois (the "Security Business"); and

WHEREAS, Seller desires to sell, and Buyer desires to purchase, certain of the assets of Seller used in the operation of the Security Business, all on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound, the parties agree as follows:

1. ## PURCHASE AND SALE OF ASSETS

    1.1 Assets to be Acquired.

    Upon the terms and subject to the conditions of this Agreement, Seller will, on the Closing Date, sell, transfer, assign and deliver to Buyer all of Seller's right, title, interest and benefit in and to certain assets of Seller used in the operation of the Security Business (collectively, the "Assets to be Acquired"). The Assets to be Acquired include all of the following:

    (a)    All of Seller's rights in all of the tangible personal property of Seller located at the real property described on Schedule 3.3, including tools, office equipment, furnishings, inventory (including all inventory on vehicles used in the Security Business), other tangible personal property of any nature, and Seller's rights in fixtures attached to the real property leased to Seller and used by Seller in the Security Business, all of which are set forth in Schedule 1.1(a) (collectively, the "Tangible Assets").

    (b)    (i)    All of Seller's rights in, to and under all alarm lease, maintenance, repair, service and monitoring agreements with customers (collectively, the "Customer Contracts").

    (ii)    All of Seller's rights in, to and under all leases of equipment that are related to and used by Seller in the Security Business, telephone book listing agreements,

noncompetition, nonsolicitation and nondisclosure agreements with third parties, and all other agreements, licenses (including any licenses held personally), permits (including permits relating to installations which are pending, currently in progress or completed) and manufacturer's warranties on tangible property that are related exclusively to Seller's conduct of the Security Business (collectively, the "Business Documents").

(iii)    All of the Customer Contracts and Business Documents are set forth in Schedule 1.1(b).

(c)    All of Seller's rights in, to and under the following assets, intangibles and rights that are related to, and presently owned by Seller or used in, the Security Business: (i) refundable deposits from customers, prepaid service charges and prepaid income items; (ii) operating and accounting data; (iii) customer lists and files (including any lists and files of former customers); (vi) rights to receiver and fax line telephone numbers (including WATS lines and numbers); and (v) goodwill.

1.2    Excluded Assets.

Seller is not selling or transferring to Buyer any assets other than those described in Section 1.1.

1.3    Assumed Liabilities.

Buyer agrees to assume all liability for the performance of all obligations arising after the Closing Date with respect to the Customer Contracts and Business Documents assigned to Buyer by Seller.

1.4    Excluded Liabilities.

Except for the liabilities that Buyer will assume pursuant to Section 1.3, Buyer will not assume or be obligated for any other liability, obligation or commitment of Seller, direct or indirect, known or unknown, absolute or contingent, including any of the following:

(a)    any foreign, federal, state, county or local income or other tax arising from the operation of the Security Business or the ownership of the Assets to be Acquired on or prior to the Closing Date;

(b)    any liability, obligation or commitment of Seller to its creditors, whether arising out of contract or tort, or to any party holding a lien on any of Seller's assets;

(c)    any employee obligation, including any obligation for wages, commissions, vacation and holiday pay, sick pay, bonuses, severance pay, pensions, or any obligation under any collective bargaining agreement, employment agreement or employment-at-will relationship, or any obligation to hire any employee of Seller after the Closing Date;

(d)    any liability, obligation or commitment incurred by Seller after the Closing Date;

(e)     any liability, the existence of which would constitute a breach of any of the representations, warranties or covenants of Seller in this Agreement;

(f)     any liability arising because Hazardous Materials are present on the real or personal property leased or otherwise used by Seller and being transferred pursuant to this Agreement, or any liability for the use, handling, generation or disposal of Hazardous Materials by Seller, any of Seller's affiliates, any previous owner of the Assets to be Acquired or any third party on any property owned, operated, leased or otherwise used by Seller or its affiliates.  The term "Hazardous Materials" includes hazardous waste, hazardous substances, toxic substances and all related materials, including all materials and substances regulated by The Comprehensive Environmental Response, Compensation and Liability Act of 1980, The Resource Conservation and Recovery Act of 1976, The Superfund Amendments and Reauthorization Act of 1986, The Clean Water Act, The Clean Air Act, The Toxic Substance Control Act, all as amended from time to time, and/or any other applicable federal, state or local environmental law, statute, rule, regulation or ordinance; or

(g)     any other liability, obligation or commitment not expressly assumed by Buyer pursuant to this Agreement.

## 2.     PURCHASE PRICE AND CLOSING

2.1     Purchase Price.

(a)     The purchase price for the Assets to be Acquired (the "Purchase Price") will equal a multiple of 31 times the Performing RMR on the Closing Date, less the amount of the Unearned Revenue.

(b)     100% of the Closing Payment will be paid to Seller on the Closing Date by federal funds wire transfer or other form of immediately available funds.

(c)     The Purchase Price will be adjusted to reflect, in accordance with generally accepted accounting principles, the principle that all income and expenses of the Security Business attributable to the period after the Closing Date are for the account of Buyer and all income and expenses attributable to the period on or before the Closing Date are for the account of Seller.

(d)     Buyer and Seller have agreed that the amount to be paid to Seller at Closing will be $7,130,000 (the "Closing Payment").  The parties acknowledge that this amount does not include the Unearned Revenue adjustment to which Buyer is entitled.  Within 30 days after Closing, Buyer will deliver to Seller an estimate of the Purchase Price as of the Closing Date, as adjusted in accordance with Sections 2.1(a) and 2.1(c) (the "Estimated Purchase Price"), together with such supporting documentation as Seller may reasonably request.  On or before 120 days after the Closing Date, Buyer will deliver to Seller a final closing adjustment calculated as of the Closing Date (the "Final Purchase Price"), together with such supporting documentation as Seller may reasonably request, which will state in reasonable detail the nature and extent of each

adjustment. Should Seller dispute Buyer's calculation of the Estimated Purchase Price or the Final Purchase Price, Seller will promptly, but in no event later than 30 days after receipt of such calculation (the "Grace Period"), deliver to Buyer written notice describing in reasonable detail the dispute, together with Seller's determination as to the amount of Estimated Purchase Price or the Final Purchase Price, as the case may be, in reasonable detail. If the dispute is not resolved by the parties within 20 days from the date of receipt by Buyer of written notice from Seller, the parties agree to promptly engage Benchmark Partners (the "Independent Arbiter") to resolve the dispute within 30 days after such engagement. The Independent Arbiter's determination will be final and binding on the parties. Buyer or Seller, as the case may be, will make appropriate payment to the other by wire transfer of the difference between the Estimated Purchase Price and the Closing Payment or the difference between the Final Purchase Price and the Estimated Purchase Price, as the case may be, within 5 business days following the expiration of the Grace Period, resolution of the dispute by the parties, or receipt of the Independent Arbiter's final determination, as the case may be; provided, that any amount not in dispute will be paid before resolution of the dispute by the parties or the receipt of the Independent Arbiter's final determination. All fees and costs of the Independent Arbiter will be borne pro rata by Buyer and Seller in proportion to the difference between the Independent Arbiter's determination of the Estimated Purchase Price or the Final Purchase Price, as the case may be, and Seller's and Buyer's determination of such adjustment. For example, if Seller's determination differs by $20,000 from the Independent Arbiter's determination, but Buyer's determination only differs by $5,000, Seller will bear 20/25 of such fees and costs and Buyer will bear 5/25 of such fees and costs.

2.2   <u>Definitions.</u>

For purposes of this Agreement, the following terms shall have the following meanings:

(a) "Performing RMR" means the amount of recurring monthly revenue (net of any private line telephone communication or third-party pass-through charges, assessments or taxes and net of any customer discounts) of the Security Business derived solely from enforceable written Customer Contracts for which: (i) the underlying customer is not more than 60 days in arrears on any payment due under such agreement; or (ii) Seller has received, no later than 30 days before the Closing Date, at least one (1) full monthly payment for recurring services rendered under such agreement, provided that the underlying customer is not more than 90 days in arrears on any payment due under such agreement. Performing RMR shall not include any revenue: (a) that is not periodic in nature, such as installation purchase payments or one-time assessments or charges; (b) from customers from whom Seller has received notice of a pending termination; (c) from customers who were recently added as a result of extraordinary marketing efforts or an amnesty program; (d) from lease agreements; (e) from the provision of long-range radio or cellular back-up services (such exclusion does not negate the Performing RMR otherwise paid by any customer who also receives such services); (f) from renters or persons who reside in mobile homes; or (g) from customers whose telephone number has been disconnected.

(b) "Unearned Revenue" means all revenue of the Security Business that has been collected, or billed but not collected, by or on behalf of Seller on or prior to the Closing Date for services to be provided by Buyer after the Closing Date.

2.3    Allocation of Purchase Price.

Buyer and Seller agree to allocate the Purchase Price among the Assets to be Acquired in accordance with Schedule 2.3 and to be bound by such allocation and to file all returns and reports regarding these transactions, including all federal, state and local tax returns (including Form 8594), on the basis of such allocation. Buyer and Seller agree that a nominal amount of the Purchase Price, not in excess of $15,000, will be allocated to the Noncompetition Agreement; provided, however, that Seller acknowledges that Buyer's remedy for a breach of the Noncompetition Agreement will not be limited to the amount of such allocation.

2.4    Closing Date and Location.

The consummation of the transfer and delivery of the Assets to be Acquired to Buyer and the receipt of the consideration therefor by Seller will constitute the "Closing." Unless otherwise mutually agreed to by the parties, the Closing will take place electronically on December 23, 2005, or upon the satisfaction by Seller of all of the conditions precedent to Buyer's obligation to consummate these transactions, whichever is later, which date and time will constitute the "Closing Date." The effective date of the sale of the Security Business will be as of 11:59:59 p.m. on the Closing Date and all prorations and allocations provided for in Section 2.1(c) will be made as of such time.

2.5    Noncompetition Agreement.

In connection with the consummation of these transactions, Seller and Peter Maltby, Seller's majority shareholder, will have executed a noncompetition/nonsolicitation agreement with respect to the greater Chicago area in the form of Exhibit A (the "Noncompetition Agreement").

2.6    Transition Services.

In connection with the consummation of these transactions, Seller shall enter into a transition services agreement in the form of Exhibit B (the "Transition Agreement").

3.    **REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER**

As an inducement to Buyer to enter into this Agreement and to consummate these transactions, Seller represents, warrants and covenants to Buyer and agrees:

- 5 -

3.1    Organization of Seller.

(a)    Seller is a corporation, duly incorporated and organized, validly existing and in good standing under the laws of the State of Illinois, and has the requisite corporate power and authority to own or lease all of the Assets to be Acquired, to own and operate the Security Business, to carry on its business as now conducted, to enter into this Agreement and to perform the terms of this Agreement.

(b)    Seller has not, within the 6-year period immediately preceding the date of this Agreement, changed its name or been the surviving entity of a merger or consolidation. There are no fictitious names under which Seller or such predecessors of Seller have conducted the Security Business. Seller agrees to cooperate with Buyer and take whatever steps are necessary promptly after Closing in order to permit Buyer to use Seller's name, but only to the extent permitted by the Transition Agreement.

