# EXHIBIT A

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

ALARM ONE, INC.

AND

SECURITY NETWORKS, LLC

# TABLE OF CONTENTS

1.  PURCHASE AND SALE OF ASSETS ................................................ - 1 -
    1.1   Assets to be Acquired. ................................................ - 1 -
    1.2   Excluded Assets. ...................................................... - 2 -
    1.3   Assumed Liabilities. .................................................. - 2 -
    1.4   Excluded Liabilities. ................................................. - 2 -

2.  PURCHASE PRICE AND CLOSING ............................................... - 3 -
    2.1   Purchase Price. ....................................................... - 3 -
    2.2   Definitions. .......................................................... - 4 -
    2.3   Allocation of Purchase Price. ......................................... - 5 -
    2.4   Closing Date and Location. ............................................ - 5 -
    2.5   Noncompetition Agreement. ............................................. - 5 -
    2.6   Transition Services. .................................................. - 5 -

3.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER ............... - 5 -
    3.1   Organization of Seller. ............................................... - 6 -
    3.2   Authority of Seller. .................................................. - 6 -
    3.3   Office Locations. ..................................................... - 6 -
    3.4   Title to Property. .................................................... - 7 -
    3.5   Compliance With Laws; Litigation. ..................................... - 7 -
    3.6   Condition of Assets. .................................................. - 7 -
    3.7   Adverse Developments. ................................................. - 8 -
    3.8   Tax Returns and Payments. ............................................. - 8 -
    3.9   Agreements With Employees. ............................................ - 8 -
    3.10  Intellectual Property Rights. ......................................... - 9 -
    3.11  Customer Contracts and Business Documents. ............................ - 9 -
    3.12  Customer and System Information. ...................................... - 10 -
    3.13  Broker or Finder. ..................................................... - 12 -
    3.14  Labor Relations. ...................................................... - 12 -
    3.15  Bulk Sales Compliance and Transfer Taxes. ............................. - 12 -
    3.16  Burdensome Agreements. ................................................ - 12 -
    3.17  Options, Warrants and Rights of First Refusal. ........................ - 12 -
    3.18  Environmental Matters. ................................................ - 13 -
    3.19  Disclosure. ........................................................... - 13 -

4.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER ............... - 13 -
    4.1   Authority of Buyer. ................................................... - 13 -
    4.2   Broker or Finder. ..................................................... - 14 -
    4.3   Litigation. ........................................................... - 14 -

5.  CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER ...................... - 14 -
    5.1   Covenants and Warranties. ............................................. - 14 -
    5.2   Corporate Action. ..................................................... - 14 -

|      |      |                                                        |        |
|------|------|--------------------------------------------------------|--------|
|      | 5.3  | No Restraint or Litigation.                            | - 14 - |
|      | 5.4  | Necessary Consents and Permits.                        | - 14 - |
|      | 5.5  | Documents, Certificates and Other Items.               | - 15 - |
|      | 5.6  | Satisfaction of Debts.                                 | - 15 - |
|      | 5.7  | Accounts Receivable.                                   | - 15 - |
|      | 5.8  | Use of Name.                                           | - 15 - |
|      | 5.9  | Employees.                                             | - 16 - |
| 6.   | **CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER**      |        | - 16 - |
|      | 6.1  | Covenants and Warranties.                              | - 16 - |
|      | 6.2  | Delivery of Purchase Price.                            | - 16 - |
|      | 6.3  | Documents, Certificates and Other Items.               | - 16 - |
|      | 6.4  | No Restraint or Litigation.                            | - 16 - |
| 7.   | **INDEMNIFICATION**                                    |        | - 17 - |
|      | 7.1  | Indemnification by Seller and Buyer.                   | - 17 - |
|      | 7.2  | Notice of Claims.                                      | - 18 - |
|      | 7.3  | Survival of Indemnity Obligations.                     | - 18 - |
|      | 7.4  | Indemnity Basket and Cap.                              | - 18 - |
|      | 7.5  | Offset for Insurance.                                  | - 19 - |
|      | 7.6  | Sole and Exclusive Remedy.                             | - 19 - |
| 8.   | **GENERAL PROVISIONS**                                 |        | - 19 - |
|      | 8.1  | Survival of Obligations.                               | - 19 - |
|      | 8.2  | Transfer Charges and Taxes.                            | - 19 - |
|      | 8.3  | Arbitration.                                           | - 19 - |
|      | 8.4  | Confidentiality.                                       | - 20 - |
|      | 8.5  | Public Announcements.                                  | - 20 - |
|      | 8.6  | Governing Law.                                         | - 20 - |
|      | 8.7  | Notices.                                               | - 21 - |
|      | 8.8  | Assignment.                                            | - 21 - |
|      | 8.9  | Entire Agreement; Amendments.                          | - 21 - |
|      | 8.10 | Interpretation.                                        | - 22 - |
|      | 8.11 | Waivers.                                               | - 22 - |
|      | 8.12 | Expenses.                                              | - 22 - |
|      | 8.13 | Partial Invalidity.                                    | - 23 - |
|      | 8.14 | Further Assurances.                                    | - 23 - |
|      | 8.15 | Counterparts.                                          | - 23 - |
|      | 8.16 | Third-Party Beneficiaries.                             | - 23 - |

## INDEX OF DEFINED TERMS

AAA                                Section 8.3
Agreement                          Caption
Assets to be Acquired              Section 1.1
Best Knowledge                     Section 8.10
Business Documents                 Section 1.1(b)(ii)
Buyer                              Caption
Buyer's Aggregate Net Loss         Section 7.1(a)
Chicago Employees                  Section 3.9(c)
Claiming Party                     Section 7.2
Closing                            Section 2.4
Closing Date                       Section 2.4
Closing Payment                    Section 2.1(d)
Customer Contracts                 Section 1.1(b)(i)
Estimated Purchase Price           Section 2.1(d)
Excluded Claims                    Section 7.3
Final Purchase Price               Section 2.1(d)
Grace Period                       Section 2.1(d)
Hazardous Materials                Section 1.4(f)
Including                          Section 8.10
Indemnifying Party                 Section 7.2
Independent Arbiter                Section 2.1(d)
Noncompetition Agreement           Section 2.5
Occurrence basis                   Section 3.6
Performing RMR                     Section 2.2(a)
Purchase Price                     Section 2.1(a)
Security Business                  Background
Seller                             Caption
Seller's Aggregate Net Loss        Section 7.1(b)
Tangible Assets                    Section 1.1(a)
Transition Agreement               Section 2.6
Unearned Revenue                   Section 2.2(b)

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of this 23rd day of December, 2005, by and between ALARM ONE, INC., an Illinois corporation ("Seller"), and SECURITY NETWORKS, LLC, a Florida limited liability company ("Buyer").

## BACKGROUND

WHEREAS, Seller owns and operates a security alarm business serving the area in and around Chicago, Illinois (the "Security Business"); and

WHEREAS, Seller desires to sell, and Buyer desires to purchase, certain of the assets of Seller used in the operation of the Security Business, all on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound, the parties agree as follows:

1.    <u>PURCHASE AND SALE OF ASSETS</u>

1.1    <u>Assets to be Acquired</u>.

Upon the terms and subject to the conditions of this Agreement, Seller will, on the Closing Date, sell, transfer, assign and deliver to Buyer all of Seller's right, title, interest and benefit in and to certain assets of Seller used in the operation of the Security Business (collectively, the "Assets to be Acquired"). The Assets to be Acquired include all of the following:

(a)    All of Seller's rights in all of the tangible personal property of Seller located at the real property described on <u>Schedule 3.3</u>, including tools, office equipment, furnishings, inventory (including all inventory on vehicles used in the Security Business), other tangible personal property of any nature, and Seller's rights in fixtures attached to the real property leased to Seller and used by Seller in the Security Business, all of which are set forth in <u>Schedule 1.1(a)</u> (collectively, the "Tangible Assets").

(b)    (i)    All of Seller's rights in, to and under all alarm lease, maintenance, repair, service and monitoring agreements with customers (collectively, the "Customer Contracts").

(ii)    All of Seller's rights in, to and under all leases of equipment that are related to and used by Seller in the Security Business, telephone book listing agreements,

noncompetition, nonsolicitation and nondisclosure agreements with third parties, and all other agreements, licenses (including any licenses held personally), permits (including permits relating to installations which are pending, currently in progress or completed) and manufacturer's warranties on tangible property that are related exclusively to Seller's conduct of the Security Business (collectively, the "Business Documents").

(iii)    All of the Customer Contracts and Business Documents are set forth in Schedule 1.1(b).

(c)    All of Seller's rights in, to and under the following assets, intangibles and rights that are related to, and presently owned by Seller or used in, the Security Business: (i) refundable deposits from customers, prepaid service charges and prepaid income items; (ii) operating and accounting data; (iii) customer lists and files (including any lists and files of former customers); (vi) rights to receiver and fax line telephone numbers (including WATS lines and numbers); and (v) goodwill.

1.2    Excluded Assets.

Seller is not selling or transferring to Buyer any assets other than those described in Section 1.1.

1.3    Assumed Liabilities.

Buyer agrees to assume all liability for the performance of all obligations arising after the Closing Date with respect to the Customer Contracts and Business Documents assigned to Buyer by Seller.

1.4    Excluded Liabilities.

Except for the liabilities that Buyer will assume pursuant to Section 1.3, Buyer will not assume or be obligated for any other liability, obligation or commitment of Seller, direct or indirect, known or unknown, absolute or contingent, including any of the following:

(a)    any foreign, federal, state, county or local income or other tax arising from the operation of the Security Business or the ownership of the Assets to be Acquired on or prior to the Closing Date;

(b)    any liability, obligation or commitment of Seller to its creditors, whether arising out of contract or tort, or to any party holding a lien on any of Seller's assets;

(c)    any employee obligation, including any obligation for wages, commissions, vacation and holiday pay, sick pay, bonuses, severance pay, pensions, or any obligation under any collective bargaining agreement, employment agreement or employment-at-will relationship, or any obligation to hire any employee of Seller after the Closing Date;

(d)    any liability, obligation or commitment incurred by Seller after the Closing Date;

- 2 -

(e)     any liability, the existence of which would constitute a breach of any of the representations, warranties or covenants of Seller in this Agreement;

(f)     any liability arising because Hazardous Materials are present on the real or personal property leased or otherwise used by Seller and being transferred pursuant to this Agreement, or any liability for the use, handling, generation or disposal of Hazardous Materials by Seller, any of Seller's affiliates, any previous owner of the Assets to be Acquired or any third party on any property owned, operated, leased or otherwise used by Seller or its affiliates. The term "Hazardous Materials" includes hazardous waste, hazardous substances, toxic substances and all related materials, including all materials and substances regulated by The Comprehensive Environmental Response, Compensation and Liability Act of 1980, The Resource Conservation and Recovery Act of 1976, The Superfund Amendments and Reauthorization Act of 1986, The Clean Water Act, The Clean Air Act, The Toxic Substance Control Act, all as amended from time to time, and/or any other applicable federal, state or local environmental law, statute, rule, regulation or ordinance; or

(g)     any other liability, obligation or commitment not expressly assumed by Buyer pursuant to this Agreement.

## 2.     PURCHASE PRICE AND CLOSING

2.1     Purchase Price.

(a)     The purchase price for the Assets to be Acquired (the "Purchase Price") will equal a multiple of 31 times the Performing RMR on the Closing Date, less the amount of the Unearned Revenue.

(b)     100% of the Closing Payment will be paid to Seller on the Closing Date by federal funds wire transfer or other form of immediately available funds.

(c)     The Purchase Price will be adjusted to reflect, in accordance with generally accepted accounting principles, the principle that all income and expenses of the Security Business attributable to the period after the Closing Date are for the account of Buyer and all income and expenses attributable to the period on or before the Closing Date are for the account of Seller.

(d)     Buyer and Seller have agreed that the amount to be paid to Seller at Closing will be $7,130,000 (the "Closing Payment"). The parties acknowledge that this amount does not include the Unearned Revenue adjustment to which Buyer is entitled. Within 30 days after Closing, Buyer will deliver to Seller an estimate of the Purchase Price as of the Closing Date, as adjusted in accordance with Sections 2.1(a) and 2.1(c) (the "Estimated Purchase Price"), together with such supporting documentation as Seller may reasonably request. On or before 120 days after the Closing Date, Buyer will deliver to Seller a final closing adjustment calculated as of the Closing Date (the "Final Purchase Price"), together with such supporting documentation as Seller may reasonably request, which will state in reasonable detail the nature and extent of each

adjustment. Should Seller dispute Buyer's calculation of the Estimated Purchase Price or the Final Purchase Price, Seller will promptly, but in no event later than 30 days after receipt of such calculation (the "Grace Period"), deliver to Buyer written notice describing in reasonable detail the dispute, together with Seller's determination as to the amount of Estimated Purchase Price or the Final Purchase Price, as the case may be, in reasonable detail. If the dispute is not resolved by the parties within 20 days from the date of receipt by Buyer of written notice from Seller, the parties agree to promptly engage Benchmark Partners (the "Independent Arbiter") to resolve the dispute within 30 days after such engagement. The Independent Arbiter's determination will be final and binding on the parties. Buyer or Seller, as the case may be, will make appropriate payment to the other by wire transfer of the difference between the Estimated Purchase Price and the Closing Payment or the difference between the Final Purchase Price and the Estimated Purchase Price, as the case may be, within 5 business days following the expiration of the Grace Period, resolution of the dispute by the parties, or receipt of the Independent Arbiter's final determination, as the case may be; provided, that any amount not in dispute will be paid before resolution of the dispute by the parties or the receipt of the Independent Arbiter's final determination. All fees and costs of the Independent Arbiter will be borne pro rata by Buyer and Seller in proportion to the difference between the Independent Arbiter's determination of the Estimated Purchase Price or the Final Purchase Price, as the case may be, and Seller's and Buyer's determination of such adjustment. For example, if Seller's determination differs by $20,000 from the Independent Arbiter's determination, but Buyer's determination only differs by $5,000, Seller will bear 20/25 of such fees and costs and Buyer will bear 5/25 of such fees and costs.

2.2    <u>Definitions</u>.

For purposes of this Agreement, the following terms shall have the following meanings:

(a) "Performing RMR" means the amount of recurring monthly revenue (net of any private line telephone communication or third-party pass-through charges, assessments or taxes and net of any customer discounts) of the Security Business derived solely from enforceable written Customer Contracts for which: (i) the underlying customer is not more than 60 days in arrears on any payment due under such agreement; or (ii) Seller has received, no later than 30 days before the Closing Date, at least one (1) full monthly payment for recurring services rendered under such agreement, provided that the underlying customer is not more than 90 days in arrears on any payment due under such agreement. Performing RMR shall not include any revenue: (a) that is not periodic in nature, such as installation purchase payments or one-time assessments or charges; (b) from customers from whom Seller has received notice of a pending termination; (c) from customers who were recently added as a result of extraordinary marketing efforts or an amnesty program; (d) from lease agreements; (e) from the provision of long-range radio or cellular back-up services (such exclusion does not negate the Performing RMR otherwise paid by any customer who also receives such services); (f) from renters or persons who reside in mobile homes; or (g) from customers whose telephone number has been disconnected.

(b) "Unearned Revenue" means all revenue of the Security Business that has been collected, or billed but not collected, by or on behalf of Seller on or prior to the Closing Date for services to be provided by Buyer after the Closing Date.

2.3     Allocation of Purchase Price.

Buyer and Seller agree to allocate the Purchase Price among the Assets to be Acquired in accordance with Schedule 2.3 and to be bound by such allocation and to file all returns and reports regarding these transactions, including all federal, state and local tax returns (including Form 8594), on the basis of such allocation. Buyer and Seller agree that a nominal amount of the Purchase Price, not in excess of $15,000, will be allocated to the Noncompetition Agreement; provided, however, that Seller acknowledges that Buyer's remedy for a breach of the Noncompetition Agreement will not be limited to the amount of such allocation.

2.4     Closing Date and Location.

The consummation of the transfer and delivery of the Assets to be Acquired to Buyer and the receipt of the consideration therefor by Seller will constitute the "Closing." Unless otherwise mutually agreed to by the parties, the Closing will take place electronically on December 23, 2005, or upon the satisfaction by Seller of all of the conditions precedent to Buyer's obligation to consummate these transactions, whichever is later, which date and time will constitute the "Closing Date." The effective date of the sale of the Security Business will be as of 11:59:59 p.m. on the Closing Date and all prorations and allocations provided for in Section 2.1(c) will be made as of such time.

2.5     Noncompetition Agreement.

In connection with the consummation of these transactions, Seller and Peter Maltby, Seller's majority shareholder, will have executed a noncompetition/nonsolicitation agreement with respect to the greater Chicago area in the form of Exhibit A (the "Noncompetition Agreement").

2.6     Transition Services.

In connection with the consummation of these transactions, Seller shall enter into a transition services agreement in the form of Exhibit B (the "Transition Agreement").

## 3.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate these transactions, Seller represents, warrants and covenants to Buyer and agrees:

3.1     Organization of Seller.

(a)     Seller is a corporation, duly incorporated and organized, validly existing and in good standing under the laws of the State of Illinois, and has the requisite corporate power and authority to own or lease all of the Assets to be Acquired, to own and operate the Security Business, to carry on its business as now conducted, to enter into this Agreement and to perform the terms of this Agreement.

(b)     Seller has not, within the 6-year period immediately preceding the date of this Agreement, changed its name or been the surviving entity of a merger or consolidation. There are no fictitious names under which Seller or such predecessors of Seller have conducted the Security Business.  Seller agrees to cooperate with Buyer and take whatever steps are necessary promptly after Closing in order to permit Buyer to use Seller's name, but only to the extent permitted by the Transition Agreement.

3.2     Authority of Seller.

Seller has full power and authority to enter into this Agreement, to consummate these transactions and to comply with the terms, conditions and provisions hereof.  This Agreement has been duly authorized, executed and delivered by Seller and is, and each other agreement or instrument of Seller contemplated by it will be, the legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, provided, however, that enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of this Agreement.  The execution, delivery and performance of this Agreement and the other agreements of Seller contemplated by it have been duly authorized and approved by the shareholders and board of directors of Seller and do not require any further authorization, the consent of or notice to any third party, except as set forth on Schedule 3.2.  Neither the execution and delivery of this Agreement nor the consummation of these transactions will conflict with or result in any violation of or constitute a default under any term of the Articles of Incorporation or Bylaws of Seller, or any agreement, mortgage, debt instrument, indenture, or other instrument, judgment, decree, order, award, law or regulation by which Seller is bound, or result in the creation of any lien, security interest, charge or encumbrance upon any of the Assets to be Acquired, except as set forth on Schedule 3.2.