3.2    Authority of Seller.

Seller has full power and authority to enter into this Agreement, to consummate these transactions and to comply with the terms, conditions and provisions hereof. This Agreement has been duly authorized, executed and delivered by Seller and is, each other agreement or instrument of Seller contemplated by it will be, the legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, provided, however, that enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of this Agreement. The execution, delivery and performance of this Agreement and the other agreements of Seller contemplated by it have been duly authorized and approved by the shareholders and board of directors of Seller and do not require any further authorization, the consent of or notice to any third party, except as set forth on Schedule 3.2. Neither the execution and delivery of this Agreement nor the consummation of these transactions will conflict with or result in any violation of or constitute a default under any term of the Articles of Incorporation or Bylaws of Seller, or any agreement, mortgage, debt instrument, indenture, or other instrument, judgment, decree, order, award, law or regulation by which Seller is bound, or result in the creation of any lien, security interest, charge or encumbrance upon any of the Assets to be Acquired, except as set forth on Schedule 3.2.

3.3    Office Locations.

(a)    Seller owns no real property in connection with the operation of the Security Business.

(b)    The only real property used by Seller under lease in connection with the operation of the Security Business is 17 W. 725 Butterfield Road, Units A & B, Oakbrook Terrace, Illinois 60181. Seller has a valid and subsisting lease for such real property, a copy of which has been delivered to Buyer. Seller will permit Buyer to use such real property after Closing pursuant to the Transition Agreement.

- 6 -

3.4     Title to Property.

Except as described on Schedule 3.4, Seller has good and marketable title to all of the Assets to be Acquired, free and clear of all liens, claims, charges, encumbrances, leases, pledges, security interests, mortgages, defects in title, equities, covenants and other restrictions of any nature whatsoever.

3.5     Compliance With Laws; Litigation.

(a)     Except as set forth on Schedule 3.5, Seller has complied, in all material respects, with all material laws, regulations, rules, writs, injunctions, ordinances, franchises, decrees or orders of any federal or state court or of any municipal or governmental department, commission, board, bureau, agency or instrumentality which are applicable to the Assets to be Acquired or the Security Business.

(b)     All reports, schedules and/or returns of any administrative agency of the federal or any state or local government required to be filed by Seller with respect to the Security Business have been filed.

(c)     Except as set forth on Schedule 3.5, there are no lawsuits, claims, suits, proceedings or investigations pending or, to the best knowledge of Seller, threatened against or affecting Seller with respect to the Security Business, nor are there any lawsuits, claims, suits or proceedings pending in which Seller is the plaintiff or claimant, that relate to the Assets to be Acquired or the Security Business and which involve the possibility of any judgment, order, award or other decision that might impair the ability of Seller to perform this Agreement, or might impair the quality of title of the Assets to be Acquired, or might adversely affect the normal operation of the Security Business, or might result in liability for damages or might otherwise adversely affect Seller's right, title or interest in the Assets to be Acquired or the Security Business.

(d)     There is no action, suit or proceeding pending or, to the best knowledge of Seller, threatened which questions the legality or propriety of these transactions.

3.6     Condition of Assets.

(a)     The Tangible Assets are in good operating condition, ordinary wear and tear excepted.

(b)     Schedule 3.6 sets forth a true and complete list of all insurance policies insuring any of the Assets to be Acquired or general liability and E&O insurance relating to the Security Business. The general liability and E&O policies are on (and for the applicable statute of limitations period plus 1 year have been on) an "occurrence basis," which means, for example, that if a claim arose after the Closing Date for an event which occurred prior to the Closing Date, Seller's applicable insurance policy in existence on the date such event occurred would cover such claim. All such policies are in full force and effect and Seller has not received any notice of cancellation with respect thereto. During the past 5 years, no application by Seller for insurance with respect to the Assets to be Acquired has been denied for any reason. After Closing, Seller

-7-

will cause its insurance agent to deliver to Buyer a copy of its insurance claims history with respect to the Security Business for the past 5 years.

(c)    The Acquisition Profile dated December 12, 2005 is true and complete in all material respects as of the date delivered to Buyer; provided, however, that to the extent such profile is inconsistent with this Agreement, this Agreement shall govern, and the consistency shall not be deemed a breach of this representation.

3.7    Adverse Developments.

Since December 31, 2004, no event or condition has occurred which materially adversely affected the Assets to be Acquired or the Security Business, including: (a) any change in the financial condition, assets or liabilities of the Security Business, other than changes in the ordinary course of business; or (b) any damage, destruction, loss or other casualty to the Security Business, however arising and whether or not covered by insurance.

3.8    Tax Returns and Payments.

All income taxes, unemployment, social security, franchise, real property, personal property and all other taxes levied, assessed or imposed upon Seller with respect to the Security Business by the United States, or any state, or governmental subdivision of either, to the extent due and payable, have been duly paid to date or are being contested through appropriate administrative or judicial procedures, and no liability for deficiencies with respect thereto exists. There are no tax audits pending nor any outstanding agreements or waivers extending the statutory period of limitations applicable to any federal, state or local income tax return for any period related to the Security Business. To Seller's best knowledge, no tax deficiencies have been determined nor proposed tax assessments charged against Seller (nor is there any basis therefor) with respect to the Security Business. Seller has filed all federal, state, local, sales, franchise, withholding, real and personal property tax returns required to be filed with respect to the Security Business. No penalties or other charges are, or will become, due with respect to the late filing of any return by Seller related to the Security Business.

3.9    Agreements With Employees.

(a)    Seller is not a party to any employment agreement with any of the Chicago Employees, written or oral, which cannot be terminated at will by Seller.

(b)    Except as set forth on Schedule 3.9, Seller does not have any pension, profit sharing or other employee benefit plan, or any health care, life insurance or other employee welfare plan, for any of the Chicago Employees.

(c)    The names, titles and rates of compensation of all of the employees of Seller who work solely in connection with the Security Business and are based in Chicago (the "Chicago Employees") are listed on Schedule 3.9. None of the Chicago Employees has indicated to Seller any intention to terminate his employment with Seller.

- 8 -

(d)    Seller has entered into a nonsolicitation/nondisclosure agreement with each of the Chicago Employees.

3.10    <u>Intellectual Property Rights.</u>

<u>Schedule 3.10</u> sets forth all of the patents (including all reissues, divisions, continuations and extensions thereof), applications for patents, patent disclosures docketed, inventions, improvements, trademarks, trademark applications, trade names and copyrights owned by Seller and used in the Security Business, and all licenses, franchises, permits, authorizations, agreements and arrangements that concern the same or that concern like items owned by others and used by Seller in connection with the Security Business. True, correct and complete copies of all such licenses, franchises, permits, authorizations, agreements and arrangements have been delivered by Seller to Buyer. Seller has no knowledge of and has not received any notice of conflict with the asserted rights of others with respect to any of these intellectual property rights, or any other intellectual property rights used in connection with the Security Business.

3.11    <u>Customer Contracts and Business Documents.</u>

Except for the Customer Contracts and Business Documents, Seller has no presently existing material contract, agreement, lease, permit, consent, license or commitment, whether written or oral, affecting or relating to the Security Business. All of the Customer Contracts are valid and enforceable (provided, however, that enforceability of the Customer Contracts may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of such Customer Contract) and are in full force and effect in accordance with their terms, are assignable to Buyer without obtaining the consent of or providing notice to any customer, and contain terms and conditions which are standard within the electronic security industry, including those involving limitation of liability/liquidated damages and third-party indemnification. All of the Customer Contracts are written on one of the forms attached as part of <u>Schedule 3.11</u> and none have been modified with respect to the provisions that limit Seller's liability. All of the Business Documents are valid and enforceable (provided, however, that enforceability of the Customer Contracts may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of such Customer Contract) and are in full force and effect in accordance with their terms. Seller has made available to Buyer copies of all of the Customer Contracts and Business Documents set forth on <u>Schedule 1.1(b)</u>. Without limiting the foregoing, Seller represents that, to the best of its knowledge, the Security Business has been operated in substantial conformity with the Customer Contracts and Business Documents. Seller has not defaulted in its obligations pursuant to any of the Customer Contracts or Business Documents, which default could result in the cancellation of any Customer Contract or Business Document or adversely affect the rights of Seller under that Customer Contract or Business Document. Seller is not a party to any franchise, license,

-9-

distributor or other similar type of agreement respecting the Security Business. Seller did not acquire any of the Customer Contracts from any third party.

3.12    Customer and System Information.

(a)    Seller has entered into written agreements with all of its customers. None of the Customer Contracts have been altered in any material adverse manner (for example, deleting or modifying the limitation of liability provision). All of the Customer Contracts contain an original term of at least three (3) years. None of Seller's customers have a history of excessive false alarms which were not satisfactorily resolved.

(b)    Seller has provided each residential customer with the 3-day right of rescission in substantial compliance with the provisions of 16 C.F.R. Part 429 (Cooling-Off Period for Door-to-Door Sales) and any applicable state laws. Seller acknowledges that any failure on its behalf to comply with such regulation and laws in connection with any transaction involving a residential customer may result in such customer having the right to rescind or cancel such transaction. Seller further acknowledges that Buyer desires not to assume any risk for any liability that might arise as a result of any such rescission or cancellation.

(c)    Schedule 3.12 sets forth a true and accurate list of the amounts which Seller charges its customers for monitoring, repair service and any other services provided by Seller. Seller has no obligations or liabilities to customers, except the obligation to supply services to customers in the ordinary course of business. To the best knowledge of Seller, there are no complaints by customers that, individually or in the aggregate, could have a material adverse effect upon the Assets to be Acquired or the financial condition or operation of the Security Business.

(d)    Seller has no free or discounted service liability to customers existing with respect to the Security Business. Seller has no obligation or liability for the refund of monies to its customers other than obligations to refund deposits made by customers in the ordinary course of business. Under applicable law, Seller is not required to pay its customers interest on these refundable deposits. Since January 1, 2005, neither Seller, nor any of Seller's officers, directors, shareholders, employees or agents have paid directly or indirectly any accounts receivable of customers.

(e)    All of the alarm systems installed by Seller in connection with its operation of the Security Business are in good working order and condition, failure of a customer to report to Seller any problem with an alarm system known to the customer and customer non-use excepted, and have been installed and maintained in accordance with good and workmanlike practices prevailing in the security alarm industry. All such alarm systems conform in all material respects to the contracts pursuant to which they were installed, and in no case has such an installation been made by Seller which at the time of installation was in violation of any applicable law, code or regulation. All manufacturers' warranties applicable to any such alarm systems are freely assignable to Buyer. Seller is not aware of any difficulty in obtaining replacement parts for its product lines.

(f)    No one customer represents more than 1% of the Performing RMR. Except as set forth on Schedule 3.12, there has been no increase in Seller's monitoring or repair service rates in the last 12 months. Seller is not aware of any legal impediments which would prevent Buyer from instituting any rate increases after the Closing Date.

(g)    The account base of the Security Business is comprised solely of digital accounts, except for less than 20 accounts that have cellular back-up service. Except as set forth on Schedule 3.12, the telephone lines and numbers applicable to the accounts included as part of the Assets to be Acquired can be converted to communicate with Buyer's central station by means of a line switch. Schedule 3.12 sets forth a list of all of the telephone numbers used in connection with the operation of the Security Business, including all customer service numbers. To Seller's knowledge, and assuming that Buyer's monitoring facilities are compatible with the facilities of Seller's monitoring center, none of the alarm systems of Seller included as part of the Assets to be Acquired should require an on-site visit in order to reprogram such system to communicate with Buyer's central station. Seller shall provide Buyer with all of the data requested by Buyer with respect to the monitoring of the accounts included as part of the Assets to be Acquired, which data shall be accurate and complete in all material respects. Such data shall be provided in a timely fashion, in an acceptable electronic format, and at no cost to Buyer, pursuant to the terms of the Transition Agreement. Seller shall use its best efforts to assist Buyer so that Buyer will be able to transfer the monitoring of the accounts included as part of the Assets to be Acquired to its own central station on or before January 31, 2006.