3.3     Office Locations.

(a)     Seller owns no real property in connection with the operation of the Security Business.

(b)     The only real property used by Seller under lease in connection with the operation of the Security Business is 17 W. 725 Butterfield Road, Units A & B, Oakbrook Terrace, Illinois 60181.  Seller has a valid and subsisting lease for such real property, a copy of which has been delivered to Buyer.  Seller will permit Buyer to use such real property after Closing pursuant to the Transition Agreement.

3.4    <u>Title to Property.</u>

Except as described on <u>Schedule 3.4</u>, Seller has good and marketable title to all of the Assets to be Acquired, free and clear of all liens, claims, charges, encumbrances, leases, pledges, security interests, mortgages, defects in title, equities, covenants and other restrictions of any nature whatsoever.

3.5    <u>Compliance With Laws; Litigation.</u>

(a)    Except as set forth on <u>Schedule 3.5</u>, Seller has complied, in all material respects, with all material laws, regulations, rules, writs, injunctions, ordinances, franchises, decrees or orders of any federal or state court or of any municipal or governmental department, commission, board, bureau, agency or instrumentality which are applicable to the Assets to be Acquired or the Security Business.

(b)    All reports, schedules and/or returns of any administrative agency of the federal or any state or local government required to be filed by Seller with respect to the Security Business have been filed.

(c)    Except as set forth on <u>Schedule 3.5</u>, there are no lawsuits, claims, suits, proceedings or investigations pending or, to the best knowledge of Seller, threatened against or affecting Seller with respect to the Security Business, nor are there any lawsuits, claims, suits or proceedings pending in which Seller is the plaintiff or claimant, that relate to the Assets to be Acquired or the Security Business and which involve the possibility of any judgment, order, award or other decision that might impair the ability of Seller to perform this Agreement, or might impair the quality of title of the Assets to be Acquired, or might adversely affect the normal operation of the Security Business, or might result in liability for damages or might otherwise adversely affect Seller's right, title or interest in the Assets to be Acquired or the Security Business.

(d)    There is no action, suit or proceeding pending or, to the best knowledge of Seller, threatened which questions the legality or propriety of these transactions.

3.6    <u>Condition of Assets.</u>

(a)    The Tangible Assets are in good operating condition, ordinary wear and tear excepted.

(b)    <u>Schedule 3.6</u> sets forth a true and complete list of all insurance policies insuring any of the Assets to be Acquired or general liability and E&O insurance relating to the Security Business. The general liability and E&O policies are on (and for the applicable statute of limitations period plus 1 year have been on) an "occurrence basis," which means, for example, that if a claim arose after the Closing Date for an event which occurred prior to the Closing Date, Seller's applicable insurance policy in existence on the date such event occurred would cover such claim. All such policies are in full force and effect and Seller has not received any notice of cancellation with respect thereto. During the past 5 years, no application by Seller for insurance with respect to the Assets to be Acquired has been denied for any reason. After Closing, Seller

- 7 -

will cause its insurance agent to deliver to Buyer a copy of its insurance claims history with respect to the Security Business for the past 5 years.

(c)    The Acquisition Profile dated December 12, 2005 is true and complete in all material respects as of the date delivered to Buyer; provided, however, that to the extent such profile is inconsistent with this Agreement, this Agreement shall govern, and the consistency shall not be deemed a breach of this representation.

3.7    Adverse Developments.

Since December 31, 2004, no event or condition has occurred which materially adversely affected the Assets to be Acquired or the Security Business, including: (a) any change in the financial condition, assets or liabilities of the Security Business, other than changes in the ordinary course of business; or (b) any damage, destruction, loss or other casualty to the Security Business, however arising and whether or not covered by insurance.

3.8    Tax Returns and Payments.

All income taxes, unemployment, social security, franchise, real property, personal property and all other taxes levied, assessed or imposed upon Seller with respect to the Security Business by the United States, or any state, or governmental subdivision of either, to the extent due and payable, have been duly paid to date or are being contested through appropriate administrative or judicial procedures, and no liability for deficiencies with respect thereto exists. There are no tax audits pending nor any outstanding agreements or waivers extending the statutory period of limitations applicable to any federal, state or local income tax return for any period related to the Security Business. To Seller's best knowledge, no tax deficiencies have been determined nor proposed tax assessments charged against Seller (nor is there any basis therefor) with respect to the Security Business. Seller has filed all federal, state, local, sales, franchise, withholding, real and personal property tax returns required to be filed with respect to the Security Business. No penalties or other charges are, or will become, due with respect to the late filing of any return by Seller related to the Security Business.

3.9    Agreements With Employees.

(a)    Seller is not a party to any employment agreement with any of the Chicago Employees, written or oral, which cannot be terminated at will by Seller.

(b)    Except as set forth on Schedule 3.9, Seller does not have any pension, profit sharing or other employee benefit plan, or any health care, life insurance or other employee welfare plan, for any of the Chicago Employees.

(c)    The names, titles and rates of compensation of all of the employees of Seller who work solely in connection with the Security Business and are based in Chicago (the "Chicago Employees") are listed on Schedule 3.9. None of the Chicago Employees has indicated to Seller any intention to terminate his employment with Seller.

     (d)    Seller has entered into a nonsolicitation/nondisclosure agreement with each of the Chicago Employees.

3.10    <u>Intellectual Property Rights</u>.

     <u>Schedule 3.10</u> sets forth all of the patents (including all reissues, divisions, continuations and extensions thereof), applications for patents, patent disclosures docketed, inventions, improvements, trademarks, trademark applications, trade names and copyrights owned by Seller and used in the Security Business, and all licenses, franchises, permits, authorizations, agreements and arrangements that concern the same or that concern like items owned by others and used by Seller in connection with the Security Business. True, correct and complete copies of all such licenses, franchises, permits, authorizations, agreements and arrangements have been delivered by Seller to Buyer. Seller has no knowledge of and has not received any notice of conflict with the asserted rights of others with respect to any of these intellectual property rights, or any other intellectual property rights used in connection with the Security Business.

3.11    <u>Customer Contracts and Business Documents</u>.

     Except for the Customer Contracts and Business Documents, Seller has no presently existing material contract, agreement, lease, permit, consent, license or commitment, whether written or oral, affecting or relating to the Security Business. All of the Customer Contracts are valid and enforceable (provided, however, that enforceability of the Customer Contracts may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of such Customer Contract) and are in full force and effect in accordance with their terms, are assignable to Buyer without obtaining the consent of or providing notice to any customer, and contain terms and conditions which are standard within the electronic security industry, including those involving limitation of liability/liquidated damages and third-party indemnification. All of the Customer Contracts are written on one of the forms attached as part of <u>Schedule 3.11</u> and none have been modified with respect to the provisions that limit Seller's liability. All of the Business Documents are valid and enforceable (provided, however, that enforceability of the Customer Contracts may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of such Customer Contract) and are in full force and effect in accordance with their terms. Seller has made available to Buyer copies of all of the Customer Contracts and Business Documents set forth on <u>Schedule 1.1(b)</u>. Without limiting the foregoing, Seller represents that, to the best of its knowledge, the Security Business has been operated in substantial conformity with the Customer Contracts and Business Documents. Seller has not defaulted in its obligations pursuant to any of the Customer Contracts or Business Documents, which default could result in the cancellation of any Customer Contract or Business Document or adversely affect the rights of Seller under that Customer Contract or Business Document. Seller is not a party to any franchise, license,

distributor or other similar type of agreement respecting the Security Business. Seller did not acquire any of the Customer Contracts from any third party.

3.12    Customer and System Information.

(a)    Seller has entered into written agreements with all of its customers. None of the Customer Contracts have been altered in any material adverse manner (for example, deleting or modifying the limitation of liability provision). All of the Customer Contracts contain an original term of at least three (3) years. None of Seller's customers have a history of excessive false alarms which were not satisfactorily resolved.

(b)    Seller has provided each residential customer with the 3-day right of rescission in substantial compliance with the provisions of 16 C.F.R. Part 429 (Cooling-Off Period for Door-to-Door Sales) and any applicable state laws. Seller acknowledges that any failure on its behalf to comply with such regulation and laws in connection with any transaction involving a residential customer may result in such customer having the right to rescind or cancel such transaction. Seller further acknowledges that Buyer desires not to assume any risk for any liability that might arise as a result of any such rescission or cancellation.

(c)    Schedule 3.12 sets forth a true and accurate list of the amounts which Seller charges its customers for monitoring, repair service and any other services provided by Seller. Seller has no obligations or liabilities to customers, except the obligation to supply services to customers in the ordinary course of business. To the best knowledge of Seller, there are no complaints by customers that, individually or in the aggregate, could have a material adverse effect upon the Assets to be Acquired or the financial condition or operation of the Security Business.

(d)    Seller has no free or discounted service liability to customers existing with respect to the Security Business. Seller has no obligation or liability for the refund of monies to its customers other than obligations to refund deposits made by customers in the ordinary course of business. Under applicable law, Seller is not required to pay its customers interest on these refundable deposits. Since January 1, 2005, neither Seller, nor any of Seller's officers, directors, shareholders, employees or agents have paid directly or indirectly any accounts receivable of customers.

(e)    All of the alarm systems installed by Seller in connection with its operation of the Security Business are in good working order and condition, failure of a customer to report to Seller any problem with an alarm system known to the customer and customer non-use excepted, and have been installed and maintained in accordance with good and workmanlike practices prevailing in the security alarm industry. All such alarm systems conform in all material respects to the contracts pursuant to which they were installed, and in no case has such an installation been made by Seller which at the time of installation was in violation of any applicable law, code or regulation. All manufacturers' warranties applicable to any such alarm systems are freely assignable to Buyer. Seller is not aware of any difficulty in obtaining replacement parts for its product lines.

- 10 -

(f)     No one customer represents more than 1% of the Performing RMR. Except as set forth on Schedule 3.12, there has been no increase in Seller's monitoring or repair service rates in the last 12 months.  Seller is not aware of any legal impediments which would prevent Buyer from instituting any rate increases after the Closing Date.

(g)     The account base of the Security Business is comprised solely of digital accounts, except for less than 20 accounts that have cellular back-up service.  Except as set forth on Schedule 3.12, the telephone lines and numbers applicable to the accounts included as part of the Assets to be Acquired can be converted to communicate with Buyer's central station by means of a line switch.  Schedule 3.12 sets forth a list of all of the telephone numbers used in connection with the operation of the Security Business, including all customer service numbers. To Seller's knowledge, and assuming that Buyer's monitoring facilities are compatible with the facilities of Seller's monitoring center, none of the alarm systems of Seller included as part of the Assets to be Acquired should require an on-site visit in order to reprogram such system to communicate with Buyer's central station.  Seller shall provide Buyer with all of the data requested by Buyer with respect to the monitoring of the accounts included as part of the Assets to be Acquired, which data shall be accurate and complete in all material respects.  Such data shall be provided in a timely fashion, in an acceptable electronic format, and at no cost to Buyer, pursuant to the terms of the Transition Agreement.  Seller shall use its best efforts to assist Buyer so that Buyer will be able to transfer the monitoring of the accounts included as part of the Assets to be Acquired to its own central station on or before January 31, 2006.

(h)     Seller may terminate any agreement providing for the monitoring of any of its customers included as part of the Assets to be Acquired by any third party monitoring facility on not more than 30 days' notice.  Except as set forth on Schedule 3.12, Seller does not offer its customers included as part of the Assets to be Acquired any type of medical alert monitoring service, two-way voice service or cellular back-up service.

(i)     To the best of Seller's knowledge, Seller is in substantial compliance with all false alarm ordinances applicable to the Security Business, and has paid all necessary permit and/or license fees that are the obligations of Seller (as opposed to obligations of the customers); to Seller's knowledge, no other communities in Illinois in which the Security Business is doing business are contemplating passing a false alarm ordinance.

(j)     To the best of Seller's knowledge, there are no pending plans by any telephone company to change the dialing procedures or exchange numbers within the areas servicing Seller's customers included as part of the Assets to be Acquired such that Seller would need to reprogram its customer's digital dialers.

(k)     All equipment sold or leased by Seller to its customers included as part of the Assets to be Acquired was of merchantable quality.  Seller has not breached any express or implied warranties in connection with such sales or leases.

(l)     Seller has not sold or otherwise made its customer list included as part of the Assets to be Acquired available to any third party, other than its past and present institutional lenders.

(m)    Over 99% of the customers of the Security Business are located in the Chicago metropolitan area.

(n)    The Security Business has no work in progress, nor any outstanding bids or proposals.

(o)    The Security Business has no post office boxes located in the State of Illinois.

3.13    Broker or Finder.

Neither Seller nor any party acting on Seller's behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of these transactions.

3.14    Labor Relations.

The employees of the Security Business are not parties to any collective bargaining agreement with Seller.  There are no grievances, disputes or controversies with any union or any other organization of the employees of the Security Business, nor are there any threats of strikes, work stoppages or any pending demands for collective bargaining by any union or organization.  Seller has not engaged in any unfair labor practices with respect to the Security Business.

3.15    Bulk Sales Compliance and Transfer Taxes.

Neither the sale and transfer of the Assets to be Acquired pursuant to this Agreement, nor Buyer's possession and use thereof after Closing because of such sale and transfer, will result in or be subject to:  (a) any law pertaining to bulk sales or transfers which make such sales or transfers ineffective as to creditors of Seller; (b) any federal, state or local sales, use, transfer, excise or license tax, fee or charge applicable to any of the Assets to be Acquired; or (c) the imposition of any liability upon Buyer for appraisal rights or other liability owing to any shareholder of Seller which is not expressly assumed by Buyer in this Agreement.

3.16    Burdensome Agreements.

Seller is not a party to any agreement or instrument nor subject to any restriction which now has or, as far as Seller can foresee, may have a material adverse effect, financial or otherwise, upon the Security Business or the Assets to be Acquired, other than the credit facilities with its institutional lenders.

3.17    Options, Warrants and Rights of First Refusal.

Seller represents that no person or entity, including ADT Security Services, Inc., has any option, warrant or right of first refusal to purchase any of the Assets to be Acquired, the Security Business.

3.18    <u>Environmental Matters</u>.

Neither Seller nor any of Seller's affiliates own, operate or lease or have owned, operated or leased any real property used in connection with the Security Business that has used, generated, stored or disposed of any Hazardous Materials, nor to the best of Seller's knowledge after due inquiry have there been any Hazardous Materials disposed of by any previous owner or any other third-party on any property owned, operated or leased by Seller or any of its affiliates.

3.19    <u>Disclosure</u>.

No representation or warranty by Seller in this Agreement or any Schedule or Exhibit, or any statement, list or certificate furnished or to be furnished by Seller pursuant to this Agreement, or in connection with these transactions, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not misleading or necessary in order to provide a prospective purchaser of the Assets to be Acquired and Security Business with proper information as to such assets and business.

## 4.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate these transactions, Buyer represents, warrants and covenants to Seller:

4.1    <u>Authority of Buyer</u>.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Florida. Buyer has full power and authority to enter into this Agreement, to consummate these transactions and to comply with the terms, conditions and provisions hereof. This Agreement is, and each other agreement or instrument of Buyer contemplated by it will be, the legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, provided, however, that enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of this Agreement. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by it will conflict with or result in any violation of or constitute a default under any term of any agreement, mortgage, debt instrument, indenture, franchise, license, permit, authorization, lease or other instrument, judgment, decree, order, award, law or regulation by which Buyer is bound. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby: (a) are permissible under Buyer's Articles of Organization; and (b) have been duly and validly authorized by all necessary and appropriate action by Buyer's members.

4.2     Broker or Finder.

Neither Buyer nor any party acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of these transactions, except for the fees payable to The Edmonds Group, which fees Buyer agrees to pay, and Buyer agrees to indemnify and hold harmless Seller from any claim or liability that may be asserted against Seller by any broker, finder or intermediary engaged by Buyer.

4.3     Litigation.

There is no action, suit or preceding pending or, to the best knowledge of Buyer, threatened which questions the legality or propriety of these transactions or that would prevent Buyer or limit Buyer in any way from assuming and performing the obligations under the Customer Contracts and Business Documents included among the Assets to be Acquired.

## 5.     CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

On or prior to the Closing Date, Seller will have satisfied (or caused to be satisfied) each of the following conditions, unless waived in writing by Buyer:

5.1     Covenants and Warranties.

There will have been no material breach by Seller in the performance of any of its covenants and agreements contained or referred to in this Agreement; each of the representations and warranties of Seller contained or referred to in this Agreement will be true and correct in all material respects on the Closing Date.

5.2     Corporate Action.

Seller will have taken all corporate action necessary to approve these transactions, and Seller will have furnished Buyer with certified copies of the resolutions adopted by its Shareholders and Board of Directors, in form and substance satisfactory to counsel for Buyer, in connection with such transactions.

5.3     No Restraint or Litigation.

No action, suit or proceeding will by pending or threatened by any third party or governmental or regulatory agency to restrain, prohibit or otherwise challenge the legality or validity of these transactions or of any of the Assets to be Acquired.

5.4     Necessary Consents and Permits.

The parties will have received all of the consents listed on Schedule 3.2, including the consent of any lender to Seller, and such consents will be valid and enforceable on the Closing Date.

5.5    Documents, Certificates and Other Items.

Seller will have delivered or caused to be delivered to Buyer:

(a)    an Assignment and Bill of Sale in the form of Exhibit C, duly executed;

(b)    the Noncompetition Agreement described in Section 2.5, duly executed;

(c)    the Transition Agreement described in Section 2.6, duly executed;

(d)    the letter attached hereto as Exhibit D by and among Buyer, Seller and Central One, duly executed by each party;

(e)    a Certificate of Good Standing issued by the Secretary of State of Illinois evidencing Seller's corporate standing in such state, dated within 30 days of the Closing Date;

(f)    all other documents and instruments required under this Agreement; and

(g)    all other documents and instruments reasonably requested by Buyer in connection with the consummation of these transactions.

5.6    Satisfaction of Debts.

(a)    Seller will have delivered to Buyer the lien searches performed against Seller for the State of Illinois and for Cook County, Illinois, showing all UCC-1 financing statements, federal, state, and local tax liens, outstanding judgments and pending litigation.

(b)    Seller will have delivered to Buyer a true and correct list of each of the secured creditors of Seller and the amount due by Seller to each such creditor on the Closing Date.

(c)    Seller will have delivered the documents necessary to release all of the liens held by Seller's secured creditors with respect to the Assets to be Acquired.

5.7    Accounts Receivable.

At Closing, Seller will deliver to Buyer an accurate complete listing of all of the accounts receivable of the Security Business which existed as of a date which is not more than 7 days prior to the Closing Date.