(h)    Seller may terminate any agreement providing for the monitoring of any of its customers included as part of the Assets to be Acquired by any third party monitoring facility on not more than 30 days' notice. Except as set forth on Schedule 3.12, Seller does not offer its customers included as part of the Assets to be Acquired any type of medical alert monitoring service, two-way voice service or cellular back-up service.

(i)    To the best of Seller's knowledge, Seller is in substantial compliance with all false alarm ordinances applicable to the Security Business, and has paid all necessary permit and/or license fees that are the obligations of Seller (as opposed to obligations of the customers); to Seller's knowledge, no other communities in Illinois in which the Security Business is doing business are contemplating passing a false alarm ordinance.

(j)    To the best of Seller's knowledge, there are no pending plans by any telephone company to change the dialing procedures or exchange numbers within the areas servicing Seller's customers included as part of the Assets to be Acquired such that Seller would need to reprogram its customer's digital dialers.

(k)    All equipment sold or leased by Seller to its customers included as part of the Assets to be Acquired was of merchantable quality. Seller has not breached any express or implied warranties in connection with such sales or leases.

(l)    Seller has not sold or otherwise made its customer list included as part of the Assets to be Acquired available to any third party, other than its past and present institutional lenders.

- 11 -

(m)    Over 99% of the customers of the Security Business are located in the Chicago metropolitan area.

(n)    The Security Business has no work in progress, nor any outstanding bids or proposals.

(o)    The Security Business has no post office boxes located in the State of Illinois.

### 3.13    Broker or Finder.

Neither Seller nor any party acting on Seller's behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of these transactions.

### 3.14    Labor Relations.

The employees of the Security Business are not parties to any collective bargaining agreement with Seller.  There are no grievances, disputes or controversies with any union or any other organization of the employees of the Security Business, nor are there any threats of strikes, work stoppages or any pending demands for collective bargaining by any union or organization.  Seller has not engaged in any unfair labor practices with respect to the Security Business.

### 3.15    Bulk Sales Compliance and Transfer Taxes.

Neither the sale and transfer of the Assets to be Acquired pursuant to this Agreement, nor Buyer's possession and use thereof after Closing because of such sale and transfer, will result in or be subject to:  (a) any law pertaining to bulk sales or transfers which make such sales or transfers ineffective as to creditors of Seller; (b) any federal, state or local sales, use, transfer, excise or license tax, fee or charge applicable to any of the Assets to be Acquired; or (c) the imposition of any liability upon Buyer for appraisal rights or other liability owing to any shareholder of Seller which is not expressly assumed by Buyer in this Agreement.

### 3.16    Burdensome Agreements.

Seller is not a party to any agreement or instrument nor subject to any restriction which now has or, as far as Seller can foresee, may have a material adverse effect, financial or otherwise, upon the Security Business or the Assets to be Acquired, other than the credit facilities with its institutional lenders.

### 3.17    Options, Warrants and Rights of First Refusal.

Seller represents that no person or entity, including ADT Security Services, Inc., has any option, warrant or right of first refusal to purchase any of the Assets to be Acquired, the Security Business.

- 12 -

3.18     Environmental Matters.

Neither Seller nor any of Seller's affiliates own, operate or lease or have owned, operated or leased any real property used in connection with the Security Business that has used, generated, stored or disposed of any Hazardous Materials, nor to the best of Seller's knowledge after due inquiry have there been any Hazardous Materials disposed of by any previous owner or any other third-party on any property owned, operated or leased by Seller or any of its affiliates.

3.19     Disclosure.

No representation or warranty by Seller in this Agreement or any Schedule or Exhibit, or any statement, list or certificate furnished or to be furnished by Seller pursuant to this Agreement, or in connection with these transactions, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not misleading or necessary in order to provide a prospective purchaser of the Assets to be Acquired and Security Business with proper information as to such assets and business.

4.     **REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER**

As an inducement to Seller to enter into this Agreement and to consummate these transactions, Buyer represents, warrants and covenants to Seller:

4.1     Authority of Buyer.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Florida. Buyer has full power and authority to enter into this Agreement, to consummate these transactions and to comply with the terms, conditions and provisions hereof. This Agreement is, and each other agreement or instrument of Buyer contemplated by it will be, the legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, provided, however, that enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of this Agreement. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by it will conflict with or result in any violation of or constitute a default under any term of any agreement, mortgage, debt instrument, indenture, franchise, license, permit, authorization, lease or other instrument, judgment, decree, order, award, law or regulation by which Buyer is bound. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby: (a) are permissible under Buyer's Articles of Organization; and (b) have been duly and validly authorized by all necessary and appropriate action by Buyer's members.

4.2    Broker or Finder.

Neither Buyer nor any party acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of these transactions, except for the fees payable to The Edmonds Group, which fees Buyer agrees to pay, and Buyer agrees to indemnify and hold harmless Seller from any claim or liability that may be asserted against Seller by any broker, finder or intermediary engaged by Buyer.

4.3    Litigation.

There is no action, suit or preceding pending or, to the best knowledge of Buyer, threatened which questions the legality or propriety of these transactions or that would prevent Buyer or limit Buyer in any way from assuming and performing the obligations under the Customer Contracts and Business Documents included among the Assets to be Acquired.

## 5.    CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

On or prior to the Closing Date, Seller will have satisfied (or caused to be satisfied) each of the following conditions, unless waived in writing by Buyer:

5.1    Covenants and Warranties.

There will have been no material breach by Seller in the performance of any of its covenants and agreements contained or referred to in this Agreement; each of the representations and warranties of Seller contained or referred to in this Agreement will be true and correct in all material respects on the Closing Date.

5.2    Corporate Action.

Seller will have taken all corporate action necessary to approve these transactions, and Seller will have furnished Buyer with certified copies of the resolutions adopted by its Shareholders and Board of Directors, in form and substance satisfactory to counsel for Buyer, in connection with such transactions.

5.3    No Restraint or Litigation.

No action, suit or proceeding will by pending or threatened by any third party or governmental or regulatory agency to restrain, prohibit or otherwise challenge the legality or validity of these transactions or of any of the Assets to be Acquired.

5.4    Necessary Consents and Permits.

The parties will have received all of the consents listed on Schedule 3.2, including the consent of any lender to Seller, and such consents will be valid and enforceable on the Closing Date.

- 14 -

5.5     Documents, Certificates and Other Items.

Seller will have delivered or caused to be delivered to Buyer:

(a)     an Assignment and Bill of Sale in the form of Exhibit C, duly executed;

(b)     the Noncompetition Agreement described in Section 2.5, duly executed;

(c)     the Transition Agreement described in Section 2.6, duly executed;

(d)     the letter attached hereto as Exhibit D by and among Buyer, Seller and Central One, duly executed by each party;

(e)     a Certificate of Good Standing issued by the Secretary of State of Illinois evidencing Seller's corporate standing in such state, dated within 30 days of the Closing Date;

(f)     all other documents and instruments required under this Agreement; and

(g)     all other documents and instruments reasonably requested by Buyer in connection with the consummation of these transactions.

5.6     Satisfaction of Debts.

(a)     Seller will have delivered to Buyer the lien searches performed against Seller for the State of Illinois and for Cook County, Illinois, showing all UCC-1 financing statements, federal, state, and local tax liens, outstanding judgments and pending litigation.

(b)     Seller will have delivered to Buyer a true and correct list of each of the secured creditors of Seller and the amount due by Seller to each such creditor on the Closing Date.

(c)     Seller will have delivered the documents necessary to release all of the liens held by Seller's secured creditors with respect to the Assets to be Acquired.

5.7     Accounts Receivable.

At Closing, Seller will deliver to Buyer an accurate complete listing of all of the accounts receivable of the Security Business which existed as of a date which is not more than 7 days prior to the Closing Date.

5.8     Use of Name.

Seller shall permit Buyer to immediately hereafter use the name "Alarm One" to the extent permitted by the Transition Agreement.

5.9     Employees.

As of the Closing Date, Seller will take all action necessary to terminate the employees of the Security Business listed on Schedule 3.9 (including terminating each such employee from coverage under all plans listed on Schedule 3.9), and will pay such employees all payroll, bonus, severance and vacation sums due to them through the Closing Date. No employee of Seller will automatically become an employee of Buyer as a result of these transactions. Buyer may offer employment to any employee of the Security Business on terms and conditions which it announces, and Buyer may, after Closing, unilaterally implement terms and conditions of employment for such persons, including a condition that each potential employee execute Buyer's standard nonsolicitation/nondisclosure agreement.

6.     **CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER**

On or prior to the Closing Date, Buyer will have satisfied each of the following conditions unless waived in writing by Seller:

6.1     Covenants and Warranties.

There will have been no material breach by Buyer in the performance of any of its covenants and agreements contained or referred to in this Agreement; each of the representations and warranties of Buyer contained or referred to in this Agreement will be true and correct in all material respects on the Closing Date.

6.2     Delivery of Purchase Price.

Buyer will have delivered the Purchase Price to Seller, less the amount of any adjustments made pursuant to Section 2.1(c).

6.3     Documents, Certificates and Other Items.

Buyer will have delivered or caused to be delivered to Seller:

(a)     all of the documents or instruments required under this Agreement; and

(b)     all other documents and instruments reasonably required by Seller in connection with the consummation of these transactions.

6.4     No Restraint or Litigation.

No action, suit or proceeding will be pending or threatened by any third party or governmental or regulatory agency to restrain, prohibit or otherwise challenge the legality or validity of these transactions.

## 7.   **INDEMNIFICATION**

### 7.1   Indemnification by Seller and Buyer.

(a)     Seller will indemnify, hold harmless, defend and bear all costs of defending Buyer, together with Buyer's subsidiaries, affiliates, successors and assigns, from, against and with respect to any and all damage, loss, deficiency, expense (including any reasonable attorney and accountant fees, legal costs or expenses), action, suit, proceeding, demand, assessment or judgment to or against Buyer (collectively, "Buyer's Aggregate Net Loss") arising out of or in connection with:

(i)     any debt, obligation, commitment or liability of Seller which is not expressly assumed by Buyer herein or which is expressly assumed by Seller in this Agreement, whether arising prior to, on or after the Closing Date and whether or not disclosed to Buyer in this Agreement, including those relating to environmental liabilities and Seller's obligation to provide residential customers with the 3-day notice of cancellation;

(ii)     any breach or violation of, or nonperformance by, Seller of any of its representations, warranties, covenants or agreements contained in this Agreement or in any document, certificate or schedule required to be furnished pursuant to this Agreement;

(iii)     any violation of the bulk sales laws or other similar laws requiring notice to governmental and nongovernmental creditors caused by consummation of these transactions; and

(iv)     with respect to payments to be made by customers of the Security Business, any failure to accurately calculate and appropriately disclose such payments to customers in accordance with applicable law.

(b)     Buyer will indemnify, hold harmless, defend and bear all costs of defending Seller, together with Seller's subsidiaries, affiliates, successors and permitted assigns, from, against and with respect to any and all damage, loss, deficiency, expense (including any reasonable attorney and accountant fees, legal costs or expenses), action, suit, proceeding, demand, assessment or judgment to or against Seller (collectively, "Seller's Aggregate Net Loss") arising out of or in connection with:

(i)     all liabilities, damages or claims incurred or accrued against Buyer or arising out of the business activities of Buyer after the Closing Date; and

(ii)     any breach or violation of, or nonperformance by, Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement or in any document, certificate or schedule required to be furnished pursuant to this Agreement.