5.8    Use of Name.

Seller shall permit Buyer to immediately hereafter use the name "Alarm One" to the extent permitted by the Transition Agreement.

5.9    Employees.

As of the Closing Date, Seller will take all action necessary to terminate the employees of the Security Business listed on Schedule 3.9 (including terminating each such employee from coverage under all plans listed on Schedule 3.9), and will pay such employees all payroll, bonus, severance and vacation sums due to them through the Closing Date.  No employee of Seller will automatically become an employee of Buyer as a result of these transactions.  Buyer may offer employment to any employee of the Security Business on terms and conditions which it announces, and Buyer may, after Closing, unilaterally implement terms and conditions of employment for such persons, including a condition that each potential employee execute Buyer's standard nonsolicitation/nondisclosure agreement.

## 6.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

On or prior to the Closing Date, Buyer will have satisfied each of the following conditions unless waived in writing by Seller:

6.1    Covenants and Warranties.

There will have been no material breach by Buyer in the performance of any of its covenants and agreements contained or referred to in this Agreement; each of the representations and warranties of Buyer contained or referred to in this Agreement will be true and correct in all material respects on the Closing Date.

6.2    Delivery of Purchase Price.

Buyer will have delivered the Purchase Price to Seller, less the amount of any adjustments made pursuant to Section 2.1(c).

6.3    Documents, Certificates and Other Items.

Buyer will have delivered or caused to be delivered to Seller:

(a)    all of the documents or instruments required under this Agreement; and

(b)    all other documents and instruments reasonably required by Seller in connection with the consummation of these transactions.

6.4    No Restraint or Litigation.

No action, suit or proceeding will be pending or threatened by any third party or governmental or regulatory agency to restrain, prohibit or otherwise challenge the legality or validity of these transactions.

7.    **INDEMNIFICATION**

    7.1    <u>Indemnification by Seller and Buyer</u>.

        (a)    Seller will indemnify, hold harmless, defend and bear all costs of defending Buyer, together with Buyer's subsidiaries, affiliates, successors and assigns, from, against and with respect to any and all damage, loss, deficiency, expense (including any reasonable attorney and accountant fees, legal costs or expenses), action, suit, proceeding, demand, assessment or judgment to or against Buyer (collectively, "Buyer's Aggregate Net Loss") arising out of or in connection with:

        (i)    any debt, obligation, commitment or liability of Seller which is not expressly assumed by Buyer herein or which is expressly assumed by Seller in this Agreement, whether arising prior to, on or after the Closing Date and whether or not disclosed to Buyer in this Agreement, including those relating to environmental liabilities and Seller's obligation to provide residential customers with the 3-day notice of cancellation;

        (ii)    any breach or violation of, or nonperformance by, Seller of any of its representations, warranties, covenants or agreements contained in this Agreement or in any document, certificate or schedule required to be furnished pursuant to this Agreement;

        (iii)    any violation of the bulk sales laws or other similar laws requiring notice to governmental and nongovernmental creditors caused by consummation of these transactions; and

        (iv)    with respect to payments to be made by customers of the Security Business, any failure to accurately calculate and appropriately disclose such payments to customers in accordance with applicable law.

        (b)    Buyer will indemnify, hold harmless, defend and bear all costs of defending Seller, together with Seller's subsidiaries, affiliates, successors and permitted assigns, from, against and with respect to any and all damage, loss, deficiency, expense (including any reasonable attorney and accountant fees, legal costs or expenses), action, suit, proceeding, demand, assessment or judgment to or against Seller (collectively, "Seller's Aggregate Net Loss") arising out of or in connection with:

        (i)    all liabilities, damages or claims incurred or accrued against Buyer or arising out of the business activities of Buyer after the Closing Date; and

        (ii)    any breach or violation of, or nonperformance by, Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement or in any document, certificate or schedule required to be furnished pursuant to this Agreement.

        (c)    Should Buyer and Seller be unable to agree as to the amount of Buyer's Aggregate Net Loss for which Buyer is to be indemnified, or the amount of Seller's Aggregate Net Loss for which Seller is to be indemnified, then either Buyer or Seller, as the case may be,

may commence arbitration proceedings in Wilmington, Delaware in accordance with the provisions of Section 8.3. Buyer may offset against amounts due from Buyer to Seller under this Agreement against any indemnification or other obligations due to Buyer from Seller under or in connection with this Agreement.

7.2    Notice of Claims.

If any claim is made by or against a party which, if sustained, would give rise to a liability of the other party hereunder, that party (the "Claiming Party") will promptly cause notice of the claim to be delivered to the other party (the "Indemnifying Party") and will afford the Indemnifying Party and its counsel, at the Indemnifying Party's sole expense, the opportunity to defend or settle the claim (and, with respect to claims made by third parties, the Claiming Party will have the right to participate at its sole expense). Any notice of a claim will state, with reasonable specification, the alleged basis for the claim and the amount of liability asserted by or against the other party by reason of the claim. If such notice is not given, it will not release the Indemnifying Party, in whole or in part, from its obligations under this Article 8, except to the extent that the Indemnifying Party's ability to defend against such claim is actually prejudiced thereby. Alternatively, if notice is given and the Indemnifying Party fails to assume the defense of the claim within 10 days thereof, the claim may be defended, compromised or settled by the Claiming Party without the consent of the Indemnifying Party and the Indemnifying Party will remain liable under this Article 7.

7.3    Survival of Indemnity Obligations.

The rights of Buyer and Seller to assert indemnification claims will survive the Closing Date and will expire: (a) with respect to all claims other than third-party claims and claims related to fraud, willful misconduct, title, environmental and pension liability, and the nonpayment of taxes under any federal, state, county or other local taxing statutes (collectively, the "Excluded Claims"), on the second anniversary of the Closing Date; and (b) with respect to the Excluded Claims, upon the expiration of 90 days following the date on which the running of the statute of limitations with respect to any such tax or claim will bar the assessment and collection of such tax or claim.

7.4    Indemnity Basket and Cap.

Neither Buyer nor Seller shall be entitled to any recovery from the other party with respect to any Buyer's Aggregate Net Loss or Seller's Aggregate Net Loss, as the case may be, unless and until the amount of loss suffered, sustained or incurred by the Claiming Party, or to which the Claiming Party becomes subject, shall exceed $20,000 calculated on a cumulative basis and not a per item basis (the "Basket Amount"), and then only with respect to the excess over the Basket Amount. The Basket Amount shall not apply to the Excluded Claims. The aggregate amount of Buyer's Aggregate Net Loss or Seller's Aggregate Net Loss, as the case may be, will not exceed the amount of the Purchase Price, exclusive of the Excluded Claims. The Excluded Claims shall not be subject to such limitation.

7.5    Offset for Insurance.

The amount of any indemnification obligation under this Article 7 will be reduced by any insurance proceeds paid to the Claiming Party as a result of the loss or other matter for which indemnification is sought.  The Claiming Party will be obligated to submit to its insurance carrier all coverable claims and pursue such claims against its insurance carrier in good faith, and will not abandon or compromise any such claim without the consent of the other party, but shall not be obligated to institute any litigation against its insurance carrier if the carrier denies coverage.  To the extent a Claiming Party receives any payment pursuant to any insurance policies as to any third party claim for which it has previously received payment from the Indemnifying Party hereunder, then, in such event the Claiming Party shall promptly reimburse the Indemnifying Party to the extent of any such duplicate payment received.

7.6    Sole and Exclusive Remedy.

After the Closing, the indemnification provided in this Article 7 shall be the sole and exclusive remedy of the parties with respect to the matters described in this Article 7 without regard to whether such matter involves claims framed in contract, tort, equity or otherwise.

8.    **GENERAL PROVISIONS**

8.1    Survival of Obligations.

Seller and Buyer acknowledge that the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement form an integral part of the consideration given to Buyer in exchange for the Purchase Price and to Seller in exchange for the Security Business, without which Buyer would be unwilling to purchase, and Seller would be unwilling to sell, the Assets to be Acquired.  Notwithstanding any investigation and review made by Buyer pursuant to this Agreement, Seller and Buyer agree that all of the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement or in any exhibit, schedule, statement, report, certificate or other document or instrument required to be delivered pursuant to this Agreement will, subject to the limitations set forth in Section 7.2, survive the making of this Agreement, any investigation or review made by or on behalf of the parties hereto and the Closing.

8.2    Transfer Charges and Taxes.

Seller will pay all stamp, sales, income, realty transfer or other taxes, federal, state or local imposed by law in respect of any and all transfers pursuant to this Agreement.

8.3    Arbitration.

Except with respect to Buyer electing to bring an action for specific performance of this Agreement (which action will be commenced and settled in a court of competent jurisdiction) or a dispute regarding the Final Purchase Price (which dispute will be settled by the

- 19 -

Independent Arbiter), any controversy or claim arising out of or relating to this Agreement, or the breach thereof, will be settled by arbitration in Wilmington, Delaware, in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"). Buyer and Seller agree that such location is the most convenient forum for both parties. The parties elect to provide for pre-arbitration discovery pursuant to the provisions of the Federal Rules of Civil Procedure. Unless modified by the arbitrators in their discretion, the arbitration will proceed upon the following schedule: (a) within 10 days from the service of a notice of demand for arbitration, the parties will select a panel of 3 AAA arbitrators; (b) within 10 days after selection of the arbitrators, the parties will conduct a pre-arbitration conference at which a schedule of pre-arbitration discovery will be set, all pre-arbitration motions scheduled and any other necessary pre-arbitration procedural matters decided; (c) all discovery will be completed within 20 days following the pre-arbitration conference; (d) all pre-arbitration motions will be filed and briefed so that they may be heard no later than 15 days following the discovery cutoff, (e) the arbitration will be scheduled to commence no later than 10 days after the decision on all pre-arbitration motions but in any event no later than 3 months following the service of the demand for arbitration; and (f) the arbitrators will agree to hear the claim on successive days and will render their written decision within 15 days following the submission of the matter. Such arbitration will be final and binding on Buyer and Seller, no appeals may be taken therefrom, and judgment upon any award rendered may be entered in any court having jurisdiction therefor. The prevailing party in any dispute will be entitled to recover its legal fees and expenses.

      8.4    Confidentiality.

      Buyer and Seller agree that they will treat in confidence all documents, materials and other information which they have obtained regarding the other party during the course of the negotiations leading to the consummation of these transactions, the investigation provided for herein and the preparation of this Agreement and other related documents. In the event these transactions are not consummated, all copies of nonpublic documents and material which have been furnished in connection with these transactions will be promptly returned to the party furnishing such documents and material, will continue to be treated as confidential information and will not be used for the benefit of the party who returned such confidential information.

      8.5    Public Announcements.

      Neither Buyer nor Seller will, without the approval of the other party (which may not be unreasonably withheld), make any press release or other public announcement concerning these transactions, except as and to the extent that such party will be so obligated by law, in which case the other party will be advised and Buyer and Seller will use their best efforts to cause a mutually agreeable release or announcement to be issued.

      8.6    Governing Law.

      This Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflicts of law provisions.

8.7    Notices.

All notices or other communications required or permitted hereunder will be in writing and will be deemed given when delivered personally, by registered or certified mail, by legible facsimile transmission or by overnight courier (fare prepaid) addressed as follows:

If to Buyer, to:

Richard W. Perry, President
3223 Commerce Place
Suite 101
West Palm Beach, FL 33407
Telecopy: (561) 697-9749

with a copy to:

S. Bryan Lawrence, III, Esquire
Buchanan Ingersoll PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
Telecopy: (412) 562-1041

If to Seller, to:

Peter Maltby, President and CEO
1601 E. Orangewood Avenue
Anaheim, CA 92805
Telecopy: (714) 939-1280

with a copy to:

Alan L. Pepper, Esquire
Mitchell Silberberg & Knupp LLP
11377 W. Olympic Blvd.
Los Angeles, CA 90064
Telecopy: (310) 231-8355

Notice will be deemed received the same day (when delivered personally), 5 days after mailing (when sent by registered or certified mail) and the next business day (when delivered by overnight courier or by facsimile transmission). Any party to this Agreement may change its address to which all communications and notices may be sent by addressing notices of such change in the manner provided.

8.8    Assignment.

This Agreement may not be assigned by Seller without the prior written consent of Buyer. Buyer will have the right to assign this Agreement and the rights and obligations hereunder to its successors and assigns, including making a collateral assignment to its secured lenders. This Agreement is nonrecourse to the members of Buyer and Robert Moe, one of the shareholders of Seller.

8.9    Entire Agreement; Amendments.

This Agreement is an integrated document, contains the entire agreement between the parties, wholly cancels, terminates and supersedes any and all previous and/or contemporaneous oral agreements, negotiations, commitments and writings between the parties hereto with respect to such subject matter, including the letter of intent dated December 12, 2005. No change, modification, extension, termination, notice of termination, discharge, abandonment or waiver of this Agreement or any of its provisions, nor any representation, promise or condition

- 21 -

relating to this Agreement, will be binding upon any party unless made in writing and signed by such party.

8.10    Interpretation.

Article titles and headings to Sections are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of any of the provisions of this Agreement. All references to Sections and subsections contained in this Agreement refer to the Sections and subsections of this Agreement. All references to Schedules or Exhibits contained in this Agreement are references to the Schedules or Exhibits described on the list immediately following the signature page hereto. All references to the words "include" or "including" mean "including without limitation." Any and all Schedules, Exhibits, statements, reports, certificates or other documents or instruments referred to in or attached to this Agreement, including the "Background" portion of this Agreement, are incorporated by reference as though fully set forth at the point referred to in this Agreement. There will be no presumption against any party on the ground that such party was responsible for preparing this Agreement or any part of it. Any representation or warranty of Seller based upon "knowledge" or "best knowledge" or similar words will include only the actual knowledge of Peter Maltby, Patrick Smith or Douglas Schultz. All pronouns and any variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require.

8.11    Waivers.

Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof, but any such waiver must be in writing and must comply with the notice provisions contained in Section 8.7. The failure of any party to enforce at any time any provision of this Agreement will not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part of it or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement will be held to constitute a waiver of any other or subsequent breach.

8.12    Expenses.

Except as otherwise provided in this Agreement, Buyer and Seller will each pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants; provided, however, that in any action to enforce the terms of this Agreement (other than a Purchase Price dispute pursuant to Section 2.1(d)), the substantially prevailing party in such action will be entitled to recover its reasonable attorneys' fees and costs incurred in connection with such action.

8.13    Partial Invalidity.

Wherever possible, each provision will be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of these provisions will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein, unless the deletion of such provision or provisions would result in such a material change as to cause the completion of these transactions to be unreasonable.

8.14    Further Assurances.

From time to time following the Closing Date, Seller will: (a) promptly notify Buyer regarding any cash or other property that it may receive in respect of receivables relating to the Security Business (whether attributable to periods before or after the Closing Date) and immediately deliver to Buyer any cash or other property that it may receive in respect of receivables billed by or on behalf of Buyer after Closing; (b) cooperate with Buyer, including the execution of any necessary documents and agreements, so that all ACH payments from customers will be redirected promptly after Closing to the account of Buyer; and (c) at the request of Buyer and without further consideration, execute and deliver to Buyer such other instruments of conveyance and transfer as Buyer may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession of, any part of the Assets to be Acquired. In the case of any agreement, contract, lease, easement or other commitment which is included in the Assets to be Acquired but which cannot be transferred or assigned effectively without the consent of a third party, whose consent has not been obtained prior to Closing, Seller will cooperate with Buyer at Buyer's request in trying to promptly obtain such consent. After the Closing, Seller shall not engage in any collection efforts with respect to the Assets to be Acquired without first obtaining Buyer's prior written consent, which consent shall not be unreasonably withheld. Buyer agrees to notify the accounts included in the Assets to be Acquired of this transaction at Buyer's sole expense.

8.15    Counterparts.

This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, which together contain the signatures of each party hereto, will have been delivered to Buyer and Seller. Delivery of executed signature pages by facsimile transmission will constitute effective and binding execution and delivery of this Agreement.

8.16    Third-Party Beneficiaries.

This Agreement will not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

ALARM ONE, INC.

By:_____

Peter Maltby, President

SECURITY NETWORKS, LLC

By:_____

Richard Perry, President

The undersigned, as the majority shareholder of Seller, hereby joins in this Agreement, with respect to Section 2.1 hereof only, and all of the covenants, agreements and obligations of Seller pursuant to Section 2.1 will also be deemed to be made by the undersigned on a joint and several basis.

_____

Peter Maltby, individually

24

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

ALARM ONE, INC.

By: _____
     Peter Maltby, President

SECURITY NETWORKS, LLC

By: _____
     Richard Perry, President

The undersigned, as the majority shareholder of Seller, hereby joins in this Agreement, with respect to Section 2.1 hereof only, and all of the covenants, agreements and obligations of Seller pursuant to Section 2.1 will also be deemed to be made by the undersigned on a joint and several basis.

_____
     Peter Maltby, individually

24

## List of Schedules

| Schedule | Description |
|---|---|
| 1.1(a) | Tangible Assets |
| 1.1(b) | Customer Contracts and Business Documents |
| 2.3 | Allocation of Purchase Price |
| 3.2 | Consents and Notices |
| 3.4 | Liens and Encumbrances |
| 3.5 | Litigation and Claims |
| 3.6 | Insurance Coverage |
| 3.9 | Employees, Employee Benefit and Welfare Plans |
| 3.10 | Intellectual Property |
| 3.11 | Form Contracts |
| 3.12 | Services and Rates, Altered Contracts, Free and Discounted Service Liability, False Alarm Ordinances, Telephone Numbers |

|  | List of Exhibits | Section Reference |
|---|---|---|
| A | Noncompetition Agreement | 2.5 |
| B | Transition Agreement | 2.6 |
| C | Assignment and Bill of Sale | 5.5(a) |
| D | Central One Letter | 5.5(d) |

## SCHEDULE 1.1 (a)

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

## TANGIBLE ASSETS

All furniture, equipment, tools, machinery and fixtures located in Chicago office, including the following:

| DATE PURCHASED | DESCRIPTION |
|---|---|
| 4/9/2001 | ARM, ALL ADJUST CHAIRS |
| 4/9/2001 | TABLE |
| 04/02/02 | 1 MANGERS DESK |
| 04/02/02 | FABRIC TASK CHAIRS |
| 04/02/02 | 25" 4 DRAWER LETTER FILE |
| 04/02/02 | CHROME CHAIR GRAY |
| 04/02/02 | CHERRY EXEC DESK |
| 04/02/02 | FABRIC CHAIR BLACK |
| 04/02/02 | ALUMINUM FRAME |
| 05/21/02 | STORAGE CABINETS |

All inventory located in Chicago office or in the vehicles of Chicago employees.
References to the "Chicago office" mean the premises located in Oakbrook Terrace, IL.