(c)     Should Buyer and Seller be unable to agree as to the amount of Buyer's Aggregate Net Loss for which Buyer is to be indemnified, or the amount of Seller's Aggregate Net Loss for which Seller is to be indemnified, then either Buyer or Seller, as the case may be,

may commence arbitration proceedings in Wilmington, Delaware in accordance with the provisions of Section 8.3. Buyer may offset against amounts due from Buyer to Seller under this Agreement against any indemnification or other obligations due to Buyer from Seller under or in connection with this Agreement.

### 7.2    Notice of Claims.

If any claim is made by or against a party which, if sustained, would give rise to a liability of the other party hereunder, that party (the "Claiming Party") will promptly cause notice of the claim to be delivered to the other party (the "Indemnifying Party") and will afford the Indemnifying Party and its counsel, at the Indemnifying Party's sole expense, the opportunity to defend or settle the claim (and, with respect to claims made by third parties, the Claiming Party will have the right to participate at its sole expense). Any notice of a claim will state, with reasonable specification, the alleged basis for the claim and the amount of liability asserted by or against the other party by reason of the claim. If such notice is not given, it will not release the Indemnifying Party, in whole or in part, from its obligations under this Article 8, except to the extent that the Indemnifying Party's ability to defend against such claim is actually prejudiced thereby. Alternatively, if notice is given and the Indemnifying Party fails to assume the defense of the claim within 10 days thereof, the claim may be defended, compromised or settled by the Claiming Party without the consent of the Indemnifying Party and the Indemnifying Party will remain liable under this Article 7.

### 7.3    Survival of Indemnity Obligations.

The rights of Buyer and Seller to assert indemnification claims will survive the Closing Date and will expire:  (a) with respect to all claims other than third-party claims and claims related to fraud, willful misconduct, title, environmental and pension liability, and the nonpayment of taxes under any federal, state, county or other local taxing statutes (collectively, the "Excluded Claims"), on the second anniversary of the Closing Date; and (b) with respect to the Excluded Claims, upon the expiration of 90 days following the date on which the running of the statute of limitations with respect to any such tax or claim will bar the assessment and collection of such tax or claim.

### 7.4    Indemnity Basket and Cap.

Neither Buyer nor Seller shall be entitled to any recovery from the other party with respect to any Buyer's Aggregate Net Loss or Seller's Aggregate Net Loss, as the case may be, unless and until the amount of loss suffered, sustained or incurred by the Claiming Party, or to which the Claiming Party becomes subject, shall exceed $20,000 calculated on a cumulative basis and not a per item basis (the "Basket Amount"), and then only with respect to the excess over the Basket Amount. The Basket Amount shall not apply to the Excluded Claims. The aggregate amount of Buyer's Aggregate Net Loss or Seller's Aggregate Net Loss, as the case may be, will not exceed the amount of the Purchase Price, exclusive of the Excluded Claims. The Excluded Claims shall not be subject to such limitation.

- 18 -

### 7.5    Offset for Insurance.

The amount of any indemnification obligation under this Article 7 will be reduced by any insurance proceeds paid to the Claiming Party as a result of the loss or other matter for which indemnification is sought.  The Claiming Party will be obligated to submit to its insurance carrier all coverable claims and pursue such claims against its insurance carrier in good faith, and will not abandon or compromise any such claim without the consent of the other party, but shall not be obligated to institute any litigation against its insurance carrier if the carrier denies coverage.  To the extent a Claiming Party receives any payment pursuant to any insurance policies as to any third party claim for which it has previously received payment from the Indemnifying Party hereunder, then, in such event the Claiming Party shall promptly reimburse the Indemnifying Party to the extent of any such duplicate payment received.

### 7.6    Sole and Exclusive Remedy.

After the Closing, the indemnification provided in this Article 7 shall be the sole and exclusive remedy of the parties with respect to the matters described in this Article 7 without regard to whether such matter involves claims framed in contract, tort, equity or otherwise.

## 8.    **GENERAL PROVISIONS**

### 8.1    Survival of Obligations.

Seller and Buyer acknowledge that the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement form an integral part of the consideration given to Buyer in exchange for the Purchase Price and to Seller in exchange for the Security Business, without which Buyer would be unwilling to purchase, and Seller would be unwilling to sell, the Assets to be Acquired.  Notwithstanding any investigation and review made by Buyer pursuant to this Agreement, Seller and Buyer agree that all of the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement or in any exhibit, schedule, statement, report, certificate or other document or instrument required to be delivered pursuant to this Agreement will, subject to the limitations set forth in Section 7.2, survive the making of this Agreement, any investigation or review made by or on behalf of the parties hereto and the Closing.

### 8.2    Transfer Charges and Taxes.

Seller will pay all stamp, sales, income, realty transfer or other taxes, federal, state or local imposed by law in respect of any and all transfers pursuant to this Agreement.

### 8.3    Arbitration.

Except with respect to Buyer electing to bring an action for specific performance of this Agreement (which action will be commenced and settled in a court of competent jurisdiction) or a dispute regarding the Final Purchase Price (which dispute will be settled by the

Independent Arbiter), any controversy or claim arising out of or relating to this Agreement, or the breach thereof, will be settled by arbitration in Wilmington, Delaware, in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"). Buyer and Seller agree that such location is the most convenient forum for both parties. The parties elect to provide for pre-arbitration discovery pursuant to the provisions of the Federal Rules of Civil Procedure. Unless modified by the arbitrators in their discretion, the arbitration will proceed upon the following schedule: (a) within 10 days from the service of a notice of demand for arbitration, the parties will select a panel of 3 AAA arbitrators; (b) within 10 days after selection of the arbitrators, the parties will conduct a pre-arbitration conference at which a schedule of pre-arbitration discovery will be set, all pre-arbitration motions scheduled and any other necessary pre-arbitration procedural matters decided; (c) all discovery will be completed within 20 days following the pre-arbitration conference; (d) all pre-arbitration motions will be filed and briefed so that they may be heard no later than 15 days following the discovery cutoff, (e) the arbitration will be scheduled to commence no later than 10 days after the decision on all pre-arbitration motions but in any event no later than 3 months following the service of the demand for arbitration; and (f) the arbitrators will agree to hear the claim on successive days and will render their written decision within 15 days following the submission of the matter. Such arbitration will be final and binding on Buyer and Seller, no appeals may be taken therefrom, and judgment upon any award rendered may be entered in any court having jurisdiction therefor. The prevailing party in any dispute will be entitled to recover its legal fees and expenses.

8.4    Confidentiality.

Buyer and Seller agree that they will treat in confidence all documents, materials and other information which they have obtained regarding the other party during the course of the negotiations leading to the consummation of these transactions, the investigation provided for herein and the preparation of this Agreement and other related documents. In the event these transactions are not consummated, all copies of nonpublic documents and material which have been furnished in connection with these transactions will be promptly returned to the party furnishing such documents and material, will continue to be treated as confidential information and will not be used for the benefit of the party who returned such confidential information.

8.5    Public Announcements.

Neither Buyer nor Seller will, without the approval of the other party (which may not be unreasonably withheld), make any press release or other public announcement concerning these transactions, except as and to the extent that such party will be so obligated by law, in which case the other party will be advised and Buyer and Seller will use their best efforts to cause a mutually agreeable release or announcement to be issued.

8.6    Governing Law.

This Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflicts of law provisions.

8.7    Notices.

All notices or other communications required or permitted hereunder will be in writing and will be deemed given when delivered personally, by registered or certified mail, by legible facsimile transmission or by overnight courier (fare prepaid) addressed as follows:

If to Buyer, to:

Richard W. Perry, President
3223 Commerce Place
Suite 101
West Palm Beach, FL 33407
Telecopy: (561) 697-9749

with a copy to:

S. Bryan Lawrence, III, Esquire
Buchanan Ingersoll PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
Telecopy: (412) 562-1041

If to Seller, to:

Peter Maltby, President and CEO
1601 E. Orangewood Avenue
Anaheim, CA 92805
Telecopy: (714) 939-1280

with a copy to:

Alan L. Pepper, Esquire
Mitchell Silberberg & Knupp LLP
11377 W. Olympic Blvd.
Los Angeles, CA 90064
Telecopy: (310) 231-8355

Notice will be deemed received the same day (when delivered personally), 5 days after mailing (when sent by registered or certified mail) and the next business day (when delivered by overnight courier or by facsimile transmission). Any party to this Agreement may change its address to which all communications and notices may be sent by addressing notices of such change in the manner provided.

8.8    Assignment.

This Agreement may not be assigned by Seller without the prior written consent of Buyer. Buyer will have the right to assign this Agreement and the rights and obligations hereunder to its successors and assigns, including making a collateral assignment to its secured lenders. This Agreement is nonrecourse to the members of Buyer and Robert Moe, one of the shareholders of Seller.

8.9    Entire Agreement; Amendments.

This Agreement is an integrated document, contains the entire agreement between the parties, wholly cancels, terminates and supersedes any and all previous and/or contemporaneous oral agreements, negotiations, commitments and writings between the parties hereto with respect to such subject matter, including the letter of intent dated December 12, 2005. No change, modification, extension, termination, notice of termination, discharge, abandonment or waiver of this Agreement or any of its provisions, nor any representation, promise or condition

- 21 -

relating to this Agreement, will be binding upon any party unless made in writing and signed by such party.

 8.10   Interpretation.

 Article titles and headings to Sections are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of any of the provisions of this Agreement. All references to Sections and subsections contained in this Agreement refer to the Sections and subsections of this Agreement. All references to Schedules or Exhibits contained in this Agreement are references to the Schedules or Exhibits described on the list immediately following the signature page hereto. All references to the words "include" or "including" mean "including without limitation." Any and all Schedules, Exhibits, statements, reports, certificates or other documents or instruments referred to in or attached to this Agreement, including the "Background" portion of this Agreement, are incorporated by reference as though fully set forth at the point referred to in this Agreement. There will be no presumption against any party on the ground that such party was responsible for preparing this Agreement or any part of it. Any representation or warranty of Seller based upon "knowledge" or "best knowledge" or similar words will include only the actual knowledge of Peter Maltby, Patrick Smith or Douglas Schultz. All pronouns and any variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require.

 8.11   Waivers.

 Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof, but any such waiver must be in writing and must comply with the notice provisions contained in Section 8.7. The failure of any party to enforce at any time any provision of this Agreement will not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part of it or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement will be held to constitute a waiver of any other or subsequent breach.

 8.12   Expenses.

 Except as otherwise provided in this Agreement, Buyer and Seller will each pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants; provided, however, that in any action to enforce the terms of this Agreement (other than a Purchase Price dispute pursuant to Section 2.1(d)), the substantially prevailing party in such action will be entitled to recover its reasonable attorneys' fees and costs incurred in connection with such action.

### 8.13   Partial Invalidity.

Wherever possible, each provision will be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of these provisions will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein, unless the deletion of such provision or provisions would result in such a material change as to cause the completion of these transactions to be unreasonable.