**SCHEDULE 1.1 (b)**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**CUSTOMER CONTRACTS and BUSINESS DOCUMENTS**

CUSTOMER CONTRACTS:

See enclosed CD containing the list of customers, Performing RMR and Unearned Revenue.

BUSINESS DOCUMENTS

There are no Business Documents for the Security Business or included among the Assets to be Acquired.

**SCHEDULE 2.3**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. -- SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**ALLOCATION OF PURCHASE PRICE**

| | |
|---|---|
| Customer Contracts and Accounts | $ 7,111,500.00 |
| Furniture and Fixtures | $ 1,000.00 |
| Inventory | $ 2,500.00 |
| Restrictive Covenant – Alarm One | $ 7,500.00 |
| Restrictive Covenant – Peter Maltby | $ 7,500.00 |

**SCHEDULE 3.2**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**CONSENTS AND NOTICES**

The consents of:

Fortress Credit Corp.
Sun Trust Equities Funding, LLC

are required to sell the Assets to be Acquired.

**SCHEDULE 3.4**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**LIEN AND ENCUMBRANCES**

Fortress Credit Corp.
Sun Trust Equities Funding, LLC

**SCHEDULE 3.5**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**COMPLIANCE WITH LAWS; LITIGATION AND CLAIMS**

3.5(a) The Seller does not have business licenses in the local jurisdictions where the customers are located, the absence of which will not result in a material adverse effect.

3.5(c)  None

**SCHEDULE 3.6**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**INSURANCE COVERAGE**

| Category of Insurance | Name of Carrier |
| --- | --- |
|  |  |

Primary automobile coverage for the personal vehicles operated by the service technicians is provided by the employees and not the Seller.

| Umbrella | | General Star Indemnity Company | IXG379126 C |
|---|---|---|---|
| Liability Limit Each Occurrence | 5,000,000 | | |
| Liability Aggregate Limit | 5,000,000 | | |
| | | | |
| **General Liability** | | Arch Insurance Company | BSPKG2060 6 |
| General Aggregate | $2,000,000 | | |
| Products/Completed Oper. Aggr. | $2,000,000 | | |
| Personal & Advertising Injury | $1,000,000 | | |
| Each Occurrence | $1,000,000 | | |
| Damage to Rented Premises | $100,000 | | |
| Medical Expense (Any One Person) | $5,000 | | |
| Employee Benefits | $1,000,000 | | |
| Per Occurrence Deductible | $1,000. | | |

**Additional Coverages, Options, Restrictions, Endorsements, and Rating Information:**
Errors & Omissions Coverage;. Includes Broad Form Property Damage, Blanket Additional Insureds, Lost Key $50,00 occ/agg);
Independent Contractors & Limited Theft Coverage $100,000
Alarm-Monitoring, Services & Installation

Premium Basis : Gross Sales

| Primary Non-Owned & Hired Auto Liability | | National Continental Insurance Company | CP6801-383-2 |
|---|---|---|---|
| Bodily Injury Per Person | $15,000 | | |
| Bodily Injury Each Accident | $30,000 | | |
| Property Damage Liability Each Accident | $5,000 | | |
| | | | |
| Excess Non-Owned & Hired Auto Liability | | Chubb Custom Insurance Co. | 79544931 |
| Liability | | | |
| Combined Single Limit For Bodily Injury and Property Damage | 1,000,000 | | |
| Hired Autos | | | |
| Non-Owned Autos | | | |
| Endorsements, Forms, Conditions: | | | |
| As Stated On Policy. | | | |
| Vehicles Per Schedule On File | | | |

| Property | | St Paul Travelers Companies | 660800X2896 |
|---|---|---|---|
| Premises - Blanket All Locations | | | |
| Personal Property: | 820,000 | | |
| Coins % 90 | | | |
| Valuation RC | | | |
| Cause of Loss SPECIAL | | | |
| Deductible 1,000 | | | |
| Blanket Limit – Locations 1 Thru 5 | | | |

**SCHEDULE 3.9**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**EMPLOYEES, EMPLOYEE BENEFIT AND WELFARE PLANS**

**Field Supervisor**
Spase Angjelkoski

**Field Tech III**
Zlatko Risteski

**Field Tech II**
Jerubabel Wright
Kenneth Aseves

**[Need compensation for each employee.]**

Alarm One 401(k) Employee Savings and Retirement Plan
TransAmerica
Employee Contribution Account Only

PPO Medical Plan
Blue Shield

PPO Dental Plan or HMO Dental Plan
Cigna

Vision Plan
VSP

Alarm One "Paid Time Off" Policy
First 5 years of employment   Employee accrues at a rate of 10 days per year
Years 6 through 12                    "         "        "       15    "
Years 13+                                  "         "        "       20    "

**SCHEDULE 3.10**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**INTELLECTUAL PROPERTY**

Corporate Name:  Alarm One, Inc.

Licenses:

| STATE | License # | Exp. | Fire | Burg |
|-------|-----------|------|------|------|
| Illinois | 127-000942 | 8/31/2008 | Yes | Yes |
|  |  |  |  |  |

None of the intellectual property is included in the Assets to be Acquired and is retained by Seller.

**SCHEDULE 3.11**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**CUSTOMER CONTRACT FORMS**

See attached forms.

DRAFT 12/23/05

## AGREEMENT

This Agreement is entered into as of the 23rd of December, 2005 by and between ALARM ONE, INC., an Illinois corporation ("Alarm One"), and SECURITY NETWORKS, LLC, a Florida corporation ("SN").

### BACKGROUND

A.      The parties have entered into that certain Asset Purchase Agreement dated as of the date hereof, pursuant to which SN is purchasing Alarm One's customer accounts located in the greater Chicago area.

B.      In connection with the consummation of this transaction, the parties also desire to enter into the following agreements.

NOW, THEREFORE, intending to be legally bound, the parties agree as follows:

1.      Alarm One agrees to either:  (a) within 60 days of the date of this Agreement, transfer a minimum of 5,000 digital alarm accounts to SN's central station; or (b) commit to have SN's central station monitor all of the new digital alarm accounts that Alarm One creates or acquires during the term of this Agreement.

2.      SN agrees to monitor these accounts on behalf of Alarm One for an initial term of two years and to do so at its customary monitoring rates and pursuant to its standard form of third-party monitoring agreement.

3.      In the event Alarm One elects the option set forth in Section 1(a) above, then during the initial term, Alarm One further agrees to maintain at all times a minimum of 5,000 monitored accounts with SN's central station.

4.      In addition, the parties agree that Alarm One will not be entitled to receive any commission with respect to future accounts purchased from APEX by SN or any of its affiliates.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

SECURITY NETWORKS, LLC                    ALARM ONE, INC.


By: _____            By: _____
     Richard Perry, President                   Peter Maltby, President

DRAFT 12/23/05

**AGREEMENT**

This Agreement is entered into as of the 23rd of December, 2005 by and between ALARM ONE, INC., an Illinois corporation ("Alarm One"), and SECURITY NETWORKS, LLC, a Florida corporation ("SN").

BACKGROUND

A.     The parties have entered into that certain Asset Purchase Agreement dated as of the date hereof, pursuant to which SN is purchasing Alarm One's customer accounts located in the greater Chicago area.

B.     In connection with the consummation of this transaction, the parties also desire to enter into the following agreements.

NOW, THEREFORE, intending to be legally bound, the parties agree as follows:

1.     Alarm One agrees to either: (a) within 60 days of the date of this Agreement, transfer a minimum of 5,000 digital alarm accounts to SN's central station; or (b) commit to have SN's central station monitor all of the new digital alarm accounts that Alarm One creates or acquires during the term of this Agreement.

2.     SN agrees to monitor these accounts on behalf of Alarm One for an initial term of two years and to do so at its customary monitoring rates and pursuant to its standard form of third-party monitoring agreement.

3.     In the event Alarm One elects the option set forth in Section 1(a) above, then during the initial term, Alarm One further agrees to maintain at all times a minimum of 5,000 monitored accounts with SN's central station.

4.     In addition, the parties agree that Alarm One will not be entitled to receive any commission with respect to future accounts purchased from APEX by SN or any of its affiliates.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

SECURITY NETWORKS, LLC                    ALARM ONE, INC.

By:_____              By:_____
   Richard Perry, President                   Peter Maltby, President

#1881750-v1

# EXHIBIT B

## IN THE AMERICAN ARBITRATION ASSOCIATION

SECURITY NETWORKS, LLC,              :
                                     :
        Claimant,                  :
                                     :
      v.                             :    Case No.
                                     :
ALARM ONE, INC. and                  :
PETER MALTBY,                        :
                                     :
        RespondentS.

## DEMAND FOR AND NOTICE OF ARBITRATION

      Security Networks, LLC ("Security Networks"), through its undersigned counsel, states

the following for its arbitration demand and statement of arbitration claims:

## PARTIES

      1.     Security Networks is a Florida limited liability company with its principal place of

business located at 3223 Commerce Place, Suite 401, West Palm Beach, Florida 33407. Security

Networks sells, designs, installs, monitors and services a wide variety of electronic security

systems.

      2.     Alarm One, Inc. ("Alarm One") is an Illinois corporation with its principal place

of business located at 1601 E. Orangewood Avenue, Anaheim, California 92805. Alarm One

also sells, designs, installs, monitors and services electronic security systems.

      3.     Peter Maltby ("Maltby") is the President and Chief Executive Officer of Alarm

One.

## STATEMENT OF CLAIMS

      4.     Security Networks, Alarm One and Maltby are parties to an Asset Purchase

Agreement (the "Agreement") dated December 23, 2005, a copy of which is attached hereto as

Exhibit A. All capitalized terms used herein and not otherwise defined shall have the meanings given them in the Agreement. The Agreement provides that Maltby individually bears joint and several liability for the claims set forth in this Demand for Arbitration. Agreement at p. 24.

5. The Agreement contains an agreement to arbitrate disputes, which states, in pertinent part, as follows:

> Except with respect to Buyer electing to bring an action for specific performance of this Agreement (which action will be commenced and settled in a court of competent jurisdiction) or a dispute regarding the Final Purchase Price (which dispute will be settled by the Independent Arbiter), *any controversy or claim arising out of or relating to this Agreement, or the breach thereof, will be settled by arbitration in Wilmington, Delaware, in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA").*

Agreement, Section 8.3 (emphasis supplied).

6. All claims asserted herein arise out of or are related to the Agreement or the breach thereof.

## The Agreement and Purchase Price

7. According to the terms of the Agreement, Security Networks agreed to purchase certain assets of Alarm One, including but not limited to, "all of [Alarm One]'s rights in, to and under [certain] alarm lease, maintenance, repair, service and monitoring agreements with customers," which agreements are defined in the Agreement as "Customer Contracts." Agreement, Section 1.1(b)(i).

8. In exchange, Security Networks agreed to pay Alarm One an amount equal to a multiple of 31 times the recurring monthly revenue ("RMR") generated by the Customer Contracts as of the Closing Date, less the Unearned Revenue associated with the Customer Contracts (the "Purchase Price"). Agreement, Section 2.1(a).

9.    Security Networks reasonably relied upon Alarm One's representations and warranties and upon its good faith and fair dealing in agreeing to the manner of computing the Purchase Price and in ultimately paying the Purchase Price to Alarm One.

10.    Security Networks paid to Alarm One on the Closing Date a Purchase Price of $7,130,000.00.

## Representations and Warranties

11.    As an inducement for Security Networks to enter into the Agreement and pay the Purchase Price, Alarm One made numerous written representations, warranties, covenants and guarantees as to the accuracy of certain business, customer and financial information regarding Alarm One, including, *inter alia,* the Customer Contracts and the condition of Alarm One's assets, all of which informed Security Networks' valuation of the Customer Contracts and other assets acquired under the Agreement.

12.    In Section 3.11 of the Agreement, Alarm One represented and warranted that "All of the Customer Contracts are valid and enforceable... and are in full force and effect in accordance with their terms... and contain terms and conditions which are standard within the electronic security industry...."

13.    In Section 3.12(c) of the Agreement, Alarm One represented and warranted that: "To the best knowledge of Seller, there are no complaints by customers that, individually or in the aggregate, could have a material adverse effect upon the Assets to be Acquired or the financial condition or operation of the Security Business."

14.    In Section 3.12(e) of the Agreement, Alarm One represented and warranted that: "All of the alarm systems installed by Seller in connection with its operation of the Security Business... conform in all material respects to the contracts pursuant to which they were

installed, and in no case has such an installation been made by Seller which at the time of
installation was in violation of any applicable law, code or regulation."

15.    In Section 3.19 of the Agreement, Alarm One represented and warranted that:
"No representation or warranty by Seller in this Agreement or any Schedule or Exhibit, or any
statement, list or certificate furnished or to be furnished by Seller pursuant to this Agreement, or
in connection with these transactions, contains or will contain any untrue statement of a material
fact, or omits to state a material fact required to be stated herein or therein or necessary to make
the statements contained herein or therein not misleading or necessary in order to provide a
prospective purchaser of the Assets to be Acquired and Security Business with proper
information as to such assets and business."

16.    Section 8.1 of the Agreement states that "the representations, warranties,
covenants and agreements of Seller and Buyer contained in this Agreement form an integral part
of the consideration given to Buyer in exchange for the Purchase Price and to Seller in exchange
for the Security Business, without which Buyer would be unwilling to purchase, and Seller would
be unwilling to sell, the Assets to be Acquired."

17.    Section 8.1 of the Agreement further states that "all of the representations,
warranties, covenants and agreements of Seller and Buyer contained in this Agreement or in any
exhibit, schedule, statement, report, certificate or other document or instrument required to be
delivered pursuant to this Agreement will, subject to the limitations set forth in Section 7.2,
survive the making of this Agreement, any investigation or review made by or on behalf of the
parties hereto and the Closing."

**Alarm One Misrepresented the Assets Sold Under the Agreement**

18.     Although Security Networks paid Alarm One for approximately 6,200 Customer Contracts meeting certain defined criteria, many of the accounts sold did not meet the definition of a performing account for a variety of reasons, including the fact that many of the customers had canceled their contracts prior to the closing of the transaction.

19.     Additionally, numerous customer accounts had cancellations pending at the time of the closing, other accounts had undisclosed prepaid balances, others had undisclosed collection risks and still others are accounts of customers which Security Networks simply has been unable to reach.

20.     Over 600 of the alleged Customer Contracts had been canceled or were pending cancellation at the time of closing.  Additionally, many of the Customer Contracts purchased by Security Networks contained renewal provisions that appear to be in violation of certain state statutes within the State of Illinois.

21.     Alarm One knew at or prior to the closing of the transaction of these defects in the Customer Contracts and in fact has admitted, through its authorized agents and representatives, to owing Security Networks substantial post-closing adjustments.  Nevertheless, Alarm One has refused to make the appropriate payments to Security Networks.

**Failure to Transfer Digital Alarm Accounts**

22.     At the time of the transaction and entry into the Agreement, Alarm One also agreed to transfer a minimum of 5,000 digital alarm accounts, in addition to the accounts Security Networks purchased, to Security Networks' central station for monitoring by Security Networks.  See Digital Alarm Agreement attached as Exhibit B.

23.    In breach of that agreement, Alarm One failed to transfer any such accounts to Security Networks' control station.

24.    As a result, Security Networks has sustained substantial damages.

## COUNT I
## Breach of the Agreement

25.    Security Networks incorporates herein by reference paragraphs 1 through 24 of this Demand for Arbitration.

26.    Alarm One has failed to perform its obligations and has breached numerous provisions, representations and warranties contained in the Agreement.

27.    Alarm One further breached the Agreement by selling and accepting payment for accounts which were not performing or which otherwise had no value.

28.    Alarm One further breached the Agreement by selling accounts and accepting payment for accounts which were not what they were expressly and implicitly represented to be.

29.    Security Networks has sustained substantial damages as a result of Alarm One's breaches of the Agreement.  Alarm One and Maltby are jointly and severally liable for those damages.

## COUNT II
## Common Law Fraud

30.    Security Networks incorporates herein by reference paragraphs 1 through 29 of this Demand for Arbitration.

31.    In order to induce Security Networks to enter into the Agreement and pay the Purchase Price, Alarm One made certain fraudulent material representations and omissions of fact.

32.    Alarm One's representations were made to Security Networks with knowledge that they were false and fraudulent and with the intent to deceive Security Networks or with reckless disregard as to their truth or falsity.

33.    Alarm One's omissions were material and were made with the intent to defraud and deceive Security Networks.

34.    Despite reasonable efforts, Security Networks had no knowledge of the falsity or misleading nature of Alarm One's representations in connection with those assets of Alarm One purchased by Security Networks.

35.    Security Networks had a right to rely upon the truth of the representations of Alarm One because, among other things, Alarm One represented in the Agreement that such statements were true and accurate and because the facts regarding those representations were peculiarly within the knowledge of Alarm One.

36.    In reasonable reliance upon the false, deceptive and misleading material representations and omissions of Alarm One, Security Networks entered into the Agreement and agreed to purchase certain accounts and other assets of Alarm One at the Purchase Price of $7,130,000.00.

37.    As a proximate result of the fraudulent, false, misleading and deceptive practices of Alarm One, Security Networks has sustained substantial damages.  Alarm One and Maltby are jointly and severally liable for those damages.

## COUNT III
## **Negligent Misrepresentation**

38.    Security Networks incorporates herein by reference paragraphs 1 through 37 of this Demand for Arbitration.

39.    In order to induce Security Networks to enter into the Agreement and pay the Purchase Price, Alarm One supplied certain information and made certain representations to Security Networks in the course of negotiations in connection with the Agreement.

40.    In connection with the representations and warranties made to Security Networks, Alarm One omitted certain material information which Alarm One knew or should have known rendered its representations and warranties false or misleading when made.

41.    Due to Alarm One's failure to exercise reasonable care to ensure the accuracy of their representations, the representations made to Security Networks were false.

42.    The inaccurate and incomplete information supplied by Alarm One to Security Networks was provided intentionally to Security Networks in connection with the purchase of certain accounts and other assets of Alarm One by Security Networks and the price paid therefor.

43.    Said representations were made by Alarm One for the purpose of Alarm One's pecuniary gain.

44.    Security Networks had no knowledge of the falsity or misleading nature of Alarm One's misrepresentations.

45.    In reasonable and justifiable reliance upon the false, deceptive and misleading material representations and omissions of Alarm One, Security Networks entered into the Agreement and agreed to purchase certain accounts and other assets of Alarm One at the Purchase Price of $7,130,000.00.

46.    As a proximate result of the negligent misrepresentations of Alarm One, Security Networks has sustained substantial damages.  Alarm One and Maltby are jointly and severally liable for those damages.