### 8.14   Further Assurances.

From time to time following the Closing Date, Seller will: (a) promptly notify Buyer regarding any cash or other property that it may receive in respect of receivables relating to the Security Business (whether attributable to periods before or after the Closing Date) and immediately deliver to Buyer any cash or other property that it may receive in respect of receivables billed by or on behalf of Buyer after Closing; (b) cooperate with Buyer, including the execution of any necessary documents and agreements, so that all ACH payments from customers will be redirected promptly after Closing to the account of Buyer; and (c) at the request of Buyer and without further consideration, execute and deliver to Buyer such other instruments of conveyance and transfer as Buyer may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession of, any part of the Assets to be Acquired. In the case of any agreement, contract, lease, easement or other commitment which is included in the Assets to be Acquired but which cannot be transferred or assigned effectively without the consent of a third party, whose consent has not been obtained prior to Closing, Seller will cooperate with Buyer at Buyer's request in trying to promptly obtain such consent. After the Closing, Seller shall not engage in any collection efforts with respect to the Assets to be Acquired without first obtaining Buyer's prior written consent, which consent shall not be unreasonably withheld. Buyer agrees to notify the accounts included in the Assets to be Acquired of this transaction at Buyer's sole expense.

### 8.15   Counterparts.

This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, which together contain the signatures of each party hereto, will have been delivered to Buyer and Seller. Delivery of executed signature pages by facsimile transmission will constitute effective and binding execution and delivery of this Agreement.

### 8.16   Third-Party Beneficiaries.

This Agreement will not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

ALARM ONE, INC.

By:_____
    Peter Maltby, President

SECURITY NETWORKS, LLC

By:_____
    Richard Perry, President

The undersigned, as the majority shareholder of Seller, hereby joins in this Agreement, with respect to Section 2.1 hereof only, and all of the covenants, agreements and obligations of Seller pursuant to Section 2.1 will also be deemed to be made by the undersigned on a joint and several basis.

_____
    Peter Maltby, individually

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

ALARM ONE, INC.

By: _____

Peter Maltby, President

SECURITY NETWORKS, LLC

By: _____

Richard Perry, President

The undersigned, as the majority shareholder of Seller, hereby joins in this Agreement, with respect to Section 2.1 hereof only, and all of the covenants, agreements and obligations of Seller pursuant to Section 2.1 will also be deemed to be made by the undersigned on a joint and several basis.

_____

Peter Maltby, individually

24

### List of Schedules

| Schedule | Description |
|----------|-------------|
| 1.1(a) | Tangible Assets |
| 1.1(b) | Customer Contracts and Business Documents |
| 2.3 | Allocation of Purchase Price |
| 3.2 | Consents and Notices |
| 3.4 | Liens and Encumbrances |
| 3.5 | Litigation and Claims |
| 3.6 | Insurance Coverage |
| 3.9 | Employees, Employee Benefit and Welfare Plans |
| 3.10 | Intellectual Property |
| 3.11 | Form Contracts |
| 3.12 | Services and Rates, Altered Contracts, Free and Discounted Service Liability, False Alarm Ordinances, Telephone Numbers |

| List of Exhibits | | Section Reference |
|---|---|---|
| A | Noncompetition Agreement | 2.5 |
| B | Transition Agreement | 2.6 |
| C | Assignment and Bill of Sale | 5.5(a) |
| D | Central One Letter | 5.5(d) |

**SCHEDULE 1.1 (a)**

To

**ASSET PURCHASE AGREEMENT**
**ALARM ONE, INC. – SECURITY NETWORKS, LLC.**
Dated as of December 23, 2005

**TANGIBLE ASSETS**

All furniture, equipment, tools, machinery and fixtures located in Chicago office, including the following:

| DATE PURCHASED | DESCRIPTION |
|---|---|
| 4/9/2001 | ARM, ALL ADJUST CHAIRS |
| 4/9/2001 | TABLE |
| 04/02/02 | 1 MANGERS DESK |
| 04/02/02 | FABRIC TASK CHAIRS |
| 04/02/02 | 25" 4 DRAWER LETTER FILE |
| 04/02/02 | CHROME CHAIR GRAY |
| 04/02/02 | CHERRY EXEC DESK |
| 04/02/02 | FABRIC CHAIR BLACK |
| 04/02/02 | ALUMINUM FRAME |
| 05/21/02 | STORAGE CABINETS |

All inventory located in Chicago office or in the vehicles of Chicago employees. References to the "Chicago office" mean the premises located in Oakbrook Terrace, IL.

**SCHEDULE 1.1 (b)**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**CUSTOMER CONTRACTS and BUSINESS DOCUMENTS**

CUSTOMER CONTRACTS:

See enclosed CD containing the list of customers, Performing RMR and Unearned Revenue.

BUSINESS DOCUMENTS

There are no Business Documents for the Security Business or included among the Assets to be Acquired.

**SCHEDULE 2.3**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**ALLOCATION OF PURCHASE PRICE**

| | |
|---|---|
| Customer Contracts and Accounts | $ 7,111,500.00 |
| Furniture and Fixtures | $ 1,000.00 |
| Inventory | $ 2,500.00 |
| Restrictive Covenant – Alarm One | $ 7,500.00 |
| Restrictive Covenant – Peter Maltby | $ 7,500.00 |

**SCHEDULE 3.2**

To

**ASSET PURCHASE AGREEMENT**
**ALARM ONE, INC. – SECURITY NETWORKS, LLC.**
Dated as of December 23, 2005

**CONSENTS AND NOTICES**

The consents of:

Fortress Credit Corp.
Sun Trust Equities Funding, LLC

are required to sell the Assets to be Acquired.

**SCHEDULE 3.4**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005


**LIEN AND ENCUMBRANCES**

Fortress Credit Corp.
Sun Trust Equities Funding, LLC

**SCHEDULE 3.5**

To

**ASSET PURCHASE AGREEMENT**
**ALARM ONE, INC. – SECURITY NETWORKS, LLC.**
Dated as of December 23, 2005

**COMPLIANCE WITH LAWS; LITIGATION AND CLAIMS**

3.5(a) The Seller does not have business licenses in the local jurisdictions where the customers are located, the absence of which will not result in a material adverse effect.

3.5(c) None

**SCHEDULE 3.6**

To

**ASSET PURCHASE AGREEMENT**
**ALARM ONE, INC. – SECURITY NETWORKS, LLC.**
Dated as of December 23, 2005

**INSURANCE COVERAGE**

| Category of Insurance | Name of Carrier |
|---|---|
|  |  |

Primary automobile coverage for the personal vehicles operated by the service technicians is provided by the employees and not the Seller.

| Umbrella | | General Star Indemnity Company | IXG379126 C |
|---|---|---|---|
| Liability Limit Each Occurrence | 5,000,000 | | |
| Liability Aggregate Limit | 5,000,000 | | |
| **General Liability** | | Arch Insurance Company | BSPKG2060 6 |
| General Aggregate | $2,000,000 | | |
| Products/Completed Oper. Aggr. | $2,000,000 | | |
| Personal & Advertising Injury | $1,000,000 | | |
| Each Occurrence | $1,000,000 | | |
| Damage to Rented Premises | $100,000 | | |
| Medical Expense (Any One Person) | $5,000 | | |
| Employee Benefits | $1,600,000 | | |
| Per Occurrence Deductible | $1,000. | | |

**Additional Coverages, Options, Restrictions, Endorsements, and Rating Information:**
Errors & Omissions Coverage; Includes Broad Form Property Damage, Blanket Additional Insureds, Lost Key $50,00 occ/agg);
Independent Contractors & Limited Theft Coverage $100,000
Alarm-Monitoring, Services & Installation

Premium Basis : Gross Sales

| Primary Non-Owned & Hired Auto Liability | | National Continental Insurance Company | CP6801-383-2 |
|---|---|---|---|
| Bodily Injury Per Person | $15,000 | | |
| Bodily Injury Each Accident | $30,000 | | |
| Property Damage Liability Each Accident | $5,000 | | |
| | | | |
| Excess Non-Owned & Hired Auto Liability | | Chubb Custom Insurance Co. | 79544931 |
| Liability | | | |
| Combined Single Limit For Bodily Injury and Property Damage | 1,000,000 | | |
| Hired Autos | | | |
| Non-Owned Autos | | | |
| Endorsements, Forms, Conditions: | | | |
| As Stated On Policy. | | | |
| Vehicles Per Schedule On File | | | |

| Property | | St Paul Travelers Companies | 660800X2696 |
|---|---|---|---|
| Premises - Blanket All Locations | | | |
| Personal Property: | 820,000 | | |
| Coins %                90 | | | |
| Valuation             RC | | | |
| Cause of Loss       SPECIAL | | | |
| Deductible           1,000 | | | |
| Blanket Limit – Locations 1 Thru 5 | | | |

**SCHEDULE 3.9**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

### EMPLOYEES, EMPLOYEE BENEFIT AND WELFARE PLANS

**Field Supervisor**
Spase Angjelkoski

**Field Tech III**
Zlatko Risteski

**Field Tech II**
Jerubabel Wright
Kenneth Aseves

**[Need compensation for each employee.]**

Alarm One 401(k) Employee Savings and Retirement Plan
TransAmerica
Employee Contribution Account Only

PPO Medical Plan
Blue Shield

PPO Dental Plan or HMO Dental Plan
Cigna

Vision Plan
VSP

Alarm One "Paid Time Off" Policy
First 5 years of employment   Employee accrues at a rate of 10 days per year
Years 6 through 12            "      "      "        15    "
Years 13+                     "      "      "        20    "

SCHEDULE 3.10

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**INTELLECTUAL PROPERTY**

Corporate Name:  Alarm One, Inc.

Licenses:

| STATE | License # | Exp. | Fire | Burg |
|---|---|---|---|---|
| Illinois | 127-000942 | 8/31/2008 | Yes | Yes |
| | | | | |

None of the intellectual property is included in the Assets to be Acquired and is retained by Seller.

SCHEDULE 3.11

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

CUSTOMER CONTRACT FORMS

See attached forms.

# EXHIBIT B

DRAFT 12/23/05

## AGREEMENT

This Agreement is entered into as of the 23rd of December, 2005 by and between ALARM ONE, INC., an Illinois corporation ("Alarm One"), and SECURITY NETWORKS, LLC, a Florida corporation ("SN").

## BACKGROUND

A.     The parties have entered into that certain Asset Purchase Agreement dated as of the date hereof, pursuant to which SN is purchasing Alarm One's customer accounts located in the greater Chicago area.

B.     In connection with the consummation of this transaction, the parties also desire to enter into the following agreements.

NOW, THEREFORE, intending to be legally bound, the parties agree as follows:

1.     Alarm One agrees to either: (a) within 60 days of the date of this Agreement, transfer a minimum of 5,000 digital alarm accounts to SN's central station; or (b) commit to have SN's central station monitor all of the new digital alarm accounts that Alarm One creates or acquires during the term of this Agreement.

2.     SN agrees to monitor these accounts on behalf of Alarm One for an initial term of two years and to do so at its customary monitoring rates and pursuant to its standard form of third-party monitoring agreement.

3.     In the event Alarm One elects the option set forth in Section 1(a) above, then during the initial term, Alarm One further agrees to maintain at all times a minimum of 5,000 monitored accounts with SN's central station.

4.     In addition, the parties agree that Alarm One will not be entitled to receive any commission with respect to future accounts purchased from APEX by SN or any of its affiliates.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

SECURITY NETWORKS, LLC                ALARM ONE, INC.

By: _____          By: _____
    Richard Perry, President              Peter Maltby, President

DRAFT 12/23/05

## AGREEMENT

This Agreement is entered into as of the 23rd of December, 2005 by and between ALARM ONE, INC., an Illinois corporation ("Alarm One"), and SECURITY NETWORKS, LLC, a Florida corporation ("SN").