## COUNT IV
### Breach of the Digital Alarm Agreement

47.    Security Networks incorporates herein by reference paragraphs 1 through 46 of this Demand for Arbitration.

48.    Alarm One has failed to perform its obligations and has breached the provisions of the Digital Alarm Agreement.

49.    Security Networks sustained substantial damages as a result of Alarm One's breaches of the Digital Alarm Agreement.  Alarm One and Maltby are jointly and severally liable for those damages.

WHEREFORE, Security Networks seeks an award in its favor and against Alarm One and Peter Maltby as follows:

1.    An award of compensatory damages, including costs and interest, in an amount to be determined by the panel[1];

2.    An award of punitive damages;

3.    An award of Security Networks's reasonable attorneys' fees and expenses as provided by, *inter alia*, Section 8.3 of the Agreement.

4.    Such other and further relief as the panel deems appropriate.

Dated:  August 17, 2006                          **REED SMITH LLP**

                                                 David E. Wilks (No. 2793)
                                                 1201 Market Street, Suite 1500
                                                 Wilmington, DE 19801
                                                 Tel.:  (302) 778.7560
                                                 Fax:  (302) 778.7575
                                                 Attorneys for Claimant

---

[1] For the purposes of Commercial Arbitration Rule R-4(a)(i), Security Networks estimates at this time that the amount involved in this matter is approximately $1,800,000.00.  Security Networks reserves the right to amend that estimate at any time.

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

ALARM ONE, INC.

AND

SECURITY NETWORKS, LLC

# TABLE OF CONTENTS

1.  PURCHASE AND SALE OF ASSETS ................................................................- 1 -
    1.1   Assets to be Acquired. ........................................................................- 1 -
    1.2   Excluded Assets. .................................................................................- 2 -
    1.3   Assumed Liabilities. ...........................................................................- 2 -
    1.4   Excluded Liabilities. ...........................................................................- 2 -

2.  PURCHASE PRICE AND CLOSING.................................................................- 3 -
    2.1   Purchase Price. ....................................................................................- 3 -
    2.2   Definitions............................................................................................- 4 -
    2.3   Allocation of Purchase Price...............................................................- 5 -
    2.4   Closing Date and Location...................................................................- 5 -
    2.5   Noncompetition Agreement..................................................................- 5 -
    2.6   Transition Services...............................................................................- 5 -

3.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER................- 5 -
    3.1   Organization of Seller. ........................................................................- 6 -
    3.2   Authority of Seller. .............................................................................- 6 -
    3.3   Office Locations...................................................................................- 6 -
    3.4   Title to Property. .................................................................................- 7 -
    3.5   Compliance With Laws; Litigation.....................................................- 7 -
    3.6   Condition of Assets..............................................................................- 7 -
    3.7   Adverse Developments. .......................................................................- 8 -
    3.8   Tax Returns and Payments...................................................................- 8 -
    3.9   Agreements With Employees...............................................................- 8 -
    3.10  Intellectual Property Rights.................................................................- 9 -
    3.11  Customer Contracts and Business Documents. ...................................- 9 -
    3.12  Customer and System Information.......................................................- 10 -
    3.13  Broker or Finder. ................................................................................- 12 -
    3.14  Labor Relations. ..................................................................................- 12 -
    3.15  Bulk Sales Compliance and Transfer Taxes. ......................................- 12 -
    3.16  Burdensome Agreements. ....................................................................- 12 -
    3.17  Options, Warrants and Rights of First Refusal. ..................................- 12 -
    3.18  Environmental Matters........................................................................- 13 -
    3.19  Disclosure. ...........................................................................................- 13 -

4.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER...............- 13 -
    4.1   Authority of Buyer. .............................................................................- 13 -
    4.2   Broker or Finder. .................................................................................- 14 -
    4.3   Litigation..............................................................................................- 14 -

5.  CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER................................- 14 -
    5.1   Covenants and Warranties. .................................................................- 14 -
    5.2   Corporate Action.................................................................................- 14 -

| | | |
|---|---|---|
| 5.3 | No Restraint or Litigation. | - 14 - |
| 5.4 | Necessary Consents and Permits. | - 14 - |
| 5.5 | Documents, Certificates and Other Items. | - 15 - |
| 5.6 | Satisfaction of Debts. | - 15 - |
| 5.7 | Accounts Receivable. | - 15 - |
| 5.8 | Use of Name. | - 15 - |
| 5.9 | Employees. | - 16 - |
| 6. | CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER | - 16 - |
| 6.1 | Covenants and Warranties. | - 16 - |
| 6.2 | Delivery of Purchase Price. | - 16 - |
| 6.3 | Documents, Certificates and Other Items. | - 16 - |
| 6.4 | No Restraint or Litigation. | - 16 - |
| 7. | INDEMNIFICATION | - 17 - |
| 7.1 | Indemnification by Seller and Buyer | - 17 - |
| 7.2 | Notice of Claims. | - 18 - |
| 7.3 | Survival of Indemnity Obligations. | - 18 - |
| 7.4 | Indemnity Basket and Cap. | - 18 - |
| 7.5 | Offset for Insurance. | - 19 - |
| 7.6 | Sole and Exclusive Remedy. | - 19 - |
| 8. | GENERAL PROVISIONS | - 19 - |
| 8.1 | Survival of Obligations. | - 19 - |
| 8.2 | Transfer Charges and Taxes. | - 19 - |
| 8.3 | Arbitration. | - 19 - |
| 8.4 | Confidentiality. | - 20 - |
| 8.5 | Public Announcements. | - 20 - |
| 8.6 | Governing Law. | - 20 - |
| 8.7 | Notices. | - 21 - |
| 8.8 | Assignment. | - 21 - |
| 8.9 | Entire Agreement; Amendments. | - 21 - |
| 8.10 | Interpretation. | - 22 - |
| 8.11 | Waivers. | - 22 - |
| 8.12 | Expenses. | - 22 - |
| 8.13 | Partial Invalidity. | - 23 - |
| 8.14 | Further Assurances. | - 23 - |
| 8.15 | Counterparts. | - 23 - |
| 8.16 | Third-Party Beneficiaries. | - 23 - |

**INDEX OF DEFINED TERMS**

| | |
|---|---|
| AAA | Section 8.3 |
| Agreement | Caption |
| Assets to be Acquired | Section 1.1 |
| Best Knowledge | Section 8.10 |
| Business Documents | Section 1.1(b)(ii) |
| Buyer | Caption |
| Buyer's Aggregate Net Loss | Section 7.1(a) |
| Chicago Employees | Section 3.9(c) |
| Claiming Party | Section 7.2 |
| Closing | Section 2.4 |
| Closing Date | Section 2.4 |
| Closing Payment | Section 2.1(d) |
| Customer Contracts | Section 1.1(b)(i) |
| Estimated Purchase Price | Section 2.1(d) |
| Excluded Claims | Section 7.3 |
| Final Purchase Price | Section 2.1(d) |
| Grace Period | Section 2.1(d) |
| Hazardous Materials | Section 1.4(f) |
| Including | Section 8.10 |
| Indemnifying Party | Section 7.2 |
| Independent Arbiter | Section 2.1(d) |
| Noncompetition Agreement | Section 2.5 |
| Occurrence basis | Section 3.6 |
| Performing RMR | Section 2.2(a) |
| Purchase Price | Section 2.1(a) |
| Security Business | Background |
| Seller | Caption |
| Seller's Aggregate Net Loss | Section 7.1(b) |
| Tangible Assets | Section 1.1(a) |
| Transition Agreement | Section 2.6 |
| Unearned Revenue | Section 2.2(b) |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of this 23rd day of December, 2005, by and between ALARM ONE, INC., an Illinois corporation ("Seller"), and SECURITY NETWORKS, LLC, a Florida limited liability company ("Buyer").

## BACKGROUND

WHEREAS, Seller owns and operates a security alarm business serving the area in and around Chicago, Illinois (the "Security Business"); and

WHEREAS, Seller desires to sell, and Buyer desires to purchase, certain of the assets of Seller used in the operation of the Security Business, all on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound, the parties agree as follows:

1. ## PURCHASE AND SALE OF ASSETS

    1.1    Assets to be Acquired.

Upon the terms and subject to the conditions of this Agreement, Seller will, on the Closing Date, sell, transfer, assign and deliver to Buyer all of Seller's right, title, interest and benefit in and to certain assets of Seller used in the operation of the Security Business (collectively, the "Assets to be Acquired"). The Assets to be Acquired include all of the following:

    (a)    All of Seller's rights in all of the tangible personal property of Seller located at the real property described on Schedule 3.3, including tools, office equipment, furnishings, inventory (including all inventory on vehicles used in the Security Business), other tangible personal property of any nature, and Seller's rights in fixtures attached to the real property leased to Seller and used by Seller in the Security Business, all of which are set forth in Schedule 1.1(a) (collectively, the "Tangible Assets").

    (b)    (i)    All of Seller's rights in, to and under all alarm lease, maintenance, repair, service and monitoring agreements with customers (collectively, the "Customer Contracts").

    (ii)    All of Seller's rights in, to and under all leases of equipment that are related to and used by Seller in the Security Business, telephone book listing agreements,

noncompetition, nonsolicitation and nondisclosure agreements with third parties, and all other agreements, licenses (including any licenses held personally), permits (including permits relating to installations which are pending, currently in progress or completed) and manufacturer's warranties on tangible property that are related exclusively to Seller's conduct of the Security Business (collectively, the "Business Documents").

(iii)    All of the Customer Contracts and Business Documents are set forth in Schedule 1.1(b).

(c)    All of Seller's rights in, to and under the following assets, intangibles and rights that are related to, and presently owned by Seller or used in, the Security Business: (i) refundable deposits from customers, prepaid service charges and prepaid income items; (ii) operating and accounting data; (iii) customer lists and files (including any lists and files of former customers); (vi) rights to receiver and fax line telephone numbers (including WATS lines and numbers); and (v) goodwill.

1.2    Excluded Assets.

Seller is not selling or transferring to Buyer any assets other than those described in Section 1.1.

1.3    Assumed Liabilities.

Buyer agrees to assume all liability for the performance of all obligations arising after the Closing Date with respect to the Customer Contracts and Business Documents assigned to Buyer by Seller.

1.4    Excluded Liabilities.

Except for the liabilities that Buyer will assume pursuant to Section 1.3, Buyer will not assume or be obligated for any other liability, obligation or commitment of Seller, direct or indirect, known or unknown, absolute or contingent, including any of the following:

(a)    any foreign, federal, state, county or local income or other tax arising from the operation of the Security Business or the ownership of the Assets to be Acquired on or prior to the Closing Date;

(b)    any liability, obligation or commitment of Seller to its creditors, whether arising out of contract or tort, or to any party holding a lien on any of Seller's assets;

(c)    any employee obligation, including any obligation for wages, commissions, vacation and holiday pay, sick pay, bonuses, severance pay, pensions, or any obligation under any collective bargaining agreement, employment agreement or employment-at-will relationship, or any obligation to hire any employee of Seller after the Closing Date;

(d)    any liability, obligation or commitment incurred by Seller after the Closing Date;

(e)    any liability, the existence of which would constitute a breach of any of the representations, warranties or covenants of Seller in this Agreement;

(f)    any liability arising because Hazardous Materials are present on the real or personal property leased or otherwise used by Seller and being transferred pursuant to this Agreement, or any liability for the use, handling, generation or disposal of Hazardous Materials by Seller, any of Seller's affiliates, any previous owner of the Assets to be Acquired or any third party on any property owned, operated, leased or otherwise used by Seller or its affiliates. The term "Hazardous Materials" includes hazardous waste, hazardous substances, toxic substances and all related materials, including all materials and substances regulated by The Comprehensive Environmental Response, Compensation and Liability Act of 1980, The Resource Conservation and Recovery Act of 1976, The Superfund Amendments and Reauthorization Act of 1986, The Clean Water Act, The Clean Air Act, The Toxic Substance Control Act, all as amended from time to time, and/or any other applicable federal, state or local environmental law, statute, rule, regulation or ordinance; or

(g)    any other liability, obligation or commitment not expressly assumed by Buyer pursuant to this Agreement.

## 2.    PURCHASE PRICE AND CLOSING

2.1    Purchase Price.

(a)    The purchase price for the Assets to be Acquired (the "Purchase Price") will equal a multiple of 31 times the Performing RMR on the Closing Date, less the amount of the Unearned Revenue.

(b)    100% of the Closing Payment will be paid to Seller on the Closing Date by federal funds wire transfer or other form of immediately available funds.

(c)    The Purchase Price will be adjusted to reflect, in accordance with generally accepted accounting principles, the principle that all income and expenses of the Security Business attributable to the period after the Closing Date are for the account of Buyer and all income and expenses attributable to the period on or before the Closing Date are for the account of Seller.

(d)    Buyer and Seller have agreed that the amount to be paid to Seller at Closing will be $7,130,000 (the "Closing Payment"). The parties acknowledge that this amount does not include the Unearned Revenue adjustment to which Buyer is entitled. Within 30 days after Closing, Buyer will deliver to Seller an estimate of the Purchase Price as of the Closing Date, as adjusted in accordance with Sections 2.1(a) and 2.1(c) (the "Estimated Purchase Price"), together with such supporting documentation as Seller may reasonably request. On or before 120 days after the Closing Date, Buyer will deliver to Seller a final closing adjustment calculated as of the Closing Date (the "Final Purchase Price"), together with such supporting documentation as Seller may reasonably request, which will state in reasonable detail the nature and extent of each

adjustment. Should Seller dispute Buyer's calculation of the Estimated Purchase Price or the Final Purchase Price, Seller will promptly, but in no event later than 30 days after receipt of such calculation (the "Grace Period"), deliver to Buyer written notice describing in reasonable detail the dispute, together with Seller's determination as to the amount of Estimated Purchase Price or the Final Purchase Price, as the case may be, in reasonable detail. If the dispute is not resolved by the parties within 20 days from the date of receipt by Buyer of written notice from Seller, the parties agree to promptly engage Benchmark Partners (the "Independent Arbiter") to resolve the dispute within 30 days after such engagement. The Independent Arbiter's determination will be final and binding on the parties. Buyer or Seller, as the case may be, will make appropriate payment to the other by wire transfer of the difference between the Estimated Purchase Price and the Closing Payment or the difference between the Final Purchase Price and the Estimated Purchase Price, as the case may be, within 5 business days following the expiration of the Grace Period, resolution of the dispute by the parties, or receipt of the Independent Arbiter's final determination, as the case may be; provided, that any amount not in dispute will be paid before resolution of the dispute by the parties or the receipt of the Independent Arbiter's final determination. All fees and costs of the Independent Arbiter will be borne pro rata by Buyer and Seller in proportion to the difference between the Independent Arbiter's determination of the Estimated Purchase Price or the Final Purchase Price, as the case may be, and Seller's and Buyer's determination of such adjustment. For example, if Seller's determination differs by $20,000 from the Independent Arbiter's determination, but Buyer's determination only differs by $5,000, Seller will bear 20/25 of such fees and costs and Buyer will bear 5/25 of such fees and costs.

    2.2   <u>Definitions</u>.

    For purposes of this Agreement, the following terms shall have the following meanings:

    (a) "Performing RMR" means the amount of recurring monthly revenue (net of any private line telephone communication or third-party pass-through charges, assessments or taxes and net of any customer discounts) of the Security Business derived solely from enforceable written Customer Contracts for which: (i) the underlying customer is not more than 60 days in arrears on any payment due under such agreement; or (ii) Seller has received, no later than 30 days before the Closing Date, at least one (1) full monthly payment for recurring services rendered under such agreement, provided that the underlying customer is not more than 90 days in arrears on any payment due under such agreement. Performing RMR shall not include any revenue: (a) that is not periodic in nature, such as installation purchase payments or one-time assessments or charges; (b) from customers from whom Seller has received notice of a pending termination; (c) from customers who were recently added as a result of extraordinary marketing efforts or an amnesty program; (d) from lease agreements; (e) from the provision of long-range radio or cellular back-up services (such exclusion does not negate the Performing RMR otherwise paid by any customer who also receives such services); (f) from renters or persons who reside in mobile homes; or (g) from customers whose telephone number has been disconnected.

(b) "Unearned Revenue" means all revenue of the Security Business that has been collected, or billed but not collected, by or on behalf of Seller on or prior to the Closing Date for services to be provided by Buyer after the Closing Date.

2.3    Allocation of Purchase Price.

Buyer and Seller agree to allocate the Purchase Price among the Assets to be Acquired in accordance with Schedule 2.3 and to be bound by such allocation and to file all returns and reports regarding these transactions, including all federal, state and local tax returns (including Form 8594), on the basis of such allocation. Buyer and Seller agree that a nominal amount of the Purchase Price, not in excess of $15,000, will be allocated to the Noncompetition Agreement; provided, however, that Seller acknowledges that Buyer's remedy for a breach of the Noncompetition Agreement will not be limited to the amount of such allocation.

2.4    Closing Date and Location.

The consummation of the transfer and delivery of the Assets to be Acquired to Buyer and the receipt of the consideration therefor by Seller will constitute the "Closing." Unless otherwise mutually agreed to by the parties, the Closing will take place electronically on December 23, 2005, or upon the satisfaction by Seller of all of the conditions precedent to Buyer's obligation to consummate these transactions, whichever is later, which date and time will constitute the "Closing Date." The effective date of the sale of the Security Business will be as of 11:59:59 p.m. on the Closing Date and all prorations and allocations provided for in Section 2.1(c) will be made as of such time.

2.5    Noncompetition Agreement.

In connection with the consummation of these transactions, Seller and Peter Maltby, Seller's majority shareholder, will have executed a noncompetition/nonsolicitation agreement with respect to the greater Chicago area in the form of Exhibit A (the "Noncompetition Agreement").

2.6    Transition Services.

In connection with the consummation of these transactions, Seller shall enter into a transition services agreement in the form of Exhibit B (the "Transition Agreement").

## 3.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate these transactions, Seller represents, warrants and covenants to Buyer and agrees:

- 5 -

3.1    Organization of Seller.

(a)    Seller is a corporation, duly incorporated and organized, validly existing and in good standing under the laws of the State of Illinois, and has the requisite corporate power and authority to own or lease all of the Assets to be Acquired, to own and operate the Security Business, to carry on its business as now conducted, to enter into this Agreement and to perform the terms of this Agreement.

(b)    Seller has not, within the 6-year period immediately preceding the date of this Agreement, changed its name or been the surviving entity of a merger or consolidation. There are no fictitious names under which Seller or such predecessors of Seller have conducted the Security Business. Seller agrees to cooperate with Buyer and take whatever steps are necessary promptly after Closing in order to permit Buyer to use Seller's name, but only to the extent permitted by the Transition Agreement.