### BACKGROUND

A.    The parties have entered into that certain Asset Purchase Agreement dated as of the date hereof, pursuant to which SN is purchasing Alarm One's customer accounts located in the greater Chicago area.

B.    In connection with the consummation of this transaction, the parties also desire to enter into the following agreements.

NOW, THEREFORE, intending to be legally bound, the parties agree as follows:

1.    Alarm One agrees to either:  (a) within 60 days of the date of this Agreement, transfer a minimum of 5,000 digital alarm accounts to SN's central station; or (b) commit to have SN's central station monitor all of the new digital alarm accounts that Alarm One creates or acquires during the term of this Agreement.

2.    SN agrees to monitor these accounts on behalf of Alarm One for an initial term of two years and to do so at its customary monitoring rates and pursuant to its standard form of third-party monitoring agreement.

3.    In the event Alarm One elects the option set forth in Section 1(a) above, then during the initial term, Alarm One further agrees to maintain at all times a minimum of 5,000 monitored accounts with SN's central station.

4.    In addition, the parties agree that Alarm One will not be entitled to receive any commission with respect to future accounts purchased from APEX by SN or any of its affiliates.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

SECURITY NETWORKS, LLC                    ALARM ONE, INC.


By:_____              By:_____
    Richard Perry, President                 Peter Maltby, President


#1881750-v1

# EXHIBIT C



705 Boston Post Road, Suite 4, Guilford, CT 06437
Tel: 203.453.0438 | Fax: 203.453.0426

ALARM ONE, INC.  v. SECURITY NETWORKS, LLC

INDEPENDENT ARBITER'S REPORT

April 15, 2007



**BENCHMARK**
PERFORMANCE PARTNERS, LLC

705 Boston Post Road, Suite 4, Guilford, CT 06437
Tel: 203.453.0438  |  Fax: 203.453.0426

April 15, 2007

Edward Naughton
**Holland & Knight**
10 St. James Avenue
11th Floor
Boston, MA 02116

David Wilkes
**Reed Smith LLP**
1201 Market Street
Suite 1500
Wilmington, DE 19801

Dear Sirs:

We were engaged as the "Independent Arbiter" in the dispute between Alarm One, Inc. ("Seller") and Security Networks, LLC ("Buyer") relating to the Asset Purchase Agreement (APA) dated December 23rd, 2005 (the "Closing Date"). It is important to note that we did not conduct a "Field Examination" and have relied upon information supplied by both the Buyer and Seller.

The objective of our engagement was to examine and analyze specific information about the Recurring Monthly Revenue (RMR), and the determination of the "Performing RMR" to be used in the calculation of the "Final Purchase Price" as of the "Closing Date"

We have used our best efforts and professional judgment, including industry experience and standards in conducting the engagement.

Sincerely,

BENCHMARK PERFORMANCE PARTNERS, LLC

James Leese                          Ryan Matkin
Principal                            Principal

# I.    Executive Summary

We were engaged as the "Independent Arbiter" to resolve the dispute between the
and Seller as to the calculation of the "Final Purchase Price" as it relates
determination of the actual amount of Recurring Monthly Revenue (RMR)
December 23, 2005 ("Closing Date"). In making our determination, we have relie
verbal, electronic and written information provided by both parties, including ac
Alarm One's customer call notes history via remote desktop connection.    W
reviewed the following files and documentation provided by legal counsel fo
parties in electronic format:

- SN to A1 RMR Adj – Benchmark January 2007.pdf
- Nbr1 – Post Sale Reconciliation Schedules.xls
- Nbr2 – Contract Example.pdf
- Nbr3 – Customer Sedona History – Raw Data – BPP Final.xls
- Nbr3 – Payment Examles.pdf
- SecNet – RMR – Collections.xls
- A1 – Exhibit 1.pdf
- A1 – Exhibit 2.pdf
- Non Pay for A1_Benchmark.xls
- Prepay for Benchmark.xls
- A1 12224 – Anderson.pdf
- A1 Letter May 12 2006.pdf
- A1 Purchase Price True Up Letter 05_11_06.pdf
- Alarm 1 – SN72106 email.pdf
- Alarm_One_Exhibits_v3.xls
- APA.pdf
- Chicago Customer Review – 228k Listing.pdf
- IL Only Due Diligence 113005.xls
- Post Sale Reconciliation Schedules.xls
- Random Contracts Selected_Fax of 50 Pages.pdf
- Chicago Cancel Notifications.xls
- Lease RMR Analysis 041906.xls
- Security Networks Contract Versions Part II 03-26-07.zip
- Security Networks Contract Versions Part I 03-26-07.zip
- Security Networks Accounts By Contract Version Date Summary 03-26-07
- Security Networks Contract Versions Defined 03-26-07.xls

## II.  Detailed Findings

The Asset Purchase Agreement dated December 23rd, 2005 defines the Purchase Price for the Assets to be acquired as a multiple of 31 times the Performing RMR as of the Closing date. 100% of the Closing Payment was paid to the Seller on the Closing Date and 120 days after the Closing Date, the Buyer delivered to the Seller a final closing adjustment calculated as of the Closing Date ("the Final Purchase Price") together with supporting documentation.

We have reviewed this documentation, including the Asset Purchase Agreement's definition of "Performing RMR" which means the amount of recurring monthly revenue derived solely from enforceable written Customer Contracts for which the customer is not more than 60 days in arrears on any payment due under such agreement; or the Seller has received no later than 30 days before the Closing Date at least one (1) full monthly payment of RMR provided the customer is not more than 90 days in arrears on any payment due under such agreement. Performing RMR does not include any revenue:

    a)  that is not periodic in nature;
    b)  from customers whom Seller has received notice of pending termination;
    c)  customer added as a result of extraordinary marketing efforts;
    d)  from lease agreements;
    e)  from the provision of long-range radio or cellular back-up services;
    f)  from renters or persons who reside in mobile homes;
    g)  from customers whose telephone number has been disconnected.

Using the above definition of RMR, both parties have agreed that the "Purchase Price" be adjusted for Pre-Sale Adjustments (customers not converted into Security Networks Billing System) and Pending Cancels (customers converted in Security Networks Billing System). The amount of these agreed upon adjustments totaled $25,342.84 of RMR. In addition to the agreed upon adjustments, Security Networks has presented four (4) categories of adjustments to the "Purchase Price". These items, which are disputed by Alarm One, are as follows:

1.  Security Networks has identified $3,720.03 of additional RMR relating to customers who contacted them to cancel that were pending cancel at close as of the current date. According to the Asset Purchase Agreement, Performing RMR does not include RMR from customers from whom the Seller has received notice of pending termination. In order to determine those accounts which should have been classified as pending cancel at the time of Close, we have reviewed the customer call notes history from Alarm One's billing system via remote access for those accounts identified by Security Networks in Index 1 of *SN to A1 RMR Adj – Benchmark Jan 2007*. In order for an account to be classified as pending cancel, it had to be indicated before the Closing Date in the call note history that the customer wished to terminate service. Without the corroborating customer call note history indicating intent to cancel, we did not classify an account as pending

cancel. Taking these factors into account, we determined that $3,130.05 of RMR should have been classified as pending cancel at the time of Close.

2. Security Networks has identified $5,674.90 of additional RMR relating to accounts where it has not received a single payment from the customer from their first invoice to the customer dated March 1st, 2006. The Asset Purchase Agreement defines "Performing RMR" as the amount of recurring monthly revenue derived solely from enforceable written Customer Contracts for which the customer is not more than 60 days in arrears on any payment due under such agreement; or the Seller has received no later than 30 days before the Closing Date at least one (1) full monthly payment of RMR provided the customer is not more than 90 days in arrears on any payment due under such agreement. The APA does not specify a deduction for RMR relating to accounts that fail to make a single payment after the Closing Date. However, based upon industry experience and standard industry practices, not all customers contact the Company to cancel their service; rather they simply stop paying their monitoring bills. These accounts would be better classified as pending cancel at the time of Close. Using the payment history files *Nbr 3 – Customer Sedona History – Raw Data – BPP Final.xls* and *SecNet – RMR – Collections.xls*, we identified those accounts that did not make a single payment on recurring invoices to Alarm One or Security Networks after the Closing Date. Taking these factors into account, we determined that $3,612.05 of RMR should have been classified as pending cancel at the time of Close due to the customers' lack of making a single payment on recurring invoices after the Closing Date.

3. Security Networks has identified what it believes to be an Equipment Lease Fee embedded in the Gross RMR. Due to the impracticality of reviewing all customer contracts, Security Networks reviewed a sample of contracts and extrapolated the results. Using this analysis, Security Networks determined that 4.67% of the Gross RMR or $9,118.75 should be adjusted per the above summary. Using the contract examples provided and the files *Security Networks Accounts By Contract Version Date Summary 03-26-07.xls* and *Security Networks Contract Versions Defined 03-26-07.xls*, we have determined that there is the possibility of lease RMR embedded within the Gross RMR. After reviewing the contract terms and definitions, we have determined that customer contracts executed prior to March 1st, 2001, contain the option for lease equipment RMR. For those contracts executed after March 1st, 2001, the contracts clearly specify an additional equipment monitoring and/or service fee and do not included any reference to an equipment lease fee. In an attempt to quantify the amount of lease RMR embedded in the Gross RMR relating to those contracts executed prior to March 1st, 2001, we used the analysis provided by Security Networks which concluded that 4.67% of the Gross RMR should have been classified as lease RMR. It should be noted that the analysis conducted by Security Network does not take into account the contract version or the customer start date and assumes all contracts contain the option for leased equipment RMR. After taking into account the contract version and customer start date, we have determined that 2,342 of the

6,070 customer contracts or 38.6% of the total customer contracts contain the option for lease equipment RMR. After applying the 38.6% to the Security Network calculation, we have determined that $3,519.84 of RMR should have been classified as leased RMR at the time of Close and should have been deducted in order to arrive at the Performing RMR.

4.  Security Networks has identified $1,926.87 of additional RMR relating to accounts which have prepaid Alarm One and cancelled with Security Networks indicating end of term. Taking into account industry experience and industry practices regarding customers' prepaying their monitoring service, we attempted to identify those customers that prepaid their monitoring contract after the start of their initial service period. Industry experience has shown that customers who prepay their monitoring service at the start of their initial term have the intention of continuing their monitoring service after this initial term but don't want to receive monthly or quarterly invoices. Likewise, industry experience has shown that customers who payoff the remaining balance on their monitoring contract after the start of their initial term are likely paying their Balance of Contract and have no intention of renewing their monitoring service. We have reviewed the customer call notes for indications of cancellation requests prior to Closing and payment history to identify Balance of Contract payments for those accounts identified by Security Networks in Index 5 of *SN to A1 RMR Adj – Benchmark Jan 2007.* We completed this review using access to Alarm One's billing system via remote access and the file *SecNet – RMR – Collections.xls.* Taking these factors into account, we determined that $944.92 of RMR should have been classified as pending cancel at the time of Close.