3.2    Authority of Seller.

Seller has full power and authority to enter into this Agreement, to consummate these transactions and to comply with the terms, conditions and provisions hereof. This Agreement has been duly authorized, executed and delivered by Seller and is, and each other agreement or instrument of Seller contemplated by it will be, the legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, provided, however, that enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of this Agreement. The execution, delivery and performance of this Agreement and the other agreements of Seller contemplated by it have been duly authorized and approved by the shareholders and board of directors of Seller and do not require any further authorization, the consent of or notice to any third party, except as set forth on Schedule 3.2. Neither the execution and delivery of this Agreement nor the consummation of these transactions will conflict with or result in any violation of or constitute a default under any term of the Articles of Incorporation or Bylaws of Seller, or any agreement, mortgage, debt instrument, indenture, or other instrument, judgment, decree, order, award, law or regulation by which Seller is bound, or result in the creation of any lien, security interest, charge or encumbrance upon any of the Assets to be Acquired, except as set forth on Schedule 3.2.

3.3    Office Locations.

(a)    Seller owns no real property in connection with the operation of the Security Business.

(b)    The only real property used by Seller under lease in connection with the operation of the Security Business is 17 W. 725 Butterfield Road, Units A & B, Oakbrook Terrace, Illinois 60181. Seller has a valid and subsisting lease for such real property, a copy of which has been delivered to Buyer. Seller will permit Buyer to use such real property after Closing pursuant to the Transition Agreement.

- 6 -

3.4    Title to Property.

Except as described on Schedule 3.4, Seller has good and marketable title to all of the Assets to be Acquired, free and clear of all liens, claims, charges, encumbrances, leases, pledges, security interests, mortgages, defects in title, equities, covenants and other restrictions of any nature whatsoever.

3.5    Compliance With Laws; Litigation.

(a)    Except as set forth on Schedule 3.5, Seller has complied, in all material respects, with all material laws, regulations, rules, writs, injunctions, ordinances, franchises, decrees or orders of any federal or state court or of any municipal or governmental department, commission, board, bureau, agency or instrumentality which are applicable to the Assets to be Acquired or the Security Business.

(b)    All reports, schedules and/or returns of any administrative agency of the federal or any state or local government required to be filed by Seller with respect to the Security Business have been filed.

(c)    Except as set forth on Schedule 3.5, there are no lawsuits, claims, suits, proceedings or investigations pending or, to the best knowledge of Seller, threatened against or affecting Seller with respect to the Security Business, nor are there any lawsuits, claims, suits or proceedings pending in which Seller is the plaintiff or claimant, that relate to the Assets to be Acquired or the Security Business and which involve the possibility of any judgment, order, award or other decision that might impair the ability of Seller to perform this Agreement, or might impair the quality of title of the Assets to be Acquired, or might adversely affect the normal operation of the Security Business, or might result in liability for damages or might otherwise adversely affect Seller's right, title or interest in the Assets to be Acquired or the Security Business.

(d)    There is no action, suit or proceeding pending or, to the best knowledge of Seller, threatened which questions the legality or propriety of these transactions.

3.6    Condition of Assets.

(a)    The Tangible Assets are in good operating condition, ordinary wear and tear excepted.

(b)    Schedule 3.6 sets forth a true and complete list of all insurance policies insuring any of the Assets to be Acquired or general liability and E&O insurance relating to the Security Business. The general liability and E&O policies are on (and for the applicable statute of limitations period plus 1 year have been on) an "occurrence basis," which means, for example, that if a claim arose after the Closing Date for an event which occurred prior to the Closing Date, Seller's applicable insurance policy in existence on the date such event occurred would cover such claim. All such policies are in full force and effect and Seller has not received any notice of cancellation with respect thereto. During the past 5 years, no application by Seller for insurance with respect to the Assets to be Acquired has been denied for any reason. After Closing, Seller

- 7 -

will cause its insurance agent to deliver to Buyer a copy of its insurance claims history with respect to the Security Business for the past 5 years.

(c)    The Acquisition Profile dated December 12, 2005 is true and complete in all material respects as of the date delivered to Buyer; provided, however, that to the extent such profile is inconsistent with this Agreement, this Agreement shall govern, and the consistency shall not be deemed a breach of this representation.

3.7    <u>Adverse Developments</u>.

Since December 31, 2004, no event or condition has occurred which materially adversely affected the Assets to be Acquired or the Security Business, including: (a) any change in the financial condition, assets or liabilities of the Security Business, other than changes in the ordinary course of business; or (b) any damage, destruction, loss or other casualty to the Security Business, however arising and whether or not covered by insurance.

3.8    <u>Tax Returns and Payments</u>.

All income taxes, unemployment, social security, franchise, real property, personal property and all other taxes levied, assessed or imposed upon Seller with respect to the Security Business by the United States, or any state, or governmental subdivision of either, to the extent due and payable, have been duly paid to date or are being contested through appropriate administrative or judicial procedures, and no liability for deficiencies with respect thereto exists. There are no tax audits pending nor any outstanding agreements or waivers extending the statutory period of limitations applicable to any federal, state or local income tax return for any period related to the Security Business.  To Seller's best knowledge, no tax deficiencies have been determined nor proposed tax assessments charged against Seller (nor is there any basis therefor) with respect to the Security Business.  Seller has filed all federal, state, local, sales, franchise, withholding, real and personal property tax returns required to be filed with respect to the Security Business.  No penalties or other charges are, or will become, due with respect to the late filing of any return by Seller related to the Security Business.

3.9    <u>Agreements With Employees</u>.

(a)    Seller is not a party to any employment agreement with any of the Chicago Employees, written or oral, which cannot be terminated at will by Seller.

(b)    Except as set forth on <u>Schedule 3.9</u>, Seller does not have any pension, profit sharing or other employee benefit plan, or any health care, life insurance or other employee welfare plan, for any of the Chicago Employees.

(c)    The names, titles and rates of compensation of all of the employees of Seller who work solely in connection with the Security Business and are based in Chicago (the "Chicago Employees") are listed on <u>Schedule 3.9</u>.  None of the Chicago Employees has indicated to Seller any intention to terminate his employment with Seller.

(d)    Seller has entered into a nonsolicitation/nondisclosure agreement with each of the Chicago Employees.

3.10    Intellectual Property Rights.

Schedule 3.10 sets forth all of the patents (including all reissues, divisions, continuations and extensions thereof), applications for patents, patent disclosures docketed, inventions, improvements, trademarks, trademark applications, trade names and copyrights owned by Seller and used in the Security Business, and all licenses, franchises, permits, authorizations, agreements and arrangements that concern the same or that concern like items owned by others and used by Seller in connection with the Security Business. True, correct and complete copies of all such licenses, franchises, permits, authorizations, agreements and arrangements have been delivered by Seller to Buyer. Seller has no knowledge of and has not received any notice of conflict with the asserted rights of others with respect to any of these intellectual property rights, or any other intellectual property rights used in connection with the Security Business.

3.11    Customer Contracts and Business Documents.

Except for the Customer Contracts and Business Documents, Seller has no presently existing material contract, agreement, lease, permit, consent, license or commitment, whether written or oral, affecting or relating to the Security Business. All of the Customer Contracts are valid and enforceable (provided, however, that enforceability of the Customer Contracts may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of such Customer Contract) and are in full force and effect in accordance with their terms, are assignable to Buyer without obtaining the consent of or providing notice to any customer, and contain terms and conditions which are standard within the electronic security industry, including those involving limitation of liability/liquidated damages and third-party indemnification. All of the Customer Contracts are written on one of the forms attached as part of Schedule 3.11 and none have been modified with respect to the provisions that limit Seller's liability. All of the Business Documents are valid and enforceable (provided, however, that enforceability of the Customer Contracts may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of such Customer Contract) and are in full force and effect in accordance with their terms. Seller has made available to Buyer copies of all of the Customer Contracts and Business Documents set forth on Schedule 1.1(b). Without limiting the foregoing, Seller represents that, to the best of its knowledge, the Security Business has been operated in substantial conformity with the Customer Contracts and Business Documents. Seller has not defaulted in its obligations pursuant to any of the Customer Contracts or Business Documents, which default could result in the cancellation of any Customer Contract or Business Document or adversely affect the rights of Seller under that Customer Contract or Business Document. Seller is not a party to any franchise, license,

distributor or other similar type of agreement respecting the Security Business. Seller did not acquire any of the Customer Contracts from any third party.

3.12    Customer and System Information.

(a)    Seller has entered into written agreements with all of its customers. None of the Customer Contracts have been altered in any material adverse manner (for example, deleting or modifying the limitation of liability provision). All of the Customer Contracts contain an original term of at least three (3) years. None of Seller's customers have a history of excessive false alarms which were not satisfactorily resolved.

(b)    Seller has provided each residential customer with the 3-day right of rescission in substantial compliance with the provisions of 16 C.F.R. Part 429 (Cooling-Off Period for Door-to-Door Sales) and any applicable state laws. Seller acknowledges that any failure on its behalf to comply with such regulation and laws in connection with any transaction involving a residential customer may result in such customer having the right to rescind or cancel such transaction. Seller further acknowledges that Buyer desires not to assume any risk for any liability that might arise as a result of any such rescission or cancellation.

(c)    Schedule 3.12 sets forth a true and accurate list of the amounts which Seller charges its customers for monitoring, repair service and any other services provided by Seller. Seller has no obligations or liabilities to customers, except the obligation to supply services to customers in the ordinary course of business. To the best knowledge of Seller, there are no complaints by customers that, individually or in the aggregate, could have a material adverse effect upon the Assets to be Acquired or the financial condition or operation of the Security Business.

(d)    Seller has no free or discounted service liability to customers existing with respect to the Security Business. Seller has no obligation or liability for the refund of monies to its customers other than obligations to refund deposits made by customers in the ordinary course of business. Under applicable law, Seller is not required to pay its customers interest on these refundable deposits. Since January 1, 2005, neither Seller, nor any of Seller's officers, directors, shareholders, employees or agents have paid directly or indirectly any accounts receivable of customers.

(e)    All of the alarm systems installed by Seller in connection with its operation of the Security Business are in good working order and condition, failure of a customer to report to Seller any problem with an alarm system known to the customer and customer non-use excepted, and have been installed and maintained in accordance with good and workmanlike practices prevailing in the security alarm industry. All such alarm systems conform in all material respects to the contracts pursuant to which they were installed, and in no case has such an installation been made by Seller which at the time of installation was in violation of any applicable law, code or regulation. All manufacturers' warranties applicable to any such alarm systems are freely assignable to Buyer. Seller is not aware of any difficulty in obtaining replacement parts for its product lines.

(f)    No one customer represents more than 1% of the Performing RMR. Except as set forth on <u>Schedule 3.12</u>, there has been no increase in Seller's monitoring or repair service rates in the last 12 months. Seller is not aware of any legal impediments which would prevent Buyer from instituting any rate increases after the Closing Date.

(g)    The account base of the Security Business is comprised solely of digital accounts, except for less than 20 accounts that have cellular back-up service. Except as set forth on <u>Schedule 3.12</u>, the telephone lines and numbers applicable to the accounts included as part of the Assets to be Acquired can be converted to communicate with Buyer's central station by means of a line switch. <u>Schedule 3.12</u> sets forth a list of all of the telephone numbers used in connection with the operation of the Security Business, including all customer service numbers. To Seller's knowledge, and assuming that Buyer's monitoring facilities are compatible with the facilities of Seller's monitoring center, none of the alarm systems of Seller included as part of the Assets to be Acquired should require an on-site visit in order to reprogram such system to communicate with Buyer's central station. Seller shall provide Buyer with all of the data requested by Buyer with respect to the monitoring of the accounts included as part of the Assets to be Acquired, which data shall be accurate and complete in all material respects. Such data shall be provided in a timely fashion, in an acceptable electronic format, and at no cost to Buyer, pursuant to the terms of the Transition Agreement. Seller shall use its best efforts to assist Buyer so that Buyer will be able to transfer the monitoring of the accounts included as part of the Assets to be Acquired to its own central station on or before January 31, 2006.

(h)    Seller may terminate any agreement providing for the monitoring of any of its customers included as part of the Assets to be Acquired by any third party monitoring facility on not more than 30 days' notice. Except as set forth on <u>Schedule 3.12</u>, Seller does not offer its customers included as part of the Assets to be Acquired any type of medical alert monitoring service, two-way voice service or cellular back-up service.

(i)    To the best of Seller's knowledge, Seller is in substantial compliance with all false alarm ordinances applicable to the Security Business, and has paid all necessary permit and/or license fees that are the obligations of Seller (as opposed to obligations of the customers); to Seller's knowledge, no other communities in Illinois in which the Security Business is doing business are contemplating passing a false alarm ordinance.

(j)    To the best of Seller's knowledge, there are no pending plans by any telephone company to change the dialing procedures or exchange numbers within the areas servicing Seller's customers included as part of the Assets to be Acquired such that Seller would need to reprogram its customer's digital dialers.

(k)    All equipment sold or leased by Seller to its customers included as part of the Assets to be Acquired was of merchantable quality. Seller has not breached any express or implied warranties in connection with such sales or leases.

(l)    Seller has not sold or otherwise made its customer list included as part of the Assets to be Acquired available to any third party, other than its past and present institutional lenders.

- 11 -

(m)    Over 99% of the customers of the Security Business are located in the Chicago metropolitan area.

(n)    The Security Business has no work in progress, nor any outstanding bids or proposals.

(o)    The Security Business has no post office boxes located in the State of Illinois.

3.13    Broker or Finder.

Neither Seller nor any party acting on Seller's behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of these transactions.

3.14    Labor Relations.

The employees of the Security Business are not parties to any collective bargaining agreement with Seller.  There are no grievances, disputes or controversies with any union or any other organization of the employees of the Security Business, nor are there any threats of strikes, work stoppages or any pending demands for collective bargaining by any union or organization.  Seller has not engaged in any unfair labor practices with respect to the Security Business.

3.15    Bulk Sales Compliance and Transfer Taxes.

Neither the sale and transfer of the Assets to be Acquired pursuant to this Agreement, nor Buyer's possession and use thereof after Closing because of such sale and transfer, will result in or be subject to:  (a) any law pertaining to bulk sales or transfers which make such sales or transfers ineffective as to creditors of Seller; (b) any federal, state or local sales, use, transfer, excise or license tax, fee or charge applicable to any of the Assets to be Acquired; or (c) the imposition of any liability upon Buyer for appraisal rights or other liability owing to any shareholder of Seller which is not expressly assumed by Buyer in this Agreement.

3.16    Burdensome Agreements.

Seller is not a party to any agreement or instrument nor subject to any restriction which now has or, as far as Seller can foresee, may have a material adverse effect, financial or otherwise, upon the Security Business or the Assets to be Acquired, other than the credit facilities with its institutional lenders.

3.17    Options, Warrants and Rights of First Refusal.

Seller represents that no person or entity, including ADT Security Services, Inc., has any option, warrant or right of first refusal to purchase any of the Assets to be Acquired, the Security Business.

3.18    Environmental Matters.

Neither Seller nor any of Seller's affiliates own, operate or lease or have owned, operated or leased any real property used in connection with the Security Business that has used, generated, stored or disposed of any Hazardous Materials, nor to the best of Seller's knowledge after due inquiry have there been any Hazardous Materials disposed of by any previous owner or any other third-party on any property owned, operated or leased by Seller or any of its affiliates.

3.19    Disclosure.

No representation or warranty by Seller in this Agreement or any Schedule or Exhibit, or any statement, list or certificate furnished or to be furnished by Seller pursuant to this Agreement, or in connection with these transactions, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not misleading or necessary in order to provide a prospective purchaser of the Assets to be Acquired and Security Business with proper information as to such assets and business.

4.    **REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER**

As an inducement to Seller to enter into this Agreement and to consummate these transactions, Buyer represents, warrants and covenants to Seller:

4.1    Authority of Buyer.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Florida. Buyer has full power and authority to enter into this Agreement, to consummate these transactions and to comply with the terms, conditions and provisions hereof. This Agreement is, and each other agreement or instrument of Buyer contemplated by it will be, the legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, provided, however, that enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws at the time in effect affecting the rights of creditors generally and that a court of competent jurisdiction may decline to grant specific performance and any other equitable remedy with respect to the enforcement of any provision of this Agreement. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by it will conflict with or result in any violation of or constitute a default under any term of any agreement, mortgage, debt instrument, indenture, franchise, license, permit, authorization, lease or other instrument, judgment, decree, order, award, law or regulation by which Buyer is bound. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby: (a) are permissible under Buyer's Articles of Organization; and (b) have been duly and validly authorized by all necessary and appropriate action by Buyer's members.

- 13 -

4.2    Broker or Finder.

Neither Buyer nor any party acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of these transactions, except for the fees payable to The Edmonds Group, which fees Buyer agrees to pay, and Buyer agrees to indemnify and hold harmless Seller from any claim or liability that may be asserted against Seller by any broker, finder or intermediary engaged by Buyer.

4.3    Litigation.

There is no action, suit or preceding pending or, to the best knowledge of Buyer, threatened which questions the legality or propriety of these transactions or that would prevent Buyer or limit Buyer in any way from assuming and performing the obligations under the Customer Contracts and Business Documents included among the Assets to be Acquired.

## 5.    CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

On or prior to the Closing Date, Seller will have satisfied (or caused to be satisfied) each of the following conditions, unless waived in writing by Buyer:

5.1    Covenants and Warranties.

There will have been no material breach by Seller in the performance of any of its covenants and agreements contained or referred to in this Agreement; each of the representations and warranties of Seller contained or referred to in this Agreement will be true and correct in all material respects on the Closing Date.

5.2    Corporate Action.

Seller will have taken all corporate action necessary to approve these transactions, and Seller will have furnished Buyer with certified copies of the resolutions adopted by its Shareholders and Board of Directors, in form and substance satisfactory to counsel for Buyer, in connection with such transactions.

5.3    No Restraint or Litigation.

No action, suit or proceeding will by pending or threatened by any third party or governmental or regulatory agency to restrain, prohibit or otherwise challenge the legality or validity of these transactions or of any of the Assets to be Acquired.

5.4    Necessary Consents and Permits.

The parties will have received all of the consents listed on Schedule 3.2, including the consent of any lender to Seller, and such consents will be valid and enforceable on the Closing Date.

5.5    Documents, Certificates and Other Items.

Seller will have delivered or caused to be delivered to Buyer:

(a)    an Assignment and Bill of Sale in the form of Exhibit C, duly executed;

(b)    the Noncompetition Agreement described in Section 2.5, duly executed;

(c)    the Transition Agreement described in Section 2.6, duly executed;

(d)    the letter attached hereto as Exhibit D by and among Buyer, Seller and Central One, duly executed by each party;

(e)    a Certificate of Good Standing issued by the Secretary of State of Illinois evidencing Seller's corporate standing in such state, dated within 30 days of the Closing Date;

(f)    all other documents and instruments required under this Agreement; and

(g)    all other documents and instruments reasonably requested by Buyer in connection with the consummation of these transactions.