### III.   Arbiter's Calculation of Performing RMR

Using the procedures described above we have recalculated the Performing RMR and RMR adjustment as of the Closing Date to be as follows:

| Performing RMR as of the Closing Date | | |
|---|---|---|
| | RMR | Amount |
| Purchased RMR as of December 23, 2005 | $ 230,000.00 | $ 7,130,000 |
| Less: | | |
| Agreed Upon Adjustments | (25,342.84) | (785,628) |
| Customer notified A1 of Pending Termination | (3,130.05) | (97,032) |
| Non-Payment - Pending Cancels | (3,612.05) | (111,974) |
| Lease RMR | (3,519.84) | (109,115) |
| Prepaid (BOC) - Pending Cancels | (944.92) | (29,293) |
| Total Adjustments | (36,549.70) | (1,133,042) |
| | | |
| Performing RMR as of December 23, 2005 | $ 193,450.30 | $ 5,996,958 |

| SN Number | A1 Number | Status | RMR | BPP Comments |
|---|---|---|---|---|
| 720785 | 107900 | Canceled | $29.16 | 11/1/05 Cxl Req |
| 721172 | 110684 | Canceled | $29.99 | 10/12/05 Cxl Req |
| 721298 | 111508 | Canceled | $23.99 | 10/18/05 Cxl Req |
| 721925 | 117946 | Canceled | $47.17 | 1/27/05 Cxl Req |
| 722125 | 121358 | Canceled | $45.17 | 1/21/04 Cxl Req |
| 723672 | 15878 | Canceled | $38.72 | 3/8/03 Cxl Req |
| 724224 | 23401 | Canceled | $19.99 | 5/5/03 Cxl Req. |
| 724251 | 23778 | Canceled | $35.00 | 2/16/05 Cxl Req |
| 725362 | 887326 | Canceled | $39.39 | 2/16/05 Cxl Req |
| 721258 | 111185 | Canceled | $29.16 | 11/1/05 Cxl Req |
| 721090 | 109970 | Canceled | $19.99 | 7/13/05 Cxl Req |
| 721980 | 118826 | Canceled | $28.99 | 3/15/04 Cxl Req |
| 722062 | 120304 | Canceled | $27.17 | 6/18/04 Cxl Req |
| 722263 | 123103 | Canceled | $37.67 | 4/13/04 Cxl Req |
| 723973 | 19748 | Canceled | $42.99 | 10/3/05 Cxl Req |
| 724899 | 5239 | Canceled | $29.49 | 7/11/05 Cxl Req |
| 722259 | 123084 | Canceled | $43.67 | 10/27/04 Cxl Req |
| 724472 | 28048 | Canceled | $35.04 | 3/25/05 Cxl Req |
| 724638 | 29625 | Canceled | $38.72 | 10/5/03 Cxl Req |
| 720846 | 108288 | Canceled | $36.67 | 11/28/05 Cxl Req |
| 720931 | 108850 | Active | $11.98 | 3/4/05 Cxl Req |
| 722164 | 12194 | Active | $32.17 | 1/7/2005 Cxl Req |
| 722287 | 123368 | Active | $47.17 | 5/27/05 Cxl Req |
| 722352 | 124212 | Canceled | $43.49 | 8/11/04 Cxl Req |
| 722541 | 126653 | Active | $43.49 | 11/19/04 Cxl Req |
| 722732 | 129609 | Active | $43.49 | 7/2/05 Cxl Req |
| 725739 | 97443 | Active | $44.99 | 2/3/05 Cxl Req |
| | | | $944.92 | |

| SN # | A1 # | RMR | Receipts | Receipts | Payment After Closing Date | | |
|------|------|-----|----------|----------|----------------------------|---|---|
| 724190 | 22965 | $37.03 | $92.06 | ($92.06) | N | Credits | |
| 721485 | 112985 | $32.17 | $50.17 | ($82.34) | N | Credits | |
| 721580 | 113724 | $29.99 | | | N | | |
| 723581 | 14907 | $38.72 | | | N | | |
| 725937 | 99283 | $65.17 | | | N | | |
| 720471 | 105128 | $29.16 | | | N | | |
| 722242 | 122892 | $47.17 | | | N | | |
| 725412 | 895114 | $40.04 | | | N | | |
| 722367 | 12438 | $36.54 | | | N | | |
| 724164 | 22478 | $37.03 | | | N | | |
| 724343 | 25760 | $23.49 | | | N | | |
| 725580 | 95891 | $55.16 | | | N | | |
| 721257 | 111181 | $33.49 | | | N | | |
| 724956 | 56437 | $31.54 | | | N | | |
| 721068 | 109809 | $29.16 | | | N | | |
| 724899 | 5239 | $29.49 | | | N | | |
| 725223 | 8284 | $38.72 | | | N | | |
| 721093 | 10999 | $32.17 | | | N | | |
| 722175 | 12210 | $38.72 | | | N | | |
| 723085 | 13385 | $37.03 | | | N | | |
| 723096 | 13399 | $35.04 | | | N | | |
| 723318 | 13685 | $40.71 | | | N | | |
| 723508 | 14311 | $35.04 | | | N | | |
| 723530 | 14569 | $24.99 | | | N | | |
| 723603 | 15188 | $37.21 | | | N | | |
| 723747 | 16805 | $26.54 | | | N | | |
| 723801 | 17702 | $38.49 | | | N | | |
| 723811 | 17776 | $38.72 | | | N | | |
| 723866 | 18410 | $38.72 | | | N | | |
| 723998 | 20228 | $38.72 | | | N | | |
| 724011 | 20457 | $38.72 | | | N | | |
| 724085 | 21299 | $38.72 | | | N | | |
| 724136 | 22031 | $32.17 | | | N | | |
| 724173 | 22561 | $43.17 | | | N | | |
| 724187 | 22952 | $40.71 | | | N | | |
| 724259 | 23965 | $32.17 | | | N | | |
| 724699 | 30272 | $39.16 | | | N | | |
| 725049 | 61440 | $40.71 | | | N | | |
| 725429 | 90342 | $59.17 | | | N | | |
| 725554 | 94796 | $45.16 | | | N | | |
| 725909 | 98997 | $49.16 | | | N | | |
| 725929 | 99217 | $39.67 | | | N | | |
| 725938 | 99290 | $45.48 | | | N | | |
| 720072 | 100817 | $45.16 | | | N | | |
| 720083 | 100917 | $45.16 | | | N | | |
| 720107 | 101119 | $35.98 | | | N | | |
| 720213 | 102386 | $55.17 | | | N | | |
| 720350 | 104019 | $43.16 | | | N | | |
| 720417 | 104663 | $25.48 | | | N | | |
| 720578 | 105925 | $29.16 | | | N | | |

Cust cxl non pay made no pmts

| SN-# | A1 # | RMR | Receipts | Receipts | Payment After Closing Date |
|---|---|---|---|---|---|
| 720663 | 106748 | $24.99 | | | N |
| 720720 | 107360 | $39.16 | | | N |
| 720725 | 107393 | $27.17 | | | N |
| 720758 | 107641 | $19.99 | | | N |
| 720810 | 108054 | $30.17 | | | N |
| 720869 | 108465 | $23.98 | | | N |
| 721028 | 109504 | $35.17 | | | N |
| 721062 | 109773 | $29.16 | | | N |
| 721104 | 110110 | $47.16 | | | N |
| 721260 | 111189 | $32.66 | | | N |
| 721273 | 111304 | $37.16 | | | N |
| 721352 | 111919 | $35.66 | | | N |
| 721398 | 112271 | $39.16 | | | N |
| 721405 | 112337 | $35.48 | | | N |
| 721423 | 112439 | $39.16 | | | N |
| 721579 | 113722 | $38.49 | | | N |
| 721765 | 115827 | $23.49 | | | N |
| 721785 | 116044 | $27.17 | | | N |
| 721839 | 116557 | $37.17 | | | N |
| 721866 | 116961 | $53.17 | | | N |
| 721894 | 117498 | $37.17 | | | N |
| 721968 | 118613 | $57.17 | | | N |
| 721980 | 118826 | $28.99 | | | N |
| 722042 | 119970 | $33.17 | | | N. |
| 722062 | 120304 | $27.17 | | | N |
| 722089 | 120937 | $47.17 | | | N |
| 722115 | 121220 | $37.17 | | | N |
| 722145 | 121654 | $47.17 | | | N |
| 722263 | 123103 | $37.67 | | | N |
| 722334 | 124007 | $43.49 | | | N |
| 722375 | 124451 | $43.67 | | | N |
| 722437 | 125268 | $47.17 | | | N |
| 722631 | 127891 | $47.48 | | | N |
| 722706 | 129236 | $43.49 | | | N |
| 722780 | 130323 | $43.49 | | | N |
| 722791 | 130424 | $43.49 | | | N |
| 722875 | 131281 | $53.49 | | | N |
| 722953 | 132110 | $39.99 | | | N |
| 723001 | 132728 | $43.49 | | | N |
| 723178 | 134886 | $33.49 | | | N |
| 723265 | 135810 | $48.49 | | | N |
| 723310 | 136659 | $33.49 | | | N |
| 723328 | 137004 | $43.49 | | | N |
| 723396 | 139150 | $23.67 | | | N |
| 723498 | 142374 | $31.99 | | | N |
| | | $3,612.05 | | | |