5.6    Satisfaction of Debts.

(a)    Seller will have delivered to Buyer the lien searches performed against Seller for the State of Illinois and for Cook County, Illinois, showing all UCC-1 financing statements, federal, state, and local tax liens, outstanding judgments and pending litigation.

(b)    Seller will have delivered to Buyer a true and correct list of each of the secured creditors of Seller and the amount due by Seller to each such creditor on the Closing Date.

(c)    Seller will have delivered the documents necessary to release all of the liens held by Seller's secured creditors with respect to the Assets to be Acquired.

5.7    Accounts Receivable.

At Closing, Seller will deliver to Buyer an accurate complete listing of all of the accounts receivable of the Security Business which existed as of a date which is not more than 7 days prior to the Closing Date.

5.8    Use of Name.

Seller shall permit Buyer to immediately hereafter use the name "Alarm One" to the extent permitted by the Transition Agreement.

5.9    Employees.

As of the Closing Date, Seller will take all action necessary to terminate the employees of the Security Business listed on Schedule 3.9 (including terminating each such employee from coverage under all plans listed on Schedule 3.9), and will pay such employees all payroll, bonus, severance and vacation sums due to them through the Closing Date. No employee of Seller will automatically become an employee of Buyer as a result of these transactions. Buyer may offer employment to any employee of the Security Business on terms and conditions which it announces, and Buyer may, after Closing, unilaterally implement terms and conditions of employment for such persons, including a condition that each potential employee execute Buyer's standard nonsolicitation/nondisclosure agreement.

## 6.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

On or prior to the Closing Date, Buyer will have satisfied each of the following conditions unless waived in writing by Seller:

6.1    Covenants and Warranties.

There will have been no material breach by Buyer in the performance of any of its covenants and agreements contained or referred to in this Agreement; each of the representations and warranties of Buyer contained or referred to in this Agreement will be true and correct in all material respects on the Closing Date.

6.2    Delivery of Purchase Price.

Buyer will have delivered the Purchase Price to Seller, less the amount of any adjustments made pursuant to Section 2.1(c).

6.3    Documents, Certificates and Other Items.

Buyer will have delivered or caused to be delivered to Seller:

(a)    all of the documents or instruments required under this Agreement; and

(b)    all other documents and instruments reasonably required by Seller in connection with the consummation of these transactions.

6.4    No Restraint or Litigation.

No action, suit or proceeding will be pending or threatened by any third party or governmental or regulatory agency to restrain, prohibit or otherwise challenge the legality or validity of these transactions.

7.    **INDEMNIFICATION**

7.1    <u>Indemnification by Seller and Buyer.</u>

(a)    Seller will indemnify, hold harmless, defend and bear all costs of defending Buyer, together with Buyer's subsidiaries, affiliates, successors and assigns, from, against and with respect to any and all damage, loss, deficiency, expense (including any reasonable attorney and accountant fees, legal costs or expenses), action, suit, proceeding, demand, assessment or judgment to or against Buyer (collectively, "Buyer's Aggregate Net Loss") arising out of or in connection with:

(i)    any debt, obligation, commitment or liability of Seller which is not expressly assumed by Buyer herein or which is expressly assumed by Seller in this Agreement, whether arising prior to, on or after the Closing Date and whether or not disclosed to Buyer in this Agreement, including those relating to environmental liabilities and Seller's obligation to provide residential customers with the 3-day notice of cancellation;

(ii)    any breach or violation of, or nonperformance by, Seller of any of its representations, warranties, covenants or agreements contained in this Agreement or in any document, certificate or schedule required to be furnished pursuant to this Agreement;

(iii)    any violation of the bulk sales laws or other similar laws requiring notice to governmental and nongovernmental creditors caused by consummation of these transactions; and

(iv)    with respect to payments to be made by customers of the Security Business, any failure to accurately calculate and appropriately disclose such payments to customers in accordance with applicable law.

(b)    Buyer will indemnify, hold harmless, defend and bear all costs of defending Seller, together with Seller's subsidiaries, affiliates, successors and permitted assigns, from, against and with respect to any and all damage, loss, deficiency, expense (including any reasonable attorney and accountant fees, legal costs or expenses), action, suit, proceeding, demand, assessment or judgment to or against Seller (collectively, "Seller's Aggregate Net Loss") arising out of or in connection with:

(i)    all liabilities, damages or claims incurred or accrued against Buyer or arising out of the business activities of Buyer after the Closing Date; and

(ii)    any breach or violation of, or nonperformance by, Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement or in any document, certificate or schedule required to be furnished pursuant to this Agreement.

(c)    Should Buyer and Seller be unable to agree as to the amount of Buyer's Aggregate Net Loss for which Buyer is to be indemnified, or the amount of Seller's Aggregate Net Loss for which Seller is to be indemnified, then either Buyer or Seller, as the case may be,

- 17 -

may commence arbitration proceedings in Wilmington, Delaware in accordance with the provisions of Section 8.3. Buyer may offset against amounts due from Buyer to Seller under this Agreement against any indemnification or other obligations due to Buyer from Seller under or in connection with this Agreement.

### 7.2    Notice of Claims.

If any claim is made by or against a party which, if sustained, would give rise to a liability of the other party hereunder, that party (the "Claiming Party") will promptly cause notice of the claim to be delivered to the other party (the "Indemnifying Party") and will afford the Indemnifying Party and its counsel, at the Indemnifying Party's sole expense, the opportunity to defend or settle the claim (and, with respect to claims made by third parties, the Claiming Party will have the right to participate at its sole expense). Any notice of a claim will state, with reasonable specification, the alleged basis for the claim and the amount of liability asserted by or against the other party by reason of the claim. If such notice is not given, it will not release the Indemnifying Party, in whole or in part, from its obligations under this Article 8, except to the extent that the Indemnifying Party's ability to defend against such claim is actually prejudiced thereby. Alternatively, if notice is given and the Indemnifying Party fails to assume the defense of the claim within 10 days thereof, the claim may be defended, compromised or settled by the Claiming Party without the consent of the Indemnifying Party and the Indemnifying Party will remain liable under this Article 7.

### 7.3    Survival of Indemnity Obligations.

The rights of Buyer and Seller to assert indemnification claims will survive the Closing Date and will expire: (a) with respect to all claims other than third-party claims and claims related to fraud, willful misconduct, title, environmental and pension liability, and the nonpayment of taxes under any federal, state, county or other local taxing statutes (collectively, the "Excluded Claims"), on the second anniversary of the Closing Date; and (b) with respect to the Excluded Claims, upon the expiration of 90 days following the date on which the running of the statute of limitations with respect to any such tax or claim will bar the assessment and collection of such tax or claim.

### 7.4    Indemnity Basket and Cap.

Neither Buyer nor Seller shall be entitled to any recovery from the other party with respect to any Buyer's Aggregate Net Loss or Seller's Aggregate Net Loss, as the case may be, unless and until the amount of loss suffered, sustained or incurred by the Claiming Party, or to which the Claiming Party becomes subject, shall exceed $20,000 calculated on a cumulative basis and not a per item basis (the "Basket Amount"), and then only with respect to the excess over the Basket Amount. The Basket Amount shall not apply to the Excluded Claims. The aggregate amount of Buyer's Aggregate Net Loss or Seller's Aggregate Net Loss, as the case may be, will not exceed the amount of the Purchase Price, exclusive of the Excluded Claims. The Excluded Claims shall not be subject to such limitation.

7.5    Offset for Insurance.

The amount of any indemnification obligation under this Article 7 will be reduced by any insurance proceeds paid to the Claiming Party as a result of the loss or other matter for which indemnification is sought. The Claiming Party will be obligated to submit to its insurance carrier all coverable claims and pursue such claims against its insurance carrier in good faith, and will not abandon or compromise any such claim without the consent of the other party, but shall not be obligated to institute any litigation against its insurance carrier if the carrier denies coverage. To the extent a Claiming Party receives any payment pursuant to any insurance policies as to any third party claim for which it has previously received payment from the Indemnifying Party hereunder, then, in such event the Claiming Party shall promptly reimburse the Indemnifying Party to the extent of any such duplicate payment received.

7.6    Sole and Exclusive Remedy.

After the Closing, the indemnification provided in this Article 7 shall be the sole and exclusive remedy of the parties with respect to the matters described in this Article 7 without regard to whether such matter involves claims framed in contract, tort, equity or otherwise.

8.    **GENERAL PROVISIONS**

8.1    Survival of Obligations.

Seller and Buyer acknowledge that the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement form an integral part of the consideration given to Buyer in exchange for the Purchase Price and to Seller in exchange for the Security Business, without which Buyer would be unwilling to purchase, and Seller would be unwilling to sell, the Assets to be Acquired. Notwithstanding any investigation and review made by Buyer pursuant to this Agreement, Seller and Buyer agree that all of the representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement or in any exhibit, schedule, statement, report, certificate or other document or instrument required to be delivered pursuant to this Agreement will, subject to the limitations set forth in Section 7.2, survive the making of this Agreement, any investigation or review made by or on behalf of the parties hereto and the Closing.

8.2    Transfer Charges and Taxes.

Seller will pay all stamp, sales, income, realty transfer or other taxes, federal, state or local imposed by law in respect of any and all transfers pursuant to this Agreement.

8.3    Arbitration.

Except with respect to Buyer electing to bring an action for specific performance of this Agreement (which action will be commenced and settled in a court of competent jurisdiction) or a dispute regarding the Final Purchase Price (which dispute will be settled by the

Independent Arbiter), any controversy or claim arising out of or relating to this Agreement, or the breach thereof, will be settled by arbitration in Wilmington, Delaware, in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"). Buyer and Seller agree that such location is the most convenient forum for both parties. The parties elect to provide for pre-arbitration discovery pursuant to the provisions of the Federal Rules of Civil Procedure. Unless modified by the arbitrators in their discretion, the arbitration will proceed upon the following schedule: (a) within 10 days from the service of a notice of demand for arbitration, the parties will select a panel of 3 AAA arbitrators; (b) within 10 days after selection of the arbitrators, the parties will conduct a pre-arbitration conference at which a schedule of pre-arbitration discovery will be set, all pre-arbitration motions scheduled and any other necessary pre-arbitration procedural matters decided; (c) all discovery will be completed within 20 days following the pre-arbitration conference; (d) all pre-arbitration motions will be filed and briefed so that they may be heard no later than 15 days following the discovery cutoff, (e) the arbitration will be scheduled to commence no later than 10 days after the decision on all pre-arbitration motions but in any event no later than 3 months following the service of the demand for arbitration; and (f) the arbitrators will agree to hear the claim on successive days and will render their written decision within 15 days following the submission of the matter. Such arbitration will be final and binding on Buyer and Seller, no appeals may be taken therefrom, and judgment upon any award rendered may be entered in any court having jurisdiction therefor. The prevailing party in any dispute will be entitled to recover its legal fees and expenses.

   8.4    Confidentiality.

      Buyer and Seller agree that they will treat in confidence all documents, materials and other information which they have obtained regarding the other party during the course of the negotiations leading to the consummation of these transactions, the investigation provided for herein and the preparation of this Agreement and other related documents. In the event these transactions are not consummated, all copies of nonpublic documents and material which have been furnished in connection with these transactions will be promptly returned to the party furnishing such documents and material, will continue to be treated as confidential information and will not be used for the benefit of the party who returned such confidential information.

   8.5    Public Announcements.

      Neither Buyer nor Seller will, without the approval of the other party (which may not be unreasonably withheld), make any press release or other public announcement concerning these transactions, except as and to the extent that such party will be so obligated by law, in which case the other party will be advised and Buyer and Seller will use their best efforts to cause a mutually agreeable release or announcement to be issued.

   8.6    Governing Law.

      This Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflicts of law provisions.

8.7    Notices.

All notices or other communications required or permitted hereunder will be in writing and will be deemed given when delivered personally, by registered or certified mail, by legible facsimile transmission or by overnight courier (fare prepaid) addressed as follows:

If to Buyer, to:

Richard W. Perry, President
3223 Commerce Place
Suite 101
West Palm Beach, FL  33407
Telecopy:  (561) 697-9749

with a copy to:

S. Bryan Lawrence, III, Esquire
Buchanan Ingersoll PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA  15219
Telecopy:  (412) 562-1041

If to Seller, to:

Peter Maltby, President and CEO
1601 E. Orangewood Avenue
Anaheim, CA  92805
Telecopy:  (714) 939-1280

with a copy to:

Alan L. Pepper, Esquire
Mitchell Silberberg & Knupp LLP
11377 W. Olympic Blvd.
Los Angeles, CA  90064
Telecopy:  (310) 231-8355

Notice will be deemed received the same day (when delivered personally), 5 days after mailing (when sent by registered or certified mail) and the next business day (when delivered by overnight courier or by facsimile transmission).  Any party to this Agreement may change its address to which all communications and notices may be sent by addressing notices of such change in the manner provided.

8.8    Assignment.

This Agreement may not be assigned by Seller without the prior written consent of Buyer.  Buyer will have the right to assign this Agreement and the rights and obligations hereunder to its successors and assigns, including making a collateral assignment to its secured lenders.  This Agreement is nonrecourse to the members of Buyer and Robert Moe, one of the shareholders of Seller.

8.9    Entire Agreement; Amendments.

This Agreement is an integrated document, contains the entire agreement between the parties, wholly cancels, terminates and supersedes any and all previous and/or contemporaneous oral agreements, negotiations, commitments and writings between the parties hereto with respect to such subject matter, including the letter of intent dated December 12, 2005. No change, modification, extension, termination, notice of termination, discharge, abandonment or waiver of this Agreement or any of its provisions, nor any representation, promise or condition

relating to this Agreement, will be binding upon any party unless made in writing and signed by such party.

     8.10   Interpretation.

          Article titles and headings to Sections are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of any of the provisions of this Agreement. All references to Sections and subsections contained in this Agreement refer to the Sections and subsections of this Agreement. All references to Schedules or Exhibits contained in this Agreement are references to the Schedules or Exhibits described on the list immediately following the signature page hereto. All references to the words "include" or "including" mean "including without limitation." Any and all Schedules, Exhibits, statements, reports, certificates or other documents or instruments referred to in or attached to this Agreement, including the "Background" portion of this Agreement, are incorporated by reference as though fully set forth at the point referred to in this Agreement. There will be no presumption against any party on the ground that such party was responsible for preparing this Agreement or any part of it. Any representation or warranty of Seller based upon "knowledge" or "best knowledge" or similar words will include only the actual knowledge of Peter Maltby, Patrick Smith or Douglas Schultz. All pronouns and any variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require.

     8.11   Waivers.

          Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof, but any such waiver must be in writing and must comply with the notice provisions contained in Section 8.7. The failure of any party to enforce at any time any provision of this Agreement will not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part of it or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement will be held to constitute a waiver of any other or subsequent breach.

     8.12   Expenses.

          Except as otherwise provided in this Agreement, Buyer and Seller will each pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants; provided, however, that in any action to enforce the terms of this Agreement (other than a Purchase Price dispute pursuant to Section 2.1(d)), the substantially prevailing party in such action will be entitled to recover its reasonable attorneys' fees and costs incurred in connection with such action.

8.13    Partial Invalidity.

Wherever possible, each provision will be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of these provisions will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein, unless the deletion of such provision or provisions would result in such a material change as to cause the completion of these transactions to be unreasonable.

8.14    Further Assurances.

From time to time following the Closing Date, Seller will:  (a) promptly notify Buyer regarding any cash or other property that it may receive in respect of receivables relating to the Security Business (whether attributable to periods before or after the Closing Date) and immediately deliver to Buyer any cash or other property that it may receive in respect of receivables billed by or on behalf of Buyer after Closing; (b) cooperate with Buyer, including the execution of any necessary documents and agreements, so that all ACH payments from customers will be redirected promptly after Closing to the account of Buyer; and (c) at the request of Buyer and without further consideration, execute and deliver to Buyer such other instruments of conveyance and transfer as Buyer may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession of, any part of the Assets to be Acquired.  In the case of any agreement, contract, lease, easement or other commitment which is included in the Assets to be Acquired but which cannot be transferred or assigned effectively without the consent of a third party, whose consent has not been obtained prior to Closing, Seller will cooperate with Buyer at Buyer's request in trying to promptly obtain such consent.  After the Closing, Seller shall not engage in any collection efforts with respect to the Assets to be Acquired without first obtaining Buyer's prior written consent, which consent shall not be unreasonably withheld.  Buyer agrees to notify the accounts included in the Assets to be Acquired of this transaction at Buyer's sole expense.

8.15    Counterparts.

This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, which together contain the signatures of each party hereto, will have been delivered to Buyer and Seller.  Delivery of executed signature pages by facsimile transmission will constitute effective and binding execution and delivery of this Agreement.

8.16    Third-Party Beneficiaries.

This Agreement will not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

ALARM ONE, INC.

By:_____
      Peter Maltby, President

SECURITY NETWORKS, LLC

By:_____
      Richard Perry, President

 

The undersigned, as the majority shareholder of Seller, hereby joins in this Agreement, with respect to Section 2.1 hereof only, and all of the covenants, agreements and obligations of Seller pursuant to Section 2.1 will also be deemed to be made by the undersigned on a joint and several basis.

_____
      Peter Maltby, individually

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

ALARM ONE, INC.

By:_____
Peter Maltby, President

SECURITY NETWORKS, LLC

By:_____
Richard Perry, President

The undersigned, as the majority shareholder of Seller, hereby joins in this Agreement, with respect to Section 2.1 hereof only, and all of the covenants, agreements and obligations of Seller pursuant to Section 2.1 will also be deemed to be made by the undersigned on a joint and several basis.