Cust cxl non pay made no pmts

Already Req'd Cancel of A1

| Date | Customer Name | RMR | Customer Claims Requested Cancellation with A1 Prior to December 23, 2005 | A1 Again Confirmed with List | A1 confirmed over phone/email | Cancellation Date | BPP Comments |
|---|---|---|---|---|---|---|---|
| 3/27/2006 | Challa, Robert | $28.99 | X | | | 4/6/2006 | 12/21/05 Cxl Req. |
| 6/14/2006 | Clark, Charles | $43.99 | X | | | 5/22/2006 | 4/11/05 Cxl Req. |
| 6/14/2006 | Cortez, Gonzalo | $82.99 | X | | | 6/19/2006 | 12/9/05 Cxl Req. |
| 6/29/2006 | Luckrigsen, Jocelyn | $35.04 | X | | | 6/29/2006 | 6/4/05 Cxl Req. |
| 6/29/2006 | M.Y.P. Wireless | $28.49 | X | | | 10/31/2005 | 1/18/06 Cxl Req. |
| 4/11/2006 | Moran, Christopher | $43.49 | X | | | 4/27/2006 | 1/14/06 Cxl Req. |
| 3/10/2006 | Arellano, Daniel | $43.17 | X | | | 4/10/2006 | 9/14/05 Cxl Req. |
| 3/10/2006 | Abraham, Bassel | $40.17 | X | | | 4/10/2006 | 1/11/06 Cxl Req. |
| 6/8/2006 | Anderson, Luis | $29.49 | X | | X | 8/7/2006 | 1/22/06 Cxl Req. |
| 5/7/2005 | Anderson, Terri | $27.17 | X | | | 4/13/2006 | 11/22/05 Cxl Req. |
| 4/26/2006 | Antoinette, Derrick | $35.04 | X | | | 11/28/2005 | 9/24/05 Cxl Req. |
| 8/7/2005 | Arabome, Adenike | $27.17 | X | | | | 12/28/05 Cxl Req. |
| 11/28/2005 | Benson, Kenneth | $23.99 | X | | | | 3/7/05 Cxl Req. |
| 11/28/2005 | Chhetra, Camila | $35.17 | X | | | 4/6/2006 | 4/1/05 Cxl Req. |
| 4/26/2006 | De La Rosa, Javier | $46.04 | X | X | | 4/6/2006 | 5/3/05 Cxl Req. |
| 4/4/2006 | Denopol, Mike | $33.17 | X | X | | 3/8/2006 | 2/7/05 Cxl Req. |
| 5/16/2006 | Delamora, Mike | $38.72 | X | | | 3/30/2006 | 10/10/05 Cxl Req. |
| 3/30/2006 | Delamora, Jorge | $28.49 | X | X | | 7/21/2006 | 1/31/06 Cxl Req. |
| 3/10/2006 | Elizarraga, Maria | $34.88 | X | | X | 6/13/2006 | 11/14/05 Cxl Req. |
| 8/18/2006 | Evans, Shirley | $31.66 | X | | | 6/25/2006 | 6/25/06 Cxl Req. |
| 8/16/2006 | Raza, Jennifer | $33.17 | X | | | 8/23/2006 | 8/23/06 Cxl Req. |
| 6/19/2006 | Flores, Omar | $47.17 | X | | | | 10/29/04 Cxl Req. |
| 8/23/2006 | Flores, Jonathan | $33.49 | X | | | | 4/28/06 Cxl Req. |
| 8/23/2006 | Fogel, Micah | $43.49 | X | | | 3/30/2006 | 5/26/05 Cxl Req. |
| 6/24/2006 | Friedman, Howard | $38.16 | X | | X | 5/22/2006 | 6/20/06 Cxl Req. |
| 6/24/2006 | Franks, Patricia | $38.67 | X | X | | | 11/21/04 Cxl Req. |
| 6/24/2006 | G.A. Gunn & Associates | $45.16 | X | | | 6/24/2006 | 1/21/06 Cxl Req. |
| 3/2/2006 | Garcia, Julio | $53.17 | X | | X | 6/22/2006 | 4/5/04 BOG Req. |
| 6/22/2006 | Gnatov, Elizabeth | $38.72 | X | | | 4/11/2006 | 2/1/06 Cxl Req. |
| 6/22/2006 | Gonzalez, Miguel | $41.17 | X | | | | 3/2/05 Cxl Req. |
| 6/22/2006 | Halverick, Brad | $43.49 | X | | | | 2/7/05 Cxl Req. |
| 4/24/2006 | Hanatl, David | $53.49 | X | | X | | 2/6/06 Cxl Req. |
| 4/24/2006 | Hashimeson, Haytham | $27.17 | X | | X | | 5/25/05 Cxl Req. |
| 4/24/2006 | Haynes, Willis | $35.99 | X | | | 4/11/2006 | 4/12/05 Cxl Req. |
| 6/13/2006 | Hernandez, Arturo | $54.17 | X | | | 5/16/2006 | 3/25/06 Cxl Req. |
| 5/16/2006 | Hernandez, Leonardo | $29.99 | X | | | 6/16/2006 | 6/16/06 Cxl Req. |
| 4/27/2006 | Hilliard, Janet | $40.17 | X | X | | 3/30/2007 | 12/8/06 Cxl Req. |
| 4/27/2006 | Hilliard, Janet | $26.16 | X | | | 4/1/2006 | 1/4/06 Cxl Req. |
| 4/4/2006 | Howard, Frankie | $45.98 | X | | | 10/31/2005 | 4/4/05 Cxl Req. |
| 12/29/2005 | Doren, John | $26.67 | X | | | | 8/27/05 Cxl Req. |
| 12/29/2005 | Jeffries, Wallas | $47.17 | X | | | 4/6/2006 | 7/25/05 Cxl Req. |
| 12/29/2005 | Jenkins, Jared | $36.99 | X | | | | 12/30/04 EOT Req. |
| 4/5/2006 | Jordan, Rachel | $40.54 | X | | | | 2/7/05 Cxl Req. |
| 4/5/2006 | Kamel, Veronica | $40.22 | X | | X | 8/31/2006 | 1/22/06 Cxl Req. |
| 8/18/2006 | Kaszubski, Bogdan | $37.49 | X | | X | 3/30/2006 | 11/23/05 Cxl Req. |
| 12/29/2005 | Kelly, Robert | $36.99 | X | | | 4/28/2006 | 11/28/05 Cxl Req. |
| 8/9/2006 | Kemp, Thomas | $38.16 | X | | | 4/28/2006 | 10/4/04 Cxl Req. |
| 6/6/2006 | Kiphart, Timothy | $35.99 | X | | | 4/4/2006 | 6/6/05 Cxl Req. |
| 6/8/2006 | Kostka, Laura | $43.87 | X | | X | 12/28/2005 | 1/5/06 Cxl Req. |
| 6/8/2006 | Mcin, Robert | $29.99 | X | | | | 12/14/05 Cxl Req. |
| 5/31/2005 | Mcin, Kimberly | $29.49 | X | | X | 5/8/2006 | 10/20/05 Cxl Req. |
| 3/1/2006 | Mikula, Jonathon | $35.16 | X | | | | 6/11/05 Cxl Req. |
| 3/8/2006 | Mikula, Jonathon | $26.67 | X | | | | 4/24/2006 |
| 3/8/2006 | Mohler, Matthew | $24.99 | X | X | X | 9/14/2006 | 9/22/05 Cxl Req. |
| 12/28/2005 | Morea, Willis | $24.99 | X | | X | 4/24/2006 | 7/19/05 Cxl Req. |
| 6/15/2006 | Morea, Paul | $23.67 | X | | X | 5/16/2006 | 9/22/05 Cxl Req. |

Already/Reqst Cancel of A1

| Date | Customer Name | RMR | Customer Claims Requested Cancellation with A1 Prior to December 23, 2006 | A1 Confirmed Again with List | A1 confirmed over phone/email | Cancellation Date | BPP Comments |
|---|---|---|---|---|---|---|---|
| 12/23/2006 | Murphy, Anthony | $38.15 | X | | | 9/22/2008 | 12/21/06 Cxl Req. |
| 6/22/2006 | Perez, Rosalee | $27.17 | X | | X | 6/1/2006 | 12/21/06 Cxl Req. |
| 6/13/2006 | Petit, Joyce | $42.17 | X | | X | 6/13/2006 | 10/7/05 Cxl Req. |
| 8/30/2006 | Rose, Harold | $37.71 | X | | X | 8/31/2008 | 8/31/2008 Cxl Req. |
| 8/26/2006 | Richter, Thomas | $38.99 | X | | | 8/30/2008 | 12/21/04 Cxl Req. |
| 12/21/2005 | Rodriguez, Maria | $25.99 | X | X | | | 12/21/05 Cxl Req. |
| 4/27/2006 | Semple, Johnnie | $43.16 | X | | | 8/31/2005 | 8/23/05 Cxl Req. |
| 6/16/2006 | Shepard, Rhonda | $37.17 | X | | | 8/1/2006 | 3/9/06 Cxl Req. |
| 6/26/2006 | Smith, Robert | $38.59 | X | | | 6/26/2008 | 12/30/05 Cxl Req. |
| 6/11/2006 | Sockwell, Lori | $40.71 | X | | X | 6/26/2006 | 3/28/04 Cxl Req. |
| 12/28/2006 | Soderberth, Jerry | $33.49 | X | | | 5/31/2008 | 8/1/2004 Cxl Req. |
| 6/1/2006 | Solognecho, Donna | $38.99 | X | | | 6/13/2008 | 8/1/2004 Cxl Req. |
| 1/12/2006 | Tirado, Glenda | $70.27 | X | | | 5/24/2006 | 11/2/03 NO Req. |
| 9/26/2006 | Taylor, Byron | $38.16 | X | | | 9/26/2006 | 4/6/05 Cxl Req. |
| 6/13/2006 | Trichy Employment | $35.89 | X | | X | 6/13/2006 | 3/6/04 Acct Term. |
| 4/24/2006 | Williams, Jose | $25.48 | X | | | 3/31/2005 | 3/31/05 Cxl Req. |
| 5/2/2006 | Wilampa, Donald | $28.99 | X | | X | 12/20/04 | 12/20/04 Cxl Req. |
| 4/28/2006 | Watson, Dennis | $42.21 | X | | X | 4/28/2006 | 5/2/04 Cxl Req. |
| 3/31/2006 | Watson, Harold | $31.54 | X | | X | 4/27/2006 | 12/1/05 Cxl Req. |
| 4/19/2006 | Welmaster, Charles | $38.16 | X | | | | 10/14/05 Cxl Req. |
| 4/5/2006 | Whitcomb, Winfred | $52.16 | X | | X | 6/6/2006 | 7/16/04 Cxl Req. |
| 4/21/2006 | Young, Wanda | $38.99 | X | | X | 4/27/2006 | 9/23/04 Cxl Req. |
| | | $3,130.25 | | | | | |

# EXHIBIT D



**Benchmark**
PERFORMANCE PARTNERS, LLC

705 Boston Post Road, Suite 4, Guilford, CT 06437
Tel: 203.453.0438  |  Fax: 203.453.0426

April 27, 2007

Invoice No:       3650

**Mr. Edward Naughton, Esq.**
Holland & Knight
10 St. James Avenue
11th Floor
Boston, MA 02116

**Mr. David Wilkes, Esq.**
Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, DE 19801

**Professional Services:**                                             $       19,500.00
Alarm One, Inc. v. Security Networks, LLC
Independent Arbiter

                            **Total Professional Fees:**    **$       19,500.00**

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

SECURITY NETWORKS, LLC,          )
                                      )
                   Plaintiff,      )
     v.                        )      C.A. No. 07-371 ***
                                        )
ALARM ONE, INC. and PETER MALTBY   )
                                      )
                   Defendants.    )

## <u>ORDER</u>

Having considered the Motion of Security Networks, LLC's to Remand Action Pursuant to 28 U.S.C. § 1447(c) (the "Motion"), and any opposition thereto, and it appearing to the Court that plaintiff Security Networks, LLC is entitled to the relief sought in its Motion, the Motion is hereby GRANTED and it is ORDERED that the above-captioned action be remanded to the Court of Chancery of the State of Delaware.  Plaintiff is awarded the costs, expenses and attorneys' fees it incurred as a result of the removal.  The Court retains jurisdiction to fix the amount of costs, expenses and attorneys' fees to be awarded.

This ___ day of _____, 2007.

_____
      J.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SECURITY NETWORKS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 07-371 *** |
| | ) | |
| ALARM ONE, INC. and PETER MALTBY | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 29, 2007, a copy of the foregoing **Motion
to Remand** was served in the manners indicated on the following counsel of record:

| **E-mail and Hand-Delivery**<br>Francis A. Monaco, Jr., Esquire<br>Kevin J. Mangan, Esquire<br>Monzack & Monaco, PA<br>1201 N. Orange Street, Suite 400<br>Wilmington, DE 19801<br>fmonaco@monlaw.com<br>kmangan@monlaw.com | **E-mail**<br>Jerome Romero, Esquire<br>Troy J. Aramburu<br>Jones, Waldo, Holbrook & McDonough, P.C.<br>170 South Main Street, Suite 1500<br>Salt Lake City, UT 84101<br>jromero@joneswaldo.com<br>taramburu@joneswaldo.com |
|---|---|
| **E-mail and Hand-Delivery**<br>Michael R. Lastowski, Esquire<br>Duane Morris, LLP<br>1100 North Market St., Suite 12000<br>Wilmington, DE 19801<br>mlastowski@duanemorris.com | **E-mail**<br>Edward J. Naughton, Esquire<br>Geraldine Aine, Esquire<br>Holland & Knight, LLP<br>10 St. James Avenue<br>Boston, MA 02116<br>edward.naughton@hklaw.com<br>geraldine.aine@hklaw.com |

David E. Wilks (Del. I.D. No. 2793)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, Delaware 19801-1163
(302) 778-7500
dwilks@reedsmith.com