_____
Peter Maltby, individually

## List of Schedules

| Schedule | Description |
|----------|-------------|
| 1.1(a) | Tangible Assets |
| 1.1(b) | Customer Contracts and Business Documents |
| 2.3 | Allocation of Purchase Price |
| 3.2 | Consents and Notices |
| 3.4 | Liens and Encumbrances |
| 3.5 | Litigation and Claims |
| 3.6 | Insurance Coverage |
| 3.9 | Employees, Employee Benefit and Welfare Plans |
| 3.10 | Intellectual Property |
| 3.11 | Form Contracts |
| 3.12 | Services and Rates, Altered Contracts, Free and Discounted Service Liability, False Alarm Ordinances, Telephone Numbers |

| List of Exhibits | | Section Reference |
|---|---|---|
| A | Noncompetition Agreement | 2.5 |
| B | Transition Agreement | 2.6 |
| C | Assignment and Bill of Sale | 5.5(a) |
| D | Central One Letter | 5.5(d) |

**SCHEDULE 1.1 (a)**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**TANGIBLE ASSETS**

All furniture, equipment, tools, machinery and fixtures located in Chicago office, including the following:

| DATE PURCHASED | DESCRIPTION |
| --- | --- |
| 4/9/2001 | ARM, ALL ADJUST CHAIRS |
| 4/9/2001 | TABLE |
| 04/02/02 | 1 MANGERS DESK |
| 04/02/02 | FABRIC TASK CHAIRS |
| 04/02/02 | 25" 4 DRAWER LETTER FILE |
| 04/02/02 | CHROME CHAIR GRAY |
| 04/02/02 | CHERRY EXEC DESK |
| 04/02/02 | FABRIC CHAIR BLACK |
| 04/02/02 | ALUMINUM FRAME |
| 05/21/02 | STORAGE CABINETS |

All inventory located in Chicago office or in the vehicles of Chicago employees.
References to the "Chicago office" mean the premises located in Oakbrook Terrace, IL.

**SCHEDULE 1.1 (b)**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**CUSTOMER CONTRACTS and BUSINESS DOCUMENTS**

CUSTOMER CONTRACTS:

See enclosed CD containing the list of customers, Performing RMR and Unearned
Revenue.

BUSINESS DOCUMENTS

There are no Business Documents for the Security Business or included among the
Assets to be Acquired.

**SCHEDULE 2.3**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**ALLOCATION OF PURCHASE PRICE**

| | |
|---|---|
| Customer Contracts and Accounts | $ 7,111,500.00 |
| Furniture and Fixtures | $ 1,000.00 |
| Inventory | $ 2,500.00 |
| Restrictive Covenant – Alarm One | $ 7,500.00 |
| Restrictive Covenant – Peter Maltby | $ 7,500.00 |

**SCHEDULE 3.2**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**CONSENTS AND NOTICES**

The consents of:

Fortress Credit Corp.
Sun Trust Equities Funding, LLC

are required to sell the Assets to be Acquired.

SCHEDULE 3.4

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**LIEN AND ENCUMBRANCES**

Fortress Credit Corp.
Sun Trust Equities Funding, LLC

**SCHEDULE 3.5**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**COMPLIANCE WITH LAWS; LITIGATION AND CLAIMS**

3.5(a) The Seller does not have business licenses in the local jurisdictions where the customers are located, the absence of which will not result in a material adverse effect.

3.5(c) None

**SCHEDULE 3.6**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**INSURANCE COVERAGE**

| Category of Insurance | Name of Carrier |
|---|---|
| | |

Primary automobile coverage for the personal vehicles operated by the service technicians is provided by the employees and not the Seller.

| Umbrella | | General Star Indemnity Company | IXG379126 C |
|---|---|---|---|
| Liability Limit Each Occurrence | 5,000,000 | | |
| Liability Aggregate Limit | 5,000,000 | | |
| | | | |
| **General Liability** | | Arch Insurance Company | BSPKG2060 6 |
| General Aggregate | $2,000,000 | | |
| Products/Completed Oper. Aggr. | $2,000,000 | | |
| Personal & Advertising Injury | $1,000,000 | | |
| Each Occurrence | $1,000,000 | | |
| Damage to Rented Premises | $100,000 | | |
| Medical Expense (Any One Person) | $5,000 | | |
| Employee Benefits | $1,000,000 | | |
| Per Occurrence Deductible | $1,000. | | |

**Additional Coverages, Options, Restrictions, Endorsements, and Rating Information:**
Errors & Omissions Coverage;. Includes Broad Form Property Damage, Blanket Additional Insureds, Lost Key $50,00 occ/agg);
Independent Contractors & Limited Theft Coverage $100,000
Alarm-Monitoring, Services & Installation

Premium Basis : Gross Sales

| Primary Non-Owned & Hired Auto Liability | | National Continental Insurance Company | CP6801-383-2 |
|---|---|---|---|
| Bodily Injury Per Person | $15,000 | | |
| Bodily Injury Each Accident | $30,000 | | |
| Property Damage Liability Each Accident | $5,000 | | |
| | | | |
| Excess Non-Owned & Hired Auto Liability | | Chubb Custom Insurance Co. | 79544931 |
| Liability | | | |
| Combined Single Limit For Bodily Injury and Property Damage | 1,000,000 | | |
| Hired Autos | | | |
| Non-Owned Autos | | | |
| Endorsements, Forms, Conditions: | | | |
| As Stated On Policy. | | | |
| Vehicles Per Schedule On File | | | |

| Property | | St Paul Travelers Companies | 660800X2896 |
|---|---|---|---|
| | | | |
| Premises - Blanket All Locations | | | |
| Personal Property: | 820,000 | | |
| Coins % 90 | | | |
| Valuation RC | | | |
| Cause of Loss SPECIAL | | | |
| Deductible 1,000 | | | |
| Blanket Limit – Locations 1 Thru 5 | | | |

SCHEDULE 3.9

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**EMPLOYEES, EMPLOYEE BENEFIT AND WELFARE PLANS**

**Field Supervisor**
Spase Angjelkoski

**Field Tech III**
Zlatko Risteski

**Field Tech II**
Jerubabel Wright
Kenneth Aseves

**[Need compensation for each employee.]**

Alarm One 401(k) Employee Savings and Retirement Plan
TransAmerica
Employee Contribution Account Only

PPO Medical Plan
Blue Shield

PPO Dental Plan or HMO Dental Plan
Cigna

Vision Plan
VSP

Alarm One "Paid Time Off" Policy
First 5 years of employment   Employee accrues at a rate of 10 days per year
Years 6 through 12                    "        "        "        15      "
Years 13+                                  "        "        "        20      "

**SCHEDULE 3.10**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**INTELLECTUAL PROPERTY**

Corporate Name:  Alarm One, Inc.

Licenses:

| STATE | License # | Exp. | Fire | Burg |
|-------|-----------|------|------|------|
| Illinois | 127-000942 | 8/31/2008 | Yes | Yes |
|  |  |  |  |  |

None of the intellectual property is included in the Assets to be Acquired and is retained by Seller.

**SCHEDULE 3.11**

To

ASSET PURCHASE AGREEMENT
ALARM ONE, INC. – SECURITY NETWORKS, LLC.
Dated as of December 23, 2005

**CUSTOMER CONTRACT FORMS**

See attached forms.

DRAFT 12/23/05

## AGREEMENT

        This Agreement is entered into as of the 23rd of December, 2005 by and between ALARM ONE, INC., an Illinois corporation ("Alarm One"), and SECURITY NETWORKS, LLC, a Florida corporation ("SN").

### BACKGROUND

        A.      The parties have entered into that certain Asset Purchase Agreement dated as of the date hereof, pursuant to which SN is purchasing Alarm One's customer accounts located in the greater Chicago area.

        B.      In connection with the consummation of this transaction, the parties also desire to enter into the following agreements.

        NOW, THEREFORE, intending to be legally bound, the parties agree as follows:

        1.      Alarm One agrees to either: (a) within 60 days of the date of this Agreement, transfer a minimum of 5,000 digital alarm accounts to SN's central station; or (b) commit to have SN's central station monitor all of the new digital alarm accounts that Alarm One creates or acquires during the term of this Agreement.

        2.      SN agrees to monitor these accounts on behalf of Alarm One for an initial term of two years and to do so at its customary monitoring rates and pursuant to its standard form of third-party monitoring agreement.

        3.      In the event Alarm One elects the option set forth in Section 1(a) above, then during the initial term, Alarm One further agrees to maintain at all times a minimum of 5,000 monitored accounts with SN's central station.

        4.      In addition, the parties agree that Alarm One will not be entitled to receive any commission with respect to future accounts purchased from APEX by SN or any of its affiliates.

        IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

SECURITY NETWORKS, LLC                    ALARM ONE, INC.


By: _____            By: _____
        Richard Perry, President                      Peter Maltby, President

DRAFT 12/23/05

**AGREEMENT**

This Agreement is entered into as of the 23rd of December, 2005 by and between ALARM ONE, INC., an Illinois corporation ("Alarm One"), and SECURITY NETWORKS, LLC, a Florida corporation ("SN").

BACKGROUND

A.    The parties have entered into that certain Asset Purchase Agreement dated as of the date hereof, pursuant to which SN is purchasing Alarm One's customer accounts located in the greater Chicago area.

B.    In connection with the consummation of this transaction, the parties also desire to enter into the following agreements.

NOW, THEREFORE, intending to be legally bound, the parties agree as follows:

1.    Alarm One agrees to either:  (a) within 60 days of the date of this Agreement, transfer a minimum of 5,000 digital alarm accounts to SN's central station; or (b) commit to have SN's central station monitor all of the new digital alarm accounts that Alarm One creates or acquires during the term of this Agreement.

2.    SN agrees to monitor these accounts on behalf of Alarm One for an initial term of two years and to do so at its customary monitoring rates and pursuant to its standard form of third-party monitoring agreement.

3.    In the event Alarm One elects the option set forth in Section 1(a) above, then during the initial term, Alarm One further agrees to maintain at all times a minimum of 5,000 monitored accounts with SN's central station.

4.    In addition, the parties agree that Alarm One will not be entitled to receive any commission with respect to future accounts purchased from APEX by SN or any of its affiliates.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

SECURITY NETWORKS, LLC                    ALARM ONE, INC.

By:_____                By:_____
    Richard Perry, President                      Peter Maltby, President

#1881750-v1

# EXHIBIT C

# American Arbitration Association

---

**In the Matter of the Arbitration between**

**Re: 14 489 Y 03128 06**

**Security Networks, LLC**

**and**

**Alarm One, Inc. and Peter Maltby**

**ARBITRATORS: Roy L. Kaufmann, Chair, Patricia Horan Latham, Brian C. Parker**
**Administrator: Hannah R. Cook**

---

Preliminary Hearing Scheduling Order #1

### REPORT OF PRELIMINARY HEARING AND SCHEDULING ORDER

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA), a preliminary hearing[1] was held by conference call on December 21, 2006 before Arbitrators Roy L. Kaufmann, Patricia Horan Latham, and Brian C. Parker. Appearing at the hearing were David E. Wilks and Edward J. Naughton. The case administrator, Hannah R. Cook was in attendance.

By agreement of the parties the following is hereby ORDERED:

1.   <u>Service and Calculation of Time:</u> As used in this Order and in these proceedings "service" means delivery by electronic mail to counsel for the opposing party before 5:00 p.m. Eastern Time on the due date, and to the Arbitrator by such means and at such time as he/they shall direct. Documents provided in response to discovery requests shall be delivered in paper form via overnight delivery to arrive on the due date, unless the parties agree otherwise in writing. Discovery requests and discovery responses shall not be served upon the Arbitrator unless there is a dispute with respect to the requests, in which case the parties shall serve the Arbitrator with only those portions of the discovery requests and responses needed to decide the dispute. Time periods are counted in calendar days. When the due date of any document falls on a week end or federal holiday, the due date shall be extended to the next business day.

---

[1] The Agreement (as defined in the Demand For and Notice of Arbitration) contains an arbitration provision that refers to a "pre-arbitration conference". By agreement of the parties, the Preliminary Hearing that took place on December 21, 2006 shall constitute that conference; however, all scheduling matters set forth in this Order are with the consent of the parties, notwithstanding anything to the contrary as may be set forth in the Agreement.

2.    <u>Hearing</u>: The arbitration shall be held pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Hearings in this matter will commence before the Arbitrators at 9:00 a.m. on March 26, 2007 at 1120 20th Street NW, South Lobby, Third Floor, Washington, DC 20036. Hearings will start promptly at 9:00 a.m. until 5:00 p.m with one hour allocated to lunch and a ten-minute break in morning and afternoon, all subject to change only by subsequent direction of the Arbitrators.

3.    <u>Pre Hearing Briefs and Motions</u>:  The parties shall have until January 3, 2007 to file any pre-hearing briefs or motions on the issue of arbitrability and waiver.  Responses may be filed on or before January 10, 2007.  By agreement of the parties, no participation in the instant proceedings by Respondent shall operate as a waiver of a contention by Respondent that the subject matter is outside the jurisdiction of the American Arbitration Association.   Apart from the foregoing, no other motions will be considered unless leave to file has been  permitted by the Arbitrators.

4.    <u>Simultaneous Proceedings</u>: On or before December 31, 2006, the parties shall advise the American Arbitration whether the parties will simultaneously engage in arbitration before Benchmark Partners as to matters set forth in Section 2 of the Agreement.  If the parties do agree to such arbitration, it is anticipated that the final order of such arbitration shall be presented at the arbitration hearing before the American Arbitration Association on March 26, 2007.

5.    <u>Disclosure of Related Entities</u>:  On or before January 24, 2007 the Parties shall provide to each other and to the AAA the identities of any affiliated, related or successor persons or entities connected with the case.

6.    <u>Schedule of Exchange of Documents</u>: On or before January 24, 2007  all production of documents between the parties shall have been concluded.

7.    <u>Resolution of Discovery Disputes</u>: No discovery dispute shall be presented to the Arbitrators until the parties have made a good-faith effort to resolve the dispute.  The parties must confer in person or by telephone to resolve the dispute.  Any party moving the Arbitrators to resolve a discovery dispute must describe, in detail, the efforts undertaken with the other party to resolve the dispute.

8.    <u>Identification of Expert Witnesses</u>: Not later January 24, 2007,  the parties must provide to the Arbitrators and to the remaining parties a list of expert witnesses, including, full names, resume, reports of experts, as well as a short summary of the anticipated testimony. These lists may be supplemented or amended not later than twenty-one (21) days before the hearing.

9.    <u>Identification of Non-Expert Witnesses</u>:  Not later than January 24, 2007, the parties must provide to the Arbitrator and the remaining parties, the identities of any affiliated, related, or successor persons or entities connected with this case as well as list of all non-

324837-1
324837v.1

expert witnesses reasonably expected to be called by the parties (exclusive of rebuttal witnesses) including full names, titles and a short summary of anticipated testimony. This list may be supplemented or amended as to additional witnesses not later than fourteen (14) days before the hearing.

10. <u>Disclosures and Witness Arrangements</u>:

    a)    Each party shall be responsible for updating its disclosures as such information becomes available.  The duty to update this information continues up to and including the date that hearing(s) in this matter terminate.

    b)    The parties shall make arrangements to schedule the attendance of witnesses so that the case can proceed with all due expedition and without any unnecessary delay.

    c)    The parties are directed to make diligent inquiry as to whether any witnesses may require the assistance of an interpreter to be fully understood and, if so, the parties are further directed to co-ordinate with the AAA Staff as to AAA-approved interpreters and to provide the name of that interpreter no later than seven (7) days before the hearing.

11. <u>Specification of Claims</u>:  Not later than the later to occur of a) February 14, 2007 and b) ten (10) days after the Arbitrators' ruling on any motion filed in accordance with Section 3 hereof, the parties must specify and quantify, in writing, the monetary amounts of any claim or counterclaim  and any amendment to claims or counterclaims and deliver copy thereof to the Arbitrator and other parties.  Any claim for attorney's fees requests must be supported by evidence produced at the Hearing,  as well as the basis therefor.  This may be in the form of a statement from the party or counsel claiming fees, brought current through the end of the hearing. The Arbitrator's preference is not to keep the record open after the conclusion of the hearing.

12. <u>Exhibits and Uncontested Facts</u>:  Not later than seven (7) days before the hearing, the parties shall have coordinated to produce a hard-covered binder for the Arbitrators containing tabbed dividers as follows:

    a)    Stipulation of Uncontested Facts

    b)    Index of Exhibits (Exhibits to include schedules, summaries, diagrams and charts to be used at the hearing).

    c)    Consolidated and comprehensive set of copies of joint exhibits, with stipulation as to authenticity except where disputed, pre-marked as exhibits JT-1, JT-2, etc.

    d)    Copies of Claimant's non-joint exhibits, including all reports, summaries, diagrams and charts to be used, pre-marked as exhibits C-1, C-2, etc.

324837-1
324837v.1

e)    Copies of Respondent's non-joint exhibits, including all reports, summaries, diagrams and charts to be used, pre-marked as exhibits, R-1, R-2, etc.

This binder is to be produced at the hearing with no advance copy to be delivered to the Arbitrator or to the AAA.  Copies of the binder are to be retained by Claimant and Respondent with sufficient copies for witness identification and discussion.

13.    <u>Stenographic Record</u>: The parties have determined not to request a stenographic record, or court reporter and any request therefor shall be made not later than seven (7) days before the hearing.

14.    <u>Form of Award</u>: A Standard Award shall issue.

15.    <u>Acknowledgment</u>: All parties and counsel have received and are familiar with the current version of the American Arbitration Association Arbitration Rules.

16.    <u>Deadlines/Postponements</u>: All deadlines stated herein shall be strictly enforced.  After such deadline, the parties may not proceed as to that matter without permission of the Arbitrator, good cause having been shown. Specifically, but not by way of limitation, motions barred by the deadlines posed hereby shall not be filed except with the permission of the Arbitrator, good cause having been shown. Postponements are subject to a fee assessment, as set forth in the Rules and subject to cancellation fees by the arbitrator.

17.    <u>Authority of Arbitrators</u>:  Nothing in this Order shall diminish the express or inherent authority of the Arbitrators as the tribunal constituted by the parties for the settlement of their dispute.

18.     This order shall continue in effect until amended by subsequent order of the Arbitrators.

Dated:     *Dec 22, 2006*     _____
                                           Roy L. Kaufmann
                                           Arbitrator

Dated:     *Dec 22, 2006*     _____
                                           Patricia Horan Latham
                                           Arbitrator

Dated:     *Dec 22, 2006*     _____
                                           Brian C. Parker
                                           Arbitrator

324837-1
324837v.1

# EXHIBIT D

# American Arbitration Association

**In the Matter of the Arbitration between**

**Re: 14 489 Y 01328 06**

**Security Networks, LLC**

**and**

**Alarm One, Inc. and Peter Maltby**

**ARBITRATORS: Roy L. Kaufmann, Chair, Patricia Horan Latham, Brian C. Parker**
**Administrator: John H. Fenimore**

## ORDER STAYING ARBITRATION PROCEEDINGS

It having been represented to the Panel have submitted certain matters to arbitration through the offices of Benchmark Partners, consistent with Section 4 of the REPORT OF PRELIMINARY HEARING AND SCHEDULING ORDER issued herein, by agreement of the parties hereby ORDERED:

The proceedings before the American Arbitration Association be and hereby are STAYED until further application by either party at which time a new scheduling order shall be issued.

FOR THE PANEL

January 31, 2007

Roy L. Kaufmann, Chair

328066v.